## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| TYRA HARRISON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RVA DIRT, LLC | ) | Civil Action No.: 3:24-cv-384 |
| | ) | |
| and | ) | |
| | ) | |
| BECCA DUVAL, | ) | |
| | ) | |
| **Defendants.** | ) | |

### DEFENDANT REBECCA DUVAL'S
### MEMORANDUM IN SUPPORT OF HER MOTION TO DISMISS

Defendant Rebecca DuVal is an education blogger for a local Richmond blog, RVA Dirt, where she regularly contributes content related to Richmond Public Schools ("RPS") and the RPS School Board. Naturally, when an investigative report related to a fatal shooting that occurred after a RPS high school graduation became public record, Ms. DuVal read it and, in an article published to RVA Dirt, provided her analysis and commentary through the lens of her regular School Board-related reporting.

Plaintiff Tyra Harrison worked for RPS prior to the shooting and resigned a few months before graduation that year. Ms. DuVal mentions Ms. Harrison a handful of time in her article, which names numerous RPS employees and board members. The overarching thesis of Ms. DuVal's article, however, analyzes the effect of numerous vacancies within RPS around the time of the shooting. A copy of the full article is attached as **Exhibit 1**.[1]

---

[1] The Court can consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *see also McCullough v. Gannett, Co.*, No. 1:22-cv-1099, 2023 WL 3075940, at *1–2 n.2 & n.3 (E.D. Va. Apr. 25, 2023) (considering the relevant publication,

Ms. Harrison filed this defamation action in response to the article alleging several specific statements constitute actionable defamation. As explained below, the statements highlighted by Ms. Harrison fail to state a claim for defamation on a variety of grounds, including that they are subject to the fair report privilege and largely constitute unactionable opinion statements. Ms. Harrison also alleges that the article's references to her generally imply that she "directly or indirectly, was somehow to blame for the June 6, 2023 shooting after the HHS graduation ceremony." (Compl. ¶ 33.) This allegation likewise fails to state a claim for defamation by implication because the statements referencing Ms. Harrison cannot be read as conveying that implication without injecting new ideas and extending the meaning of the words Ms. DuVal used far beyond their plain meaning. Finally, Ms. DuVal is entitled to immunity under Virginia's anti-SLAAP statute because her article addressed a matter of public concern and Ms. Harrison has failed to adequately plead that Ms. DuVal made her statements with reckless disregard for their truthfulness. For the reasons set forth below, Ms. DuVal respectfully moves the Court to grant her motion and dismiss Ms. Harrison's complaint in its entirety.

## I. Background

On June 6, 2023, a fatal shooting occurred immediately after Huguenot High School's ("HHS") graduation ceremony at the Altria Theater in downtown Richmond, Virginia. (Compl. ¶¶ 2, 15.) RPS engaged a local law firm to investigate and prepare a report (the "Report") focusing on: (1) "graduation day operations from set up, the break down, and . . . process[es] and procedures for entrance of all students and guests[;]" (2) "findings that include written statements from RPS Division staff and HHS staff involved with the June 6 graduation preparations of all graduations

---

attached to the motion to dismiss, in a defamation case); *Fairfax v. CBS Broad. Inc.*, 534 F. Supp. 3d 581, 585 n.2 (E.D. Va. 2020) (same).

on June 6[;]" and (3) a "breakdown of [RPS's] homebound process and procedures that directly impact grading." (*Id.* ¶ 17.) While the School Board voted not to make the Report public, the Circuit Court for the City of Richmond later ordered that RPS make the Report public in compliance with the Virginia Freedom of Information Act. (*Id.* ¶¶ 19–21.) On January 17, 2024, the Report became public, along with over sixty related exhibits. (*Id.* ¶ 21.) Notably, Exhibit 20 to the Report is an interview transcript from the interview of Solomon Jefferson, Chief Academic Officer at RPS, conducted on October 26, 2023. A copy of Mr. Jefferson's interview transcript is attached in full as **Exhibit 2**.

Ms. DuVal, like many Richmond-area news commentators at the time, read the Report and particular exhibits and wrote her own commentary in an article which was posted on RVA Dirt— a local Richmond blog to which Ms. DuVal often contributed. (*Id.* ¶¶ 1, 24–25.) RVA Dirt published the article, entitled "The Altria Shooting and the Attorney-Client-Public Report," on January 18, 2024 (the "Article"). *See* Exhibit 1. The Article overwhelmingly focuses on vacancies in leadership positions within RPS that were present during the 2022–2023 school year. *See generally* Exhibit 1. In the Article, Ms. DuVal discusses how these vacancies were "created by the School Board's 'toxic' 'mean-spirited' leadership in 2022" and led to "the many cumulative failures of the remaining staff who were unprepared, overworked, and/or bickering among themselves." *See id.* at 7. Ms. DuVal quotes and relies upon portions of interview transcripts of individuals interviewed in connection with the investigation, including Mr. Jefferson.

Ms. Harrison filed this defamation action against Ms. DuVal and RVA Dirt on May 24, 2024. Ms. Harrison alleges the following statements[2] included in the Article constitute defamation against her:

> (1) "Solomon [Jefferson] was overseeing [a personnel] transition . . . when his boss, Tyra Harrison, Director of Teaching and Learning, (note: and another aggrieved underling) 'went after' the Chief of Staff, Michelle Hudacsko, and set off another wave of resignations." *Id.* at 5.

> (2) "Rumor has it that Tyra [Harrison] had been denied that [Chief Academic Officer] position, so she filed unsubstantiated allegations of abuse against Michelle Hudacsko, took her own FMLA break, then (per a source) 'quit before she could be fired.'" *Id.*

> (3) "Solomon [Jefferson] tells investigators that Tyra [Harrison] and Tracy [Epp] 'were there, [but] they weren't really present . . .' which left 'other folks holding the bag.'" *Id.*

> (4) "Someone from central office probably should have thought to ask—to identify particularly challenging cases and offer support. But the woman (Tyra [Harrison]) responsible for the 2023 graduations was a no-show after 'about a month' on the job—and the guy (Solomon [Jefferson]) forced to fill her shoes was 'actually doing 3 jobs' and didn't even 'have a high school background.' Obviously, this was NOT ideal." *Id.* at 6.

Ms. Harrison also alleges that the article defames her by implying that she "directly or indirectly, was somehow to blame for the June 6, 2023 shooting after the HHS graduation ceremony." (Compl. ¶ 33.)

---

[2] The Court may consider "the actual language in the article, rather than the Plaintiff's Complaint, which alleges what is contained in the article" because the article is a document integral to the Complaint. *See McCullough*, 2023 WL 3075940, at *2 n.3 (citing *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)). Accordingly, Ms. DuVal includes the allegedly defamatory statements in full, as they are written in the Article.

Ms. DuVal moves to dismiss Ms. Harrison's claim because (1) the highlighted statements are not actionable defamation; (2) the complaint fails to state a claim for defamation by implication; and (3) Ms. DuVal is entitled to immunity under Virginia's anti-SLAAP statute.

## II. LEGAL STANDARD

To survive a challenge under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). While the Court must accept factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Rule 12 plays an especially important role in defamation cases[.]" *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 6 (D.D.C. 2021). "To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017). "Moreover, because the defense of baseless defamation claims imposes an additional cost, in the form of potentially deterred speech, federal courts have historically given close scrutiny to pleadings in libel actions." *Arthur v. Offit*, No. 01:09-cv-1398, 2010 WL 883745, at *3 (E.D. Va. Mar. 10, 2010). "As a result, courts in Virginia and the Fourth Circuit routinely dismiss at the outset defamation claims that are based on constitutionally protected speech by media defendants." *Id.*

### III. ARGUMENT

To prevail on her defamation claim, Ms. Harrison must show "(1) publication of (2) an actionable statement with (3) the requisite intent." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005). To be "actionable" a statement must be both "false and defamatory." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015). A statement ranks as "defamatory" only if it "tends to injure one's reputation in the common estimation of mankind . . . ." *Id.* When, as here, a plaintiff alleges defamation *per se*, an even narrower category of statements is potentially actionable. Those include statements that (1) impute guilt of a crime of moral turpitude; (2) impute unfitness to perform the duties of employment or lack of integrity in employment; or (3) prejudice a person in her profession or trade. *Tronfeld v. Nationwide Mut. Ins. Co.*, 636 S.E.2d 447, 449–50 (Va. 2006).

Under Virginia law, a court "must decide as a threshold matter of law whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 784 (4th Cir. 2018) (citation omitted). "Ensuring that defamation suits proceed only upon statements which actually may defame a plaintiff, rather than those which merely may inflame a jury to an award of damages, is an essential gatekeeping function of the Court." *Webb v. Virginian-Pilot Media Cos.*, 752 S.E.2d 808, 811 (Va. 2014); *see also Jackson v. Liberty Univ.*, No. 6:17-cv-00041, 2017 WL 3326972, at *10 (W.D. Va. Aug. 3, 2017) ("The Court, in its [] 'gatekeeping' role, must first determine 'whether, as a matter of law, the article is reasonably capable of the defamatory meaning [] acribe[d] to it.'" (quoting *Webb*, 752 S.E.2d at 811).) "Expressions of opinion" are "constitutionally protected and are not actionable as defamation." *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 750 (Va. 2009); *see also Fuste v. Riverside Healthcare Ass'n*, 575 S.E.2d 858, 861 (Va. 2003) ("Statements

that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion.").

In performing this function, the Court must assess the alleged defamatory statements within the context of the Article as a whole. *See Schaecher*, 772 S.E.2d at 595 ("[I]t is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning and to be understood by courts and juries as other people would understand them, and according to the sense in which they appear to have been used.") (citation omitted)). The statements that Ms. Harrison relies upon to support her defamation claim are not actionable on several grounds, as explained below.

## A. Statement 1 Is Not Actionable Because It Reflects Opinions and Does Not Contain the Requisite Defamatory Sting.

Ms. Harrison first alleges that Ms. DuVal defamed her by stating that she "went after" the former RPS Chief of Staff, Michelle Hudacsko; "set off another wave of resignations"; was an "aggrieved underling"; and was Mr. Jefferson's "boss." (*See* Compl. ¶ 35.) Each of these allegations arise from the same sentence in the Article, which must be considered in its full context:

> Solomon [Jefferson] was overseeing [a personnel transition] . . . when his boss, Tyra Harrison, Director of Teaching and Learning, (note: and another aggrieved underling) 'went after' the Chief of Staff, Michelle Hudacsko, and set off another wave of resignations.

Exhibit 1, at 5.

This statement is not actionable because it largely consists of opinion that is not subject to evidentiary proof. The First Amendment protects opinion and hyperbolic language because such statements "cannot reasonably be interpreted as stating actual facts about an individual.'" *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008) (internal quotation marks and citations omitted) (noting that the First Amendment protect "rhetorical hyperbole, a vigorous epithet and loose, figurative, or hyperbolic language" (internal quotation marks omitted)). When,

as here, statements "appear[] in a place usually devoted to, or in a manner usually thought of as representing personal viewpoints, it is also likely to be understood—and deemed by a court—to be nonactionable opinion." Robert D. Sack, *Sack on Defamation* § 4:3.1 (4th ed. 2011); *see also Depp v. Heard*, No. CL-2019-2911, 2020 WL 8772348, at *2 (Va. Cir. Ct. Mar. 27, 2020) (noting as the typical rule that "an editorial or op-ed column is ordinarily not actionable"). Indeed, the Complaint recognizes that RVA Dirt describes its content as opinion-focused "edutainment" and that the blog is "publicly lauded as [featuring] the 'Savviest, Shadiest Pundits In The City.'" (*See* Compl. ¶¶ 1–2.) It is clearly understood that readers of RVA Dirt, and the Article at issue, will find a hefty dose of personal—and therefore non-actionable—viewpoints on the site.

"Expressions of opinion include [s]tatements that are relative in nature and depend largely upon the speaker's viewpoint. . . . Similarly, rhetorical hyperbole, even if insulting, offensive, or otherwise inappropriate, is not actionable." *Steele*, 382 F. Supp. 3d at 419 (internal quotation marks and citations omitted); *see also Chaves v. Johnson*, 335 S.E.2d 97, 101 (Va. 1985) (noting that "the relative nature of such opinions is obvious to anyone who hears them"). Whether a statement constitutes rhetorical hyperbole or opinion is a question of law. *CACI Premier Tech.*, 536 F.3d at 293–94. Courts should "'assess how an objective, reasonable reader would understand' a statement, 'emphasiz[ing] the verifiability of the statement,' since 'a statement not subject to objective verification is not likely to assert actual facts.'" *Cox v. Red Hat, Inc.*, No. 1:23-cv-766, 2024 WL 98162, at *6 (E.D. Va. Jan. 9, 2024) (quoting *Snyder v. Phelps*, 580 F.3d 206, 218–19 (4th Cir. 2009)).

First, to the extent any portion of this statement characterizes Ms. Harrison as "an aggrieved underling," it is not actionable as defamation.[3] There is no objective basis through which to assess the truth or falsity of whether a person is "an aggrieved underling." Ms. DuVal's use of this descriptor is clear hyperbolic language and any reasonable person reading the article would understand the "relative nature" of Ms. DuVal's word choice. *See Chaves*, 335 S.E.2d at 101; *see also Cox*, 2024 WL 98162, at *6 (finding that use of a vulgar epithet "merely evince[d] [the speaker's] general animosity toward the Plaintiff and thus does not amount to an actionable statement"). Because this opinion cannot be proven false it cannot be actionable as defamation and cannot form the basis of Ms. Harrison's defamation claim.

The remainder of this statement refers to Ms. Harrison "going after" Ms. Hudacsko and "setting off another wave of resignations." These statements also cannot constitute actionable defamation because they are largely figurative and incapable of being proven true or false. Where a statement with even some apparent basis in fact turns on a subjective judgment, it still qualifies as an opinion. *See Raytheon Tech. Servs. Co. v. Hyland*, 641 S.E.2d 84, 92 (Va. 2007). A Court, "in determining whether a statement is one of fact or opinion . . . may not isolate one portion of the statement at issue from another portion of the statement." *Lewis v. Kei*, 708 S.E.2d 884, 891 (Va. 2011). "Rather, a court must consider the statement as a whole." *Id.*

For example, in *Raytheon*, the Supreme Court of Virginia held that the trial court erred by submitting to a jury the following allegedly defamatory statement from an employee's performance review: "Cynthia is frequently verbose and vocal in her opinions, to a degree that others stop participating in open dialogue." 641 S.E.2d at 92. The Court found that, "[w]hether the

---

[3] It is worth noting however that Ms. DuVal's reference to "another aggrieved underling" in fact refers to another individual who also "went after" Ms. Hudacsko, not Ms. Harrison.

result [(others choosing to stop participating in open dialogue)] in fact occurred is only relevant if [Cynthia's] negative conduct was its cause. However, the negative conduct, and whether and how often it occurred, is a matter of the speaker's perspective and, as such, constitutes opinion, not fact." *Id.* This matter of opinion, the Court found, "is not subject to proof" and, accordingly "should not have been submitted the jury." *Id.*

Similarly here, whether the result ("setting off another wave of resignations") in fact occurred is only relevant if Ms. Harrison's conduct ("going after" Ms. Hudacsko) was its cause. Whether or not Ms. Harrison "went after" Ms. Hudacsko is a matter of perspective, just as whether the plaintiff in *Raytheon* frequently voicing her opinions is a matter of perspective. *See id.* Neither statement of perspective is subject to evidentiary proof. Whether or not a wave of resignations resulted from any of Ms. Harrison's conduct is dependent on this statement of perspective and cannot, on its own, constitute defamation. The entire statement therefore constitutes an opinion and is not actionable as defamation. *See id.*

Finally, this statement's brief reference to Ms. Harrison as Mr. Jefferson's "boss," whether true or false, lacks the requisite defamatory sting to be considered an actionable statement.[4] A statement only has the required defamatory "sting" if it "tends to injure one's reputation in the common estimation of mankind, to throw contumely, shame, or disgrace upon him, or which tends to hold him up to scorn, ridicule, or contempt, or which is calculated to render him infamous, odious, or ridiculous." *Schaecher*, 772 S.E.2d at 594. There is nothing inherently shameful or disgraceful about merely being someone's boss. To the extent, that Ms. Harrison relies on this portion of the statement to support her defamation claim, that too should be dismissed.

---

[4] Ms. Harrison specifically calls out the alleged falsity of the statement that she was Mr. Jefferson's "boss" in paragraph 35 of the Complaint.

**B. Statement 3 Is Not Actionable Under the Fair Report Privilege and Because It Reflects an Opinion.**

Ms. Harrison next alleges that the Article defamed her by stating that she was "checked out or somehow 'not present' mentally while working at RPS." (Compl. ¶ 35.) The actual alleged defamatory statement is, "Solomon [Jefferson] tells investigators that Tyra [Harrison] and Tracy [Epp] 'were there, [but] they weren't really present . . .' which left 'other folks holding the bag.'" Exhibit 1, at 5. This statement is not actionable under the fair report privilege.

Under the fair report privilege, "[t]he publication of public records to which everyone has a right of access is privileged, if the publication is a fair and substantially correct statement of the transcript of the record." *Alexandria Gazette Corp. v. West*, 93 S.E.2d 274, 279 (Va. 1956). Notably, "[t]he record's privileged status is not [a]ffected by incorrectness or falsity." *Nystrom v. Servus Robots, L.L.C.*, No. LF-1517-3, 2000 WL 249246, at *7 (Va. Cir. Ct. Mar. 2, 2000). Generally, the fair report privilege "is based on public policy to further the right of free speech by protecting certain communications of public or social interests from liability for defamation that otherwise would be actionable." *Vaile v. Willick*, No. 6:07-cv-11, 2008 WL 2754975, at *6 (W.D. Va. July 14, 2008).

The Report and Mr. Jefferson's interview transcript are public records to which everyone has a right of access. *See* Exhibit 2. The Article merely reports on statement Mr. Jefferson made in his interview. The Complaint, in fact, acknowledges that this allegedly defamatory statement by Ms. DuVal is merely a recitation of Mr. Jefferson's comments in his interview. (*See* Compl. ¶ 30 ("The Article goes on to comment *about Mr. Jefferson's negative remarks about Harrison*, saying she and one of her colleagues 'were there, [but] they weren't really present' which left 'other folks holding the bag.'") (emphasis added).) The quoted statements originate from Mr. Jefferson's interview transcript. *See* Exhibit 2, at 24–26. Because this statement fairly and substantially

11

correctly restates information contained in a publicly available record almost verbatim, it is not actionable as defamation. *See Alexandria Gazette*, 93 S.E.2d at 279.

Moreover, this statement again reflects an opinion that relies on the speaker's perspective and is not actionable defamation. Whether Ms. Harrison was "really present" and whether "other folks" were left "holding the bag" is a matter of perspective that is not subject to evidentiary proof of its truth or falsity. *See Steele*, 382 F. Supp. 3d at 419. The "relative nature" of these statements "is obvious to anyone who hear them." *See Chaves*, 335 S.E.2d at 119. This provides a separate and sufficient basis for finding this statement not actionable as defamation.

## C. Statement 4 Is Not Actionable Under the Fair Report Privilege.

Ms. Harrison also alleges that the Article defamed her by stating that she was "'responsible' for the 2023 graduations as part of her job at RPS" and that she was "a 'no show' after about a month on the job[.]" (Compl. ¶ 35.) The alleged defamatory statement from which these quotes are drawn is:

> Someone from central office probably should have thought to ask—to identify particularly challenging cases and offer support. But the woman (Tyra [Harrison]) responsible for the 2023 graduations was a no-show after "about a month" on the job—and the guy (Solomon [Jefferson]) forced to fill her shoes was "actually doing 3 jobs" and didn't even "have a high school background." Obviously, this was NOT ideal.

Exhibit 1, at 6. This statement is not actionable based on the fair report privilege, because the portions of this statement that relate to Ms. Harrison come from Mr. Jefferson's interview transcript, which is attached as an exhibit to the Report and is therefore a public record. *See* Exhibit 2.

In his interview, Mr. Jefferson stated that Ms. Harrison "was supposed to be leading the graduation charge" in her role at RPS. *Id.* at 11. He goes on to say "[a]nd so to be completely

honest, it just didn't happen." *Id.* From this testimony, Ms. DuVal fairly and substantially correctly reported that Ms. Harrison was "responsible for the 2023 graduations." *See* Exhibit 1, at 6. Similarly, Mr. Jefferson was asked in his interview who assumed a leadership position with RPS after December 2022. *See* Exhibit 2, at 11. Mr. Jefferson referred to Ms. Harrison and discussed that "she was out on [FMLA][5] quite a bit, and her mom, I feel the[n] passed away." *Id.* Mr. Jefferson goes on to say that Ms. Harrison "was probably there about a month [] in [the] aggregate." *Id.* From this testimony, Ms. DuVal again fairly and substantially correctly reported that Ms. Harrison worked only about a month in her leadership role with RPS. *See* Exhibit 1, at 6.

Regardless of the truth or falsity of these statements, Ms. DuVal is permitted to rely upon and report on information gleaned from Mr. Jefferson's publicly-available interview transcript. *See Nystrom*, 2000 WL 249246, at *7 (noting that "[t]he record's privileged status is not [a]ffected by incorrectness or falsity"). This statement therefore is also not actionable as defamation.

**D. The Complaint Fails to State a Claim for Defamation by Implication.**

To state a claim for defamation by implication, Ms. Harrison must allege: "(1) that the defendant[] made the statements alleged in the complaint, (2) that the statements, even if facially true, were designed and intended by the defendant[] to imply [the defamatory meaning], (3) that in the light of the circumstances prevailing at the time they were made, the statements conveyed that defamatory implication to those who heard or read them, and (4) that [Ms. Harrison] suffered harm as a result." *Owen v. Liberty Univ.*, No. 6:19-cv-00007, 2020 WL 1856798, at *15 (W.D. Va. Apr. 13, 2020) (third alteration in original) (quoting *Pendleton v. Newsome*, 772 S.E.2d 759,

---

[5] As noted on the cover page of Mr. Jefferson's interview transcript, the interview was transcribed using Microsoft Teams "talk to text" which does not create a verbatim transcript. Exhibit 2, at 1. Accordingly, some alterations to quotations are included based on an interpretation of words and phrases the "talk to text" attempted, but failed, to capture.

765 (Va. 2015)). "To state a plausible claim, the defamatory implication must be firmly moored to the allegedly defamatory language or image." *Morrisey v. WTVR, LLC*, 432 F. Supp. 3d 617, 624 (E.D. Va. 2020).

The central allegation in Ms. Harrison's complaint is that the Article implies that "Harrison, directly or indirectly, was somehow to blame for the June 6, 2023 shooting after the HHS graduation ceremony." (Compl. ¶ 33.) To reach this conclusion, Ms. Harrison takes substantial liberties in interpreting and twisting the actual words Ms. DuVal wrote. For example, Ms. Harrison portrays the article as "lay[ing] the blame for [RPS's] failure to communicate squarely at the feet of Harrison." (*Id.* ¶ 32.) The primary statement (Statement 4) that Ms. Harrison alleges lays blame at her feet is, in full:

> Someone from central office probably should have thought to ask—to identify particularly challenging cases and offer support. But the woman (Tyra [Harrison]) responsible for the 2023 graduations was a no-show after "about a month" on the job—and the guy (Solomon [Jefferson]) forced to fill her shoes was "actually doing 3 jobs" and didn't even "have a high school background." Obviously, this was NOT ideal.

Exhibit 1, at 6.

Ms. Harrison asks the Court to imply a meaning that is not intended or conveyed by the language of this statement in its full context. The above statement does not lay blame "squarely at the feet of Harrison" for RPS's failures in communication and certainly does not lay blame on Ms. Harrison for the June 6 shooting. In fact, it (1) acknowledges that Ms. Harrison was not present for the 2023 graduations; (2) recognizes that Mr. Jefferson was filling Ms. Harrison's shoes during the relevant time period; and (3) to the extent it places blame on anyone at all, inculpates nearly everyone in RPS's central office by offering the opinion that "*[s]omeone* from central office

probably should have thought to ask—to identify particularly challenging cases and offer support."

*Id.* (emphasis added).

The other statements that reference Ms. Harrison also do not intend or convey the defamatory implication that Ms. Harrison asks the Court to find:

> (1) "Solomon [Jefferson] was overseeing [a personnel transition] . . . when his boss, Tyra Harrison, Director of Teaching and Learning, (note: and another aggrieved underling) 'went after' the Chief of Staff, Michelle Hudacsko, and set off another wave of resignations." *Id.* at 5.
>
> (2) "Rumor has it that Tyra [Harrison] had been denied that CAO position, so she filed unsubstantiated allegations of abuse against Michelle Hudacsko, took her own FMLA break, then (per a source) 'quit before she could be fired.'" *Id.*
>
> (3) "Solomon [Jefferson] tells investigators that Tyra [Harrison] and Tracy [Epp] 'were there, [but] they weren't really present . . .' which left 'other folks holding the bag.'" *Id.*

None of these other statements even identify the 2023 graduations, discuss the June 6 shooting, or purport to link Ms. Harrison to either. The statements would not "naturally and presumably be understood by those who [read] them" to mean or imply that Ms. Harrison is to blame for the June 6, 2023 shooting. *See Hatfill v. New York Times Co.*, 416 F.3d 320, 331 (4th Cir. 2005). This is particularly true when considered in the full context of the Article that discusses multiple personnel and issues within RPS.

Ms. Harrison portrays the Article as one that "all but morphed into a gossip column" about her and "focused on **_her_**." (Compl. ¶ 3.) A review of the full article reveals this characterization as disingenuous. The Article did not focus on Ms. Harrison, it focused on vacancies in leadership positions within RPS. *See, e.g.*, Exhibit 1, at 4 ("RPS'[s] central office was so full of 'high profile vacancies' (resignations) that their organizational chart looked like Swiss cheese."). In fact, Ms. Harrison acknowledges this as the thesis of the Article. (*See* Compl. ¶ 27 ("According to RVA

Dirt, this was the report's *true* damning narrative—that is, high-profile vacancies at the central office."); *id.* ¶ 38 ("RVA Dirt chose to use the [] report as an opportunity to further their own pre-conceived narrative about criticizing RPS staffing levels and personnel.").)

Despite acknowledging the true thesis of the Article, Ms. Harrison asks the Court to find Ms. DuVal liable for defamation by implication for what Ms. Harrison mischaracterizes as the Article's "clear conclusion" that Harrison is at fault for the tragic shooting. (*Id.* ¶ 33.) Viewing the brief references to Ms. Harrison in this regard "would stretch it well beyond its ordinary and common meaning." *Lokhova v. Halper*, 441 F. Supp. 3d 238, 263 (E.D. Va. 2020) (internal quotation marks omitted) (finding that the article at issue was not defamatory where "only brief portions of the lengthy article" relate to the plaintiff and when "considered either separately or in the context of the article as a whole," could not "be read to imply" the defamatory meaning alleged).

The Article does not contain any express statement assigning liability or responsibility for the June 6, 2023 shooting to Ms. Harrison, any individual associated with RPS, or even the School Board for that matter. Where no statements assigning blame appear in the Article, those statements identifying Ms. Harrison "cannot reasonably be construed to include innuendo that is simply not there." *Id.*; *cf. Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) (noting that to find actionable defamation by implication, the statements "must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference"). The Court should therefore dismiss Ms. Harrison's claim to the extent it relies on a theory of defamation by implication.

**E. The Article Discusses a Matter of Public Concern and Ms. DuVal is Entitled to Immunity and Attorney's Fees Under Virginia Code § 8.01-223.2.**

The Article discusses a matter of public concern—the June 6, 2023 shooting at HHS graduation, the subsequent investigative report, and RPS staffing issues. Under Virginia's anti-SLAPP statute, Ms. DuVal is entitled to immunity. "Generally speaking, anti-SLAPP statutes aim to weed out and deter lawsuits brought for the improper purpose of harassing individuals who are exercising their protected right to freedom of speech." *Fairfax v. CBS Corp.*, 2 F.4th 286, 296 (4th Cir. 2021). Virginia's anti-SLAPP statute provides that "[a] person shall be immune from tort liability if the tort claim is based solely on statements . . . regarding matters of public concern that would be protected under the First Amendment . . . ." Va. Code § 8.01-223.2.

The statute contemplates an exception for statements that "the declarant knew or should have known were false or were made with reckless disregard to whether they were false." *Id.* "A 'reckless disregard' for the truth . . . requires more than a departure from reasonably prudent conduct." *Harte-Hanks Comms., Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). "Instead, the evidence must establish that the defendant had a high degree of awareness of probable falsity. Unless the defendant had such an awareness, its failure to investigate before publishing is not sufficient to establish a reckless disregard for the truth." *Shenandoah Pub. House, Inc. v. Gunter*, 427 S.E.2d 370, 372 (Va. 1993) (internal citations omitted).

The Complaint fails to allege that Ms. DuVal had a "high degree of awareness of probable falsity" related to the statements she included in the Article referencing Ms. Harrison. The Complaint acknowledges at most that Ms. DuVal "knew full well that [she] was publishing a slanted version of events." (*See* Compl. ¶ 47.) Ms. Harrison's allegations of Ms. DuVal's intent reflect behaviors that are common among journalist and commentators. For example, she alleges that Ms. DuVal "drafted [her] story from the perspective of a pre-conceived narrative" and "quoted

unnamed sources[.]" (*See id.*) Publishing a story from a pre-conceived narrative that contains a slanted version of events does not rise to the level of publishing statements with a high degree of awareness of probable falsity. If that were true, the reckless disregard standard would sweep in countless news publications.

Ms. DuVal therefore requests that this Court award her reasonable attorney fees and costs, as authorized by Virginia Code § 8.01-223.2(B). "[T]he purpose of so-called 'Anti-SLAPP' laws like Virginia's is to protect plaintiffs from the chilling effect of meritless civil action[s], which are intended to force upon a political opponent the high cost of defending against a lawsuit." *Flanagan v. Pittsylvania County*, No. 7:19-cv-00413, 2020 WL 2754754, at *10 n.6 (W.D. Va. May 27, 2020) (internal quotation marks and citation omitted) (second alteration in original).

## IV. CONCLUSION

For the foregoing reasons, Defendant Rebecca DuVal respectfully requests that the Court grant her motion to dismiss and dismiss Ms. Harrison's complaint in its entirety.

Respectfully submitted,

By: /s/ J. Benjamin Rottenborn
J. Benjamin Rottenborn (VSB No. 84796)
Jamie H. Wood (VSB No. 97297)
Woods Rogers Vandeventer Black PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia 24011
Telephone: (540) 983-7600
Facsimile: (540) 983-7711
ben.rottenborn@woodsrogers.com
jamie.wood@woodsrogers.com

*Counsel for Defendant Rebecca DuVal*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 2, 2024, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notice to all counsel of record.


/s/ J. Benjamin Rottenborn
J. Benjamin Rottenborn