# EXHIBIT 2

**EXHIBIT 20**

Interview conducted via Microsoft Teams

Transcribed using Microsoft Teams

This platform does not create a verbatim transcription, but rather the best approximation based upon talk to text

Prepared by

Sands Anderson PC

1111 East Main Street, Suite 2400

Post Office Box 1998

Richmond, Virginia 23218-1998

(804) 648-1636

Fax: (804) 783-7291



CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

**PYO handling TEAMS PHONE CALL with S Jefferson WE are to initiate call with Jefferson  14046680863 RPS ThirdParty Investigation PRIVILEGED AND CONFIDENTIAL  VFOIA EXEMPT-20231026_163852-Meeting Recording**

October 26, 2023, 2:26PM

2h 12m 9s

⊙   started transcription

👤 **Paulsrud, Kimberly A.** joined the meeting

👤 **Pamela O'Berry** joined the meeting

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

**Pamela O'Berry**  4:23
OK.

**Paulsrud, Kimberly A.**  4:23
Umm.
So we'll need to let Mr Jefferson know that.

**Pamela O'Berry**  4:27
OK.

**Paulsrud, Kimberly A.**  4:28
So let me call him.

  **c910373a-72bd-476c-aa06-889eea2eed63** joined the meeting

**c910373a-72bd-476c-aa06-889eea2eed63**  5:04
Hello.

**Pamela O'Berry**  5:06
Good morning.

**c910373a-72bd-476c-aa06-889eea2eed63**  5:08
Hey, good morning.

**Pamela O'Berry**  5:09
This Mr Jefferson.

**c910373a-72bd-476c-aa06-889eea2eed63**  5:11
Yes, ma'am.

**Pamela O'Berry**  5:12
Oh, good morning, Mr Jefferson and I so regret that we've had to.
We've had to, like, intrude on your recovery time and you stepping away from work

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

for a little bit, so I'll try to move through this so you can get back to relaxing and and healing.

 **c910373a-72bd-476c-aa06-889eea2eed63**  5:32

Ohh no problem at all, no problem.

**Pamela O'Berry**  5:35

Well, I think you were on the phone call when I initially met with Mr Cameras and Miss Parks.

But I'm Pam O'berry with sands.

Anderson and I have on the phone, Kimberly, also with Sands.

Anderson, she is set up the call for us, which we're doing through teams, but it is already this one called because it's a phone call.

 **c910373a-72bd-476c-aa06-889eea2eed63**  5:49

OK.

**Pamela O'Berry**  5:59

We had to do through Microsoft Teams and it immediately starts recording the minute we set it up.

The other meeting meetings have been by via Zoom, where we ask for permission to record, but I wanted to just kind of let you know that this one is already recording because that's the way the software works.

Do you have it at any problem with the recording?

 **c910373a-72bd-476c-aa06-889eea2eed63**  6:16

Yeah.

Ohh, not not at all, not at all.

**Pamela O'Berry**  6:21

OK.

Well, in that case, Kimberly, I think I don't think you can fall off because you initiate it, but you'll you're gonna go into a a mute and not monitor status, right?

**PA** **Paulsrud, Kimberly A.**  6:32

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Yeah, I'm just going to mute and UM, do some other things, but if you need me just kind of get my attention because you are on the screen so.

 **Pamela O'Berry**  6:39
Uh.
OK.
Yeah, I'll.
I'll ping if I need you.
I'll ping you through a teams chat.

 **Paulsrud, Kimberly A.**  6:46
Perfect.
Thank you.

 **Pamela O'Berry**  6:47
Alright, thank you.
Alright, alright.
Well, good morning again, Mr Jefferson.
Can you first tell me what is the exact title that you have with Richmond public schools?

 **c910373a-72bd-476c-aa06-889eea2eed63**  7:02
I'm the chief academic officer for a secondary academics. Yeah.

 **Pamela O'Berry**  7:10
And how long have you had that role?

 **c910373a-72bd-476c-aa06-889eea2eed63**  7:14
Efficient.
Well, I would say last October, as interim officially, uh, March.

 **Pamela O'Berry**  7:26
Well, congratulations.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

**c910373a-72bd-476c-aa06-889eea2eed63**    7:29

Thank you.

**Pamela O'Berry**    7:32

And what is your as an educator?

What's your background as an educator?

**c910373a-72bd-476c-aa06-889eea2eed63**    7:38

Uh, wow, this is my 25th year in education.

All of my work have been entitled one schools turn around principal.

Turn around.

Work.

Umm yeah.

Been in three districts.

Uh Atlanta Public Schools rest with most of my career.

Henrico.

Uh in Richmond public schools.

**Pamela O'Berry**    8:07

No, you don't take the easy ones, do you?

**c910373a-72bd-476c-aa06-889eea2eed63**    8:10

Yeah, my family.

Uh.

As I get older saying I need to take a different route, so I'm starting to listen to maybe five more years and I just have to do something different.

**Pamela O'Berry**    8:22

Well, I'll tell you what these title one schools would not be standing, but for people like you who who know, know how important it is to have good people there.

So thank you for that for sure.

**c910373a-72bd-476c-aa06-889eea2eed63**    8:33

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I appreciate it.

I appreciate it.

 **Pamela O'Berry**  8:36

So what?

What are the roles and responsibilities of as a chief academic officer?

Like, what is?

What do you have oversight of?

 **c910373a-72bd-476c-aa06-889eea2eed63**  8:47

Yep.

So the first thing that I have oversight of is the the secondary school.

So middle schools and high schools.

So I oversee 2 principal directors.

Uh.

And I previously wasn't principal director for four years before the promotion.

I was the principal director of middle schools.

Uh, and then I also oversee everything, curriculum and instruction.

That's six through 12.

Ohm, I also manage the data analytics department out of academics.

So you know any type of dashboard that needs to be created that department does it.

Uh also oversee exceptional Ed for academics?

For the division.

And the last department that I have is.

It's actually called secondary success pathways and under that umbrella is CTE, UM also alternative programs and the last piece is is what we call.

Ohh, like our college and career pathways.

Uh secondary counselors.

I supported there so though that's my primary responsibility.

But if I was to say in sum it up, it really the three, the three buckets is to make sure that principles are supported on the secondary level.

Uh.

Making sure that we actually have the strong curriculum and things in place to support middle school accreditation, high school accreditation and on time

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

graduation and then the last piece would be, you know, making sure we're in compliance with the CTE and college and career and exceptional education pieces.

 **Pamela O'Berry**  10:52

OK.

And do I know you said you have oversight of two principal directors?

So does that mean you don't directly oversee principles?

Principles are overseen by principle.

Directors and then the principal directors report to you.

 **c910373a-72bd-476c-aa06-889eea2eed63**  11:10

Yep, that's correct.

Yeah.

And this is actually a a pretty new structure because before this we had one chief academic officer that service pre K through 12 uh and I you know Jason considering the lift and Richmond Public Schools decided to split it elementary uh and secondary to try to get some better results.

 **Pamela O'Berry**  11:39

Trying to figure out.

 **c910373a-72bd-476c-aa06-889eea2eed63**  11:39

Yeah.

And so I also have I have managers for uh, have a manager of data analytics.

I actually have a manager of CTE, a manager of College in career pathways have a directive, secondary success pathways, a directive, exceptional Ed director of curriculum and instruction.

Umm.

And so they really, uh.

As I said, also the two principal director, so they managed their departments.

But again, I provide the oversight, instructure for them, yeah.

 **Pamela O'Berry**  12:11

Over 70.

Got you.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

OK.

That makes sense.

Now, who were your two principal directors during the 2223 last 2223 school year?

**c910373a-72bd-476c-aa06-889eea2eed63**  12:22

Well, it was just me.

I was just pretty interesting because at the time I'm not sure if you followed in the paper at the beginning of the school year, August 2022, we actually had the passing of the principal over at George with at the time.

And so my my counterpart J, often Brown, who was the director of high schools, Jason placed him mobile as the principal because we didn't really have any options.

The interim principle and that he eventually retired in December.

And so I actually had both middle schools and high schools at the time.

And then eventually in October, Jason, because we didn't have a chief academic officer asked.

Uh.

Lovely.

Who?

Doctor Wiggins at the elementary is Cao and asked me to take on secondary.

So at the time I was actually doing 3 jobs and so it was just me primarily.

**Pamela O'Berry**  13:25

So the structure you just the structure you just described that's now in place with the two principal directors that will report to you and then those principal directors would oversee the schools.

**c910373a-72bd-476c-aa06-889eea2eed63**  13:26

Last year.

**Pamela O'Berry**  13:38

You were doing the position you have now.

Plus, you were acting as the principal directors.

**c910373a-72bd-476c-aa06-889eea2eed63**  13:44

Yeah.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

So I was acting as the principal director of Middle School High School and the Cao second.

What interim Cao?

Secondary.

Uh. Yep.

 **Pamela O'Berry**  13:57

OK.

So you would have had direct oversight of of the principle at the Huguenot for last year.

 **c910373a-72bd-476c-aa06-889eea2eed63**  14:03

Yep, Yep.

And So what?

Uh, But what ended up happening was I, I guess until December.

Ohh, they often brown who was the high school director, was trying to do both jobs.

He was trying to do interim at George wife and also handle some of the high school pieces and so to be completely honest, I would actually say that I stepped into the complete role in January after Jason.

He really had no choice.

We we know it's ludicrous.

I mean, it's it's hard enough to do one job and RPS, but at the time you really didn't have any choices.

So initially when they often took on the principal interim principal role and August him and I had created a division of Labor in terms of the things that I would handle.

So he continued to have like graduation meetings and he continued that we have something called monthly principal meetings.

He continued to help me facilitate those and for the most part, principles that had, uh, you know, major issues with actually include both of us on those chains initially.

Uh, and I really took on his parent complaints and I took on the piece in terms of really structuring the principles meetings and, you know, all of the data day things that involve high schools.

My kind of took on.

He also kept graduation and his hat on his shop until December.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  15:43

And who took it on after December?

 **c910373a-72bd-476c-aa06-889eea2eed63**  15:45

So.

Ohg.

My God, this is such a messy story.

Umm.

So in the absence of a Cao, we had an executive director of teaching and learning who, but supposed to be leading our department, principal directors and Director of Exceptional Ed.

So that was her responsibility.

However, she was out on after mail quite a bit, and her mom, I feel them passed away.

So what I would say is maybe.

Does she eventually resigned in January?

I'm not mistaken.

January, February.

But essentially what I would dare to say is from the summer until.

Her resignation?

She was probably there about a month and in aggregate.

Umm.

And so she was really supposed to be leading the department in the absence of a chief academic officer.

Umm.

So she was supposed to be leading the graduation charge as well.

Uh, we have to say Austin.

And so to be completely honest, it just didn't happen.

Umm.

And So what I found in January was I just took on everything, all things high school, even though I don't have a high school background, I was elementary and middle school.

I learned everything high school pretty quickly and took on the graduation charge.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  17:23

OK.

And that person's name that was supposed to be doing it the same.

**c910373a-72bd-476c-aa06-889eea2eed63**  17:26

Her.

Yeah, yeah.

Her name was Tara Harrison.

 **Pamela O'Berry**  17:30

OK.

**c910373a-72bd-476c-aa06-889eea2eed63**  17:32

Yeah, but she was the executive director.

Teaching and learning.

 **Pamela O'Berry**  17:38

And she left RPS.

**c910373a-72bd-476c-aa06-889eea2eed63**  17:40

Yes, you left RPS and I believe was February or March, she turned in her resignation.

I'm at their mom passed and and I said she has some FML challenges.

Uh, and ICAO at the time, went out.

FML as well and I believe she resigned in July.

It was pretty messy.

Umm.

And I know myself, Doctor Wiggins and also doctor, doctor, Doctor Parks, who at the time was the director of Exceptional Ed.

You know, we kind of stepped up to keep everything afloat, you know, in the absence of, you know, the folks who were supposed to be leaving.

 **Pamela O'Berry**  18:24

Got you.

So then then just taking it back to the oversight of principles, roles, did you from the

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

time you stepped into, I guess pretty much from the from the time you were interim, you were having direct over you would have had direct oversight of the principle at at Huguenot since October?

 **c910373a-72bd-476c-aa06-889eea2eed63**  18:44

Yeah.

Yep, Yep.

That Mister gilstrap?

Yeah. Yeah.

 **Pamela O'Berry**  18:55

And and I put in my notes that you since October 2023, but that would have been last month.

So that was October 2022, alright.

 **c910373a-72bd-476c-aa06-889eea2eed63**  19:02

Yeah, yeah.

And like I said, they often actually a lot of them still went to him because he had the closest relationship with them.

And so there were some things that.

And I'm I'm sure you looked at the notebook that I put together.

There were some changes around things that I wasn't even included on.

Because I think Rob was one of those principles that needed a lot of hand holding.

And so Jay Austin tended to.

Uh, you know, he knew my plate was pretty heavy.

So I think that he tried to help him navigate through those things because he had a relationship.

But yeah, there were some, some things that I had to step into, particularly over at Huguenot, enrich from high school at the arts pretty frequently.

 **Pamela O'Berry**  19:56

All right.

Now, did you did Huguenot High School as far as you knew?

No, it did.

Did it have like a any org chart or any any document or policy about OK?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

A Gilstrap on the principle when I can't act as principled.

This person is my designee or for these types of issues.

If I'm not making the decision, I designate this person to be the designee to make these types of decisions.

Was there any sort of document or policy or procedure in place for that kind of thing?

 **c910373a-72bd-476c-aa06-889eea2eed63**  20:31

Yep, yeah.

So let me explain the the the procedure and the request that we made of them.

Even when I started as principal directed because it was pretty ludicrous to me, some of the practices and so essentially we said to every principle that they should actually create a very clear division of Labor ohm.

And so that division of Labor included what they were responsible for, so gave them a pretty.

Simple Excel spreadsheet.

Uh, to say these are the things that the principals responsible for.

These are the things that the assistant principal director of counseling and so we did a lot of work with them primarily on the role of.

Of Division of Labor for their senior leadership team and their leadership team.

So senior leadership team is the principals and assistant principals and their leadership team would include like department chairs like they have technology leads and the building umm.

And so every principle was mandated every year to actually have a division of Labor which outlines the responsibilities of senior leadership team, including the director of counselor, and then from there.

 **Pamela O'Berry**  21:47

And and and was that called a division of Labor spreadsheet.

 **c910373a-72bd-476c-aa06-889eea2eed63**  21:52

Yeah, it was actually called.

It was actually called senior Leadership Team Division, division of Labor, yeah.

And I'm trying to think whether we actually.

Ohh cause I I know we had a gap with our office associate but we normally collected

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

all of those things and A in the drive.

Uh, just even for us, like we went into a building.

If somebody was over map, we wanted to go to the person that was responsible for math because it could have been a P versus the principle. Right.

Uh, so I'm not sure if we have that, but I I know every summer that was one of the exercises that we did with them and we also tried to help them be crystal clear around like don't just put their responsible for testing like what does that mean?

It would have facets of it, and if there's a plan that can be done, just make sure you attached artifact in the plan.

 **Pamela O'Berry**  22:53

So again, you said you don't know if that was something kept in a drive that was in central office or like, where would that document we reside unless I haven't seen that document yet.

**c910373a-72bd-476c-aa06-889eea2eed63**  23:04

Yeah.

And I'm it it.

 **Pamela O'Berry**  23:06

So I don't know if it's something that's still exists or who has it and how I can see that.

**c910373a-72bd-476c-aa06-889eea2eed63**  23:14

Yeah, I would have to.

I mean, I would dare to say that it resided with the principles I know for dental school.

I had access to all of the middle school principal division of Labor in their handbooks.

There were certain things that I just required to see, and as I said, I'm not sure Jay Austin had our secretary collectives or not.

So when do you need all the documents?

I can actually share with you some examples from middle school if that's helpful, or the actual document that we shared with them.

I'm not sure if.

You know, if we have access to hers or not.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  23:58

Yeah, I would be interested in seeing one if you just have a representative sample of what it should look like, but I am, as in, more interested in seeing whatever the one the the the senior leadership Team division of Labor spreadsheet would look like for the 2223, for Huguenot.

 **c910373a-72bd-476c-aa06-889eea2eed63**  24:18

OK. OK.

Yeah, let me umm I can definitely share some middle school examples with you and just the template itself.

I guess I would have to connect with Dana to see if she could possibly open up, you know, cause Rob is left.

I mean, maybe his emails and maybe we could search his emails to see if, you know it's still existed.

 **Pamela O'Berry**  24:40

And Dana is his admin that was there.

 **c910373a-72bd-476c-aa06-889eea2eed63**  24:43

No Dana is our Chief Operating Officer.

So she's over technology?

 **Pamela O'Berry**  24:46

OK.

**c910373a-72bd-476c-aa06-889eea2eed63**  24:47

Yep.

So she would have to open it from the back end when an employee leaves.

 **Pamela O'Berry**  24:53

OK.

That would be really helpful if you could see if you're you're Co could get access to Huguenots for 2223.

And yeah, if you and if you have a representative sample of the kind of things that

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

should be sort of laid out there for division of Labor, that would be helpful to see kind of what an ideal one would look like.

And then what?

This one looked like, which may have been ideal as well, but I I haven't seen it.

 **c910373a-72bd-476c-aa06-889eea2eed63**  25:21

OK, OK.

 **Pamela O'Berry**  25:23

OK.

So and just so that there is this this spreadsheet that should lay these kind of things out, but just in a practical day-to-day way, if a principal was not going to be making decisions about something and was going to assign a designee to make those decisions, is that something that should be in writing or is that something that should other than you know, that spreadsheet is, is that something that you would expect to see in writing?

 **c910373a-72bd-476c-aa06-889eea2eed63**  25:54

Yeah.

Yeah.

And So what the practice that we gave them and and I just believe it's a good practice in any organization is that you know you create this document and it really should be a living, breathing document, right?

Because something may change throughout the year, you may say in November.

Hey I want this person to take on testing because this person has not done a great job so far, right?

And so we told them that that should happen.

But the way that decisions were documented should have been through two venues. The first would have been through their senior through two models to to, to spaces.

 **Pamela O'Berry**  26:32

Through what?

OK.

 **c910373a-72bd-476c-aa06-889eea2eed63**  26:38

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Uh, and the first one should have been there weekly.

Senior leadership team meetings, which I've come to find out that Rob was not having those uh, frequently.

Uh, and I know my middle school principals were because I actually visited a few of them, but part of it isn't a single leadership team meeting.

There should be an agenda and the agenda items should also include the projects that people manage, right and again for the senior leadership team meeting, if not to get into the nitty gritty details.

Uh, that's for the 2nd venue, which is called the what I call the 03 is the 10 ones where you actually if somebody manages testing or they manage graduation that is where you have those individual conversations.

So progress monitor to give them support around uh, all things.

Graduation.

Right.

And so, uh, it really should have been those two spaces.

So the weekly single leadership team meetings, some principles actually had them twice a week, depending on how new their team was.

Uh.

And of course, the officer had leadership team meetings twice a month, which included, as I said, the auxiliary people such as the Director of Counseling the the Math Department chair.

And then as I said, they were required to have weekly one on ones for at least 60 minutes with the people that they managed.

And again, though, that's where the oversight and direction and coaching around people's projects and what's on their plate should have happened.

And we we gave them, but I can speak for middle school and I think y'all still did customize it for high school.

Uh, we can send you an example of what the 03 agenda should look like and as well as the single leadership team meeting we gave them.

So like a baseline agenda that they could, of course, you know, augment and add to, but like that's the way that the communication works and I even use that with my team like we have a weekly, you know, uh directors, managers meeting and then from there I meet with them, you know, individually for 60 minutes to work through some of those, you know, individual pieces so that they're successful with the things that they own.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  29:08

And then those individual conversations you said they would be weekly one to ones with the people they manage with that include counselors or would counselors not be directly having those with the principal?

 **c910373a-72bd-476c-aa06-889eea2eed63**  29:19

Yeah.
So it would.
So it would include his director of counseling, which had happened because she's leadership team and not senior leadership team.
We set the expectation that they should do it twice a month.
Uh, But the counselor should actually be going back to have those same meetings with their teams.
And so, I mean, if you manage the math department, you know you should actually be having conversation with your math teacher, that trickle down the things that you discussed with your school leader.

 **Pamela O'Berry**  29:52

Got you.

 **c910373a-72bd-476c-aa06-889eea2eed63**  29:53

Now now for example, the math department chair.

 **Pamela O'Berry**  29:53

That makes sense.

 **c910373a-72bd-476c-aa06-889eea2eed63**  29:57

Say for example, they were under the assistant principle.
They should have had a weekly meeting with the assistant principal.

 **Pamela O'Berry**  30:09

And is there, was there any system in place umm?
Like if I think you, you know you said that Rob was not having them regularly, his senior leadership meeting did how, how did that come to your attention?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

**c910373a-72bd-476c-aa06-889eea2eed63**    30:20

You're right to monitor, yeah.

Well.

Ohh, this came to my attention.

You know, there was always this theory, and of course where I wasn't directly over high schools at the time that Rob was at, he's a fast talker.

And was more of a lazy fair manager versus some of our other principles that were very much hands on.

And.

How this really came to my attention is when this summer it was actually prior to the incident.

I think it was in May.

Or maybe April.

They were a couple of situations that were happening.

There with personnel.

Uh.

And as I went over to the school to have conversation with personnel and even someone who's assistant principals, you know, they shared with me that.

You know where I was often in his office.

He often delegated things to people without any clear direction.

Uh.

And when they were crisis, they had to figure it out.

And the teachers just felt like, and this became even more apparent as we started to have conversations with the teachers after the incident.

I I'm sure this parks probably talk to you about we had a couple of sessions with them and July and August.

Some of the comments that we got from people is that the kids ran in the school.

But you have to know the principle was if a lot of.

You know, just a a lot of peace and robbed himself, even him.

And I had a couple of conversations in April and May when some things popped up around because ability to, you know, you can leave without micromanaging, but you have to give your folks direction and vision and there has to be some progress monitoring to help folks be successful and even some coaching and modeling, right. And so he admitted to me that he was not like fully present in that.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Umm, he was actively looking for something else to do.

And then he realized what RPS was in the fit for him.

So I think April of May is when it really hit my radar that.

But unfortunately at the same time we had George Rift, who had a brand new interim principal that we had a shooting at.

George, we have it just was.

It was a mess between Jason and I.

Let me Jason was a Superintendent.

He was spending come up with days at George Webb sitting in front of the doors and I said, I think half of my time at Georgia with and been dealing with all the other issues that were secondary and I would dare to say that my second priority was Q and I, as of April, there's just there's a lot of things coming out of there.

Related to person now.

 **Pamela O'Berry**  33:39

You said it was your.

You said it was a secondary priority.

 **c910373a-72bd-476c-aa06-889eea2eed63**  33:43

I would say if there was a second school that it was on my radar, it was she cannot. And in fact.

I mean, this year, not just because of the shooting, but also.

You know, we had a hard time finding a school leader for Huguenot because because of the time, man, I think because of the circumstances, but also even one of the API's who eventually he we I convinced him to become the interim principle.

It just felt like it was just.

Attached that was Herculean.

You know that it's something that he knew what?

It take an investment and he wasn't sure he was ready to take that on.

I mean, even though he had been pretzel for seven years and another district, he just felt that because of the way that things were structured and the looseness that he would have, a lot of work to do.

And so that has been, you know, prior to my illness, I can probably say you cannot just probably the school that I spent the most time at this year.

In fact, I was there the first two weeks just trying to get them Ohh settled and.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Doctor bell.

Who's the high school director has been over at Richmond High School of the Arts too.

Really.

Focus on them.

So yeah, I mean, there was a sense out there to say and in April and May where I just felt and knew that Rob was, you know, kind of checked out think that's the first that where I was kind of like tagged in.

 **Pamela O'Berry**  35:31

And did you and I I this just came up just in terms of someone who was escorting dignitaries during the the June six were were you or RPS generally aware that there was a Washington Post reporter shadowing Rob Gilstrap?

**C** **c910373a-72bd-476c-aa06-889eea2eed63**  35:51

I was not aware.

No. Wow.

 **Pamela O'Berry**  36:03

Is that the kind of thing I mean?

Because it is a school setting and we've got FERPA and confidentiality and all these other privacy interests that surround a school setting.

Is that the kind of thing you would expect to be floated through the Central Office for approval before a reporter is brought into a school setting to shadow a principal?

**C** **c910373a-72bd-476c-aa06-889eea2eed63**  36:28

Most definitely.

And The funny thing about it is, is that I mean, the one thing that I have been clear about specifically with middle school and I think with secondary in general, we're principals meeting.

It's just really understanding like.

I mean this in a bad way, changing the command because when I took on this role everything was so loosely Goosey, it was kind of, you know, every school kind of did its own thing.

And that is why we got the disparate results that we had.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And so we were clear with them about processes.

We spent a lot of time going through processes and protocols with folks and even at principals meeting, there was always space and folks had questions like they knew how to get in contact with us.

But I think to your to your to your question that you asked earlier is like how do we monitor this.

 **Pamela O'Berry**  37:21

Mm-hmm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  37:22

I mean, we actually and and our principal director is now have the space to do it because uh, they're not doing 3 jobs, but essentially we actually have weekly school visits and so, uh and maybe I seem to say weekly for for the majority of our schools, we see them at least twice a month because just for example, with high school, Jay Austin had nine schools.

I had 10 middle schools and so as you can imagine, with everything that happened in the course of the day would be impossible to go to every school, you know, every day and do well.

I mean, I mean every week and do well.

And so we had some schools that we tiered that we may saw once the once a month or twice a month, for example community or open high or Franklin Franklin military. They also may have visit like once a month because they were pretty much on Autopilot right.

 **Pamela O'Berry**  38:24

Umm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  38:24

But we would at least once a week, go to our what we call our priority schools, which would have been at George with and that you and I and Armstrong.

Yeah.

And what I would say is they, Austin and I were probably very more diligent when we didn't have the, you know, passing of the principle and having multiple jobs to do.

I think we did a better job of managing, but the 2223 school year.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I don't even know how to describe it.

It just was so.

Traumatic and so many ways, but.

This is something I wanna forget because I mean I have a touch of OCD and I have a type A personality.

So like it all drove me crazy because it just was.

It's things that were unmanaged.

And you know, and I think that's what happens when you have a lot of high profile vacancies too, not only we also had the director of Curriculum instruction labs, uh, we have so many directions.

 **Pamela O'Berry**  39:34

Yeah, the director of what?

What was that position?

 **c910373a-72bd-476c-aa06-889eea2eed63**  39:37

The director of curriculum and instruction, she she resigned.

It's just the director of.

Academic programs and support.

We had an interim.

Yeah, Renesha transition in December to Chief Wellness officer.

So we had a vacancy for Director of Exceptional Ed, but of course, uh, I put an interim in place until we could, you know, really hire figured out.

But we just had so many vacancies in key levels of Chief Operating Officer.

Sure.

I mean, it just flashier was.

If I could be completely honest between Leslie Renesha and I.

I think we were the ones that held that department together and would even dare to say other departments because it just was.

It was only Jason Michelle who, dasco, who's the chief of staff at the time, Doctor Harris.

They were the only three chiefs and there was a vacuum of leadership in the academic realm.

And so, you know, we stepped up to do what we could and even prior to that, because even though people were there, they weren't really present.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  41:01

Mm-hmm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  41:01

But it was last year was disastrous.

And then to have this happened.

Uh, yeah, it's just a.

I've never seen and I think I started off with the preference of doing title won't work.

I worked at Atlanta Public Schools at it's roughness and I would dare to say that that repelled in comparison to last year in Richmond, Bobby Schools.

 **Pamela O'Berry**  41:29

What do you why do you?

What do you what do you attribute that sort of vacuum of leadership to like?

Was it just because it a bad series of people moving on and and sicknesses and FMLA and and and deaths?

Or was it just kind of more systemic than that?

 **c910373a-72bd-476c-aa06-889eea2eed63**  41:48

Well.

Yeah, it.

Yeah, it was school board, but I think the bigger issue was and I'm starting to understand it now as I sit in the as a part of the division of leadership team, which I'll definitely say we have a pretty healthy relationship because.

I guess because of the struggle and also because we and maybe also because we're pretty young in the role, but we also have great communication.

But previously ah, I mean, and I've said this is Jason.

Ohh that ohh.

The Chiefs just had bad relationships.

They did not communicate.

They did not get along.

Everything was last minute and and as a result of some of the conflicts and issues, I mean people decide to go after ML umm and leave other folks holding the bag and.

Yeah.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And it just, you know, and Jason, by God, tried to.

I mean, I've never seen the Superintendent try to come and leave academic meetings, but I mean.

He did what he felt that he had to do.

Just with the vacuum of of leadership, you know.

And so when there are many theories out there, you know, some people felt that the chief of staff, Michelle Hadassa, was too strong and had a close relationship with Jason.

And so it's just, it's a lot of things, but unfortunately these vacuums and leadership led to, you know, a lot of the traumatic events that happened.

You know.

Last year.

**Pamela O'Berry**  43:37

Yeah.

**c910373a-72bd-476c-aa06-889eea2eed63**  43:38

Yeah.

**Pamela O'Berry**  43:41

Alright and.

**c910373a-72bd-476c-aa06-889eea2eed63**  43:42

Alright.

**Pamela O'Berry**  43:45

Let's see.

Is I wanna pivot a little bit to.

Umm, the graduation criteria specifically for Shawn Jackson?

I know, I've just.

**c910373a-72bd-476c-aa06-889eea2eed63**  44:03

Yeah.

**Pamela O'Berry**  44:04

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I've just recently read the report.

The internal report from the division and it said that you were the person tasked with reviewing transcript and reviewing everything to A to confirm whether he actually did qualify for graduation.

**c910373a-72bd-476c-aa06-889eea2eed63**  44:13

Yep.

Yeah.

**Pamela O'Berry**  44:19

Can you walk me through kind of what you what questions you thought were the questions that needed to be answered and what what you looked at?

**c910373a-72bd-476c-aa06-889eea2eed63**  44:20

Yeah.

Yeah.

So I mean.

On the surface, he met the criteria for he had to have 22 ohh verify credits, right?

So he had the the coursework right, he passed the coursework.

Ohh, he also met the requirements in terms of passing the the test that he needed to even though it was a struggle and he had to get some what we call local, you know verified credits.

**Pamela O'Berry**  44:59

Umm.

**c910373a-72bd-476c-aa06-889eea2eed63**  45:00

Ohh however.

Where the challenge lies is like there's this new requirement that for video E around the called CCRI which is, you know, college career, civic readiness indicator.

And so every uh.

The singer had to meet that requirement where we fell short and I don't know if you saw my summary cause.

I mean, when I tell you I'm so well versed in this and I think I have been traumatized through going back through these documents on millions of occasions.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Is where we fell short.

Is that the state didn't give a lot of guidance around the criteria for.

CCRI it's pretty clear cut in some cases.

If you take advanced coursework or ID or you're like J.

ROTC.

You know, there's some clear cut ways.

However, they have this Ave where kids could actually engage in the school base enterprise.

Now.

It's funny as I took this on not only in January was I planning the logistics for graduation, but also managing on time, graduation rates, making sure that Council is understood what they needed to do to ensure that kids walked across the stage. Some of our schools had the event started the process.

I'll see C alright in January, which is so scary.

 **Pamela O'Berry**   46:38

Now, when did when did CCRI start?

When did that start being a graduation requirement?

 **c910373a-72bd-476c-aa06-889eea2eed63**   46:43

So well, the the video, he actually wrote it out.

It was actually 2122.

They rolled it out and the thing about it is, is that it just was kind of like hell, harmless, right for that year for kid didn't meet that requirement, even though they tracked it, you know, on school profiles, it didn't impact your, you know, ability to graduate all those different things.

However, this year it did so we kind of had some, some leeway, some, you know, some some lag time from the state.

But again, if you go back and look at all of the documents from the state, the state wasn't really clear and didn't give a lot of good exemplars.

And so, for example, that Sean's case and also this is just not a humanist thing, even at John Marshall.

 **Pamela O'Berry**   47:28

Umm.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **c910373a-72bd-476c-aa06-889eea2eed63**  47:34

What a lot of schools did for kids that should not that did not have IB coursework or advanced coursework, or didn't have GRTC or could not pass the assessment such as Sean couldn't pass the WISE certification.

Those sorts of things.

What schools did at the last minute?

Some of them in May let me early May late May.

They created these school based enterprises where for example.

There was a store like the kids created a store and so items which again is not even in compliance with our Wellness policy because that's supposed to be selling candy and all that stuff doing the.

So it's really flawed.

And so if you look at the CI requirement, did he actually meet it?

Based on what we have, the State 35 it and said yes.

However, if you look at the document and the, I think they started there on May 29th for something.

No.

May 2720 second or something it it just it wasn't enough time to actually.

Uh.

Be legit in my opinion, and so in my summary and I talked to Jason and gave him my recommendations, and we have already fixed it for this year and there has to be some better standards and we create an exemplar and a checklist.

And uh, the manager of college and career and technical education at her team.

I thoroughly going to school to see the operations.

Look at the plan to make sure that it's something that's quality and that at least spans 60 days, like you can't be.

You do this for two weeks, and if you look at Sean's work, Sean didn't even complete all the assignments as it relates to, you know, the things that he was supposed to do.

So, uh, you know, on the surface didn't meet the requirement.

Yes.

Was it the standard that should have been?

The answer is no.

Ohm and so, yeah, it it troubled me that, you know, we had adults and and don't be wrong I think I mean working inside of 1 schools.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I've seen it that, you know, accounts with our teachers and even as principles we want to do what we think is best for kids because of their environment and their challenges and because we want to support the families.

But in some cases we lower the bar and we don't set them up for the success that they need to.

Yeah, you know, to operate in the real world.

So uh yeah.

 **Pamela O'Berry**   50:20

Did you feel like that happened here?

That the bar was lowered to to kind of push him across the line.

 **c910373a-72bd-476c-aa06-889eea2eed63**   50:26

I do.

I do it again.

I mean, I think that Miss Harris is one of our hardest working counselors.

Very insightful, but I do think in this case I mean because it's shawne situation.

I mean and it's since you know counselors, a lot of our counselors operate with this empathy.

Some of them sympathy.

I think that that was her goal to her mission because Mom was very supportive.

In the sense of, you know, not trying to compare to other RPS parents, but sometimes some of our parents, especially kids with challenges, they aren't as communicative as Miss Jackson was.

And so.

But I also will say is that you know, when I had the conversation with Rob.

Around certifying the graduates and Sean Jackson, I mean, he literally said to me he doesn't sound off on all graduate.

He left the Council's make those decisions, you know, and he's like, well, you know, essentially, you know, if you really wanna talk about it, technically, I do certify all the graduates, but I don't check, you know, each one.

One so uh, yeah, I believe it was the case of.

 **Pamela O'Berry**   51:40

Is.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Is.
Is that expected?
Is that expected?
I mean, aren't do you expect him?

 **c910373a-72bd-476c-aa06-889eea2eed63**   51:44

No, it we we no, we didn't have a rid of policy and those division really I mean no division.

I mean, I have friends and Fairfax and Prince William and I mean literally, I mean like in Prince William.

They do have, you know, Principal signed off, you know, on graduates.

But if the counselors that check, you know the requirements and then it is the director of counseling that comes to the principal, to say, Yep, here, this lady candidates for graduation, here are the 10 kids who challenges, they have to take tests up into this state.

And so they could potentially be graduates, right?

So I mean, and I think we know any job people delegate, but there's something about delegation.

However, still monitoring right and the purpose of the OH threes and the the one on ones and those meetings, it's a monitor and have conversations about the Sean Jackson cases.

You know, and I think if robs the more plugged in.

Maybe he would have had that conversation, but the other variable that makes this situation so strange and I've been having this conversation.

Since before they open up the Richmond Virtual Academy, is that you know, Sean was in the Richmond Virtual Academy?

Ohh, you know, based on his psychological.

Ohh which made it a little hairy because you have a principle there.

Who the parent was also communicating with.

Ohh, but the schools actually have the ultimate responsibility.

Even though their kid is not there under their direct supervision, which makes it kind of weird.

And so this year, yummy it.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  53:36

So you, yeah.

 **c910373a-72bd-476c-aa06-889eea2eed63**  53:39

And it's not just that you got case, I mean, the principles complain from every high school in middle school about the Virtual Academy, because it's just this weird structure and not just kids with 504's, but, like, General Ed Kidd, who they were responsible for, who they didn't even.

They have not even seen before, but they had to provide school based services because RVA was a program and not at school.

And so this year, our VA is a school, so the responsibilities for everything falls on that one principle.

So I think this is what also kind of made made the situation unique and I think the other variable that made the situation unique is that.

The assistant principal, who had the strongest relationship with Sean Jackson.

And Miss Jackson was the.

Umm was tapped as the interim to go over to George with and so uh that it ministrator who had the relationship with him was no longer at Huguenot.

And essentially, I mean, his hands were full when he went over to Georgia.

 **Pamela O'Berry**  54:56

Was that Mister Olds?

 **c910373a-72bd-476c-aa06-889eea2eed63**  54:58

Yeah, Kevin knows, yeah.

Yeah.

So I mean, as I've reflected on this thing and just.

I mean, and peel back the the layers.

I mean, there was to be completely honest, and I went back and read through all those emails myself, and I wasn't included on any of them and not as an excuse, but part of me wished that I wasn't included so that I probably could have flagged it.

But there were some things that were alarming and disturbing that probably would have given me some pause around, you know, our approach.

Does that mean that Sean Jackson?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Probably would have come to graduation cause in some divisions, and I mean I've seen it done and and we have done it in the past and RPS say you have a kid with the 504 disability you know you would actually have them come to graduation, but you would actually give them their certificate first, have them walk across the stage and then they would leave with their families.

Uh, so that way, you honor, you know the occasion.

Uh, but you also don't have liability, I mean, and not just if it's like a valid the piece, but just say for kids just had a, you know, they had a Walker or like they had a, a, an illness or, you know, a disability like there are a lot of liability pieces that could, you know, be opened up.

But the other conversation that I've have started to explore with our legal side, our legal team is really around like could those practices be discriminatory?

But I guess I'll pick those conversations up when I come back.

 **Pamela O'Berry**  56:51

And those will be deep conversations. But.

 **c910373a-72bd-476c-aa06-889eea2eed63**  56:55

Yeah, but yeah.

 **Pamela O'Berry**  56:58

So.

So these are these are some some good points here that we're we're getting into.

So umm guess kind of moving just to wrap up the the academic readiness for graduation, like you said, technically he clicked all the boxes.

But there was really with with be between him not doing many of the assignments that kind of gave him the school based enterprise.

 **c910373a-72bd-476c-aa06-889eea2eed63**  57:17

Yep, and and.

 **Pamela O'Berry**  57:28

Uh endorsement, I mean with not doing the assignments, he probably should not have received a completion of the school based enterprise endorsement, correct?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **c910373a-72bd-476c-aa06-889eea2eed63**  57:39

Correct, correct.

And the and then the other piece is.

I mean, even if you look at, I mean some of the exchanges that were in the email with the teachers, the teachers made a lot of exceptions for him in terms attorney and work and those types of things.

Don't get me wrong, we have, you know, policies around, you know, lateness and so forth.

But I do believe that you know.

In any of the school division, he probably wouldn't have graduated.

Or he may have been what we call a summer grad or December grad.

 **Pamela O'Berry**  58:17

Umm so.

 **c910373a-72bd-476c-aa06-889eea2eed63**  58:19

And to be complete complete complete the honest.

Our counselor, specialist, did the transcript review.

Twice.

Candace, who's the manager of college and career pathways, have done it twice, and I've done it twice just to make sure we didn't miss anything.

And we even got together and talked through.

Uh, just because of, you know, the level of scrutiny from the school board and everybody, but again on the merit of it, I mean, I could walk you through the transcript and tell you how he met it on paper.

But literally, I mean the quality was low and as I said, if you've been any other division, he probably would have graduated.

**Pamela O'Berry**  59:05

Do you feel like there was any?

Was that the decision you feel like that decision was made strictly at the counselor level?

Or do you feel like there was an well first, let me answer it.

Do you feel like that decision?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **c910373a-72bd-476c-aa06-889eea2eed63**  59:19

Yeah, absolutely.

The absolutely and again I have met with the everybody that's involved with graduation.

Every counselor in August to say to them.

Like this is gonna be a different year.

And you know, part of it is, is that I mean, the director of Counselor, I mean, at the end of the day, the principle is the one whose name is on the report card.

Who's responsible for that entire school?

But we also know that a principal can't do everything.

And so I've said to them that they need to have the structures and I think even I shared with you the document and if I have it, my recommendations for how we are going to move forward, right, we're principal certified, their graduates and so, uh, yeah.

So absolutely it was a.

It was a counselor based decision and Rob, to be completely honest, how do you think he had a clue was going on with Sean Jackson?

I mean, I had multiple conversations with him after the incident and he would say talk to Miss Harris or Miss Harrison.

Miss Harrison is the director of counselor in there.

 **Pamela O'Berry**  1:00:35

Right.

Lisa Harrison.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:00:38

Yeah.

Who?

I mean, who also was a very, I mean, she's committed, very committed.

The work that she does not.

I saw it the first two weeks I was there and and in the past.

Have you know I've seen the work that you've done?

 **Pamela O'Berry**  1:00:52

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And do you do you?

So the decision to kind of give them, Sean, the school based enterprise endorsement, do you was that made at Miss Monique Harris's level or would that have had to have been made at Miss Lisa Harrison's level?

**C** **c910373a-72bd-476c-aa06-889eea2eed63**  1:01:09

So at at actually had to be may on the central office level.

So what happens is because I think you have the documents, this school actually submits their plan.

That's a template.

That VDOE provides uh, there are a couple other documents.

That video he has them to submit, they submitted these documents to the manager of career and technical education.

She reviewed them and approve the actual.

School plan now in terms of her.

 **Pamela O'Berry**  1:01:46

You say she that was which which she was at.

**C** **c910373a-72bd-476c-aa06-889eea2eed63**  1:01:49

Her name is Doctor.

Doctor Rhonda Turner.

Who's the manager of CTE?

 **Pamela O'Berry**  1:01:54

OK.

**C** **c910373a-72bd-476c-aa06-889eea2eed63**  1:01:56

So she approves the plan.

However, it is up to the counselor in the director or counseling for each school to gather the artifacts for each kid that was in the school based enterprise.

And then there was a dashboard where they were supposed to upload the documents for approval.

Now.

Ohh my gosh, this is a nightmare so it mostly I would say 80% of our schools.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Uploaded the documentation for.
The kids and I did even go through some of the other schools to look at the samples and they are not quality either, right?
So it's not just the Sean Jackson issue, it's they division quality issue, right?
Ohh that.
About 80% of them, they upload it in time.
However, we did have a glitch with our dashboard because some of the people waited of course to the last minute to upload stuff.
In the case of, I think they were like 18 students that you cannot and they refuse.
Students at John Marshall that they kind of waited to upload, and there's a whole email exchange about it and and essentially even trying Jackson artifacts did not get uploaded to get approved.
Until after graduation.
And so yeah, there are a lot of things that we, I mean it wasn't submitted to video we until I mean I think it was my God, August, September.

 **Pamela O'Berry**  1:03:43

So video he didn't even see them to approve them until August.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:03:44

Because I remember I I had.
For video Eden approve them video.
He just takes your word.
I mean the division word for it.
So if Rhonda approved, Rhonda.

 **Pamela O'Berry**  1:03:55

So yeah, it is.
It's just like put it, put it in a file to show that.
OK.
Huguenot High School, we've received yours.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:04:02

Yeah. Yeah, yeah.
So.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

So Rhonda approves them.

What happened is, is the way that we actually communicate with the state is something called the.

It's called the the SRC report, which is like the the it's an end of year report that we send to them about who would have graduates, you know, have they met for requirements like what classes are they taking?

Did they take honors classes?

So we upload all of that stuff to the state and I signed off on the I reviewed report, signed off on the report.

Jason does the same and so essentially we submitted that report to VDOE.

And August.

And then there were some issues with CCRI as we.

Saw the data that the state sent back, and then they were like ohh that's the glitch that you know happened back in June.

We need to fix it, so I had to go back to the state and say, can we please, can you please reopen the window?

Let us resubmit this data so their kids get their credit that they deserve, and again also just remember that the state never certifies anything until October anyway, right?

Accreditation or, you know basically everything is what the school division, you know, reports uh so.

 **Pamela O'Berry**  1:05:24

Gotcha.

So.

So there's no, so to say that if VDOE hadn't signed off on or accepted or or reviewed or whatever, their process is to say that his that Sean Jackson getting credit before VDOE even received the the things makes his credit invalid is not true.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:05:49

Yeah, it's not true.

I mean, so the only thing we're video E gets immediate validation is test scores, right?

Because everything comes through Pearson, right?

So it comes through Pearson.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

But also remember, those scores really are what they call them, like they're not certified either until I think maybe a week after this validated or whatever.

So but yeah, so like anything that's like a artifact like that.

I mean, they really depend on the division to report that information accurately based on the standards that they have set for the guidance that they have given now where we get the kickback is when we submit the report and they find errors in the reports.

And then they may ask for the documentation, and if the documentation doesn't line up, they will go back and correct kick kick the, you know, kick the percentage out, the number of kids out and make the update to your school quality profile.

 **Pamela O'Berry**  1:06:46

OK.

So would you would, did you say?

I know you said there was some delay in in RPS getting the things uploaded to VDOE did that at least the part where RPS signs off and gets it off the VDOE?

Did that occur before the graduation?

**C c910373a-72bd-476c-aa06-889eea2eed63**  1:07:04

No, no, no, that, that that did not occur before the graduation. No.

So what what we did was we did have.

Uh, all of the credential uh approval from Central Office on the actual programs.

And as I said, 80% of the kids artifacts uploaded successfully.

 **Pamela O'Berry**  1:07:20

No.

**C c910373a-72bd-476c-aa06-889eea2eed63**  1:07:27

Now, that doesn't even mean that it was reviewed by the CTE department, because there was no way she could actually turn everything around that fast.

But the goal was for them to actually have the information uploaded.

But what we've done this year is we've actually backed up the deadline, so essentially everything has to be done by like May may it may.

So that gives us time to actually review, like there's not gonna be this last minute that

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

give this kid.

It's CCR credit by letting them work in the store for two weeks.

**Pamela O'Berry**  1:08:01

Right, right.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:08:04

Up into the day of graduation, which is we create our own problems and so ohh, we put in some checks and balances around that.

**Pamela O'Berry**  1:08:13

And so just to kind of put a a a sort of cap on the, the, the school based enterprise portion, the work he hadn't really completed all this assignments kind of got pushed through the quality wasn't really there for for to make it a pass, but they made it a pass and that is the part of the system that you say that kind of made it questionable but questionable for him to be approved for graduation just that sort of micro piece of it because he in terms of testing and and let me see.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:08:51

Like his coursework?

Yeah, he met the requirement.

**Pamela O'Berry**  1:08:53

Yeah.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:08:54

Yeah, yeah, yeah.

**Pamela O'Berry**  1:08:56

And.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:08:56

So essentially, yes, correct.

Like for example, if you look at some of the artifacts, I mean the responsibility that he was given was to create Flyers, OK?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And to create a list of cleaning supplies and to do a baseline inventory.

A school based enterprise with I mean, if you look at the states, it's like the kids come up with an idea, they come up with the funding like they they think think everything.

And so Shawn Jackson's also supposed to be like keeping track of what was so, you know.

And I mean, there were a couple days that he didn't even do the spreadsheet because Mom said something was going on with him, like mentally or something.

No, something to do with his mental health.

So it's like if you look at this spreadsheet, this spreadsheet is only like I think he tracked it for five days like in my mind, that is not enough.

You know, I would dare to say a video.

Yeah.

Pulled back and looked at it.

It would probably say it's not enough, but again, what video he has said to us, and I've talked to the state, they're aware of the issue been concerned is that they know they haven't done a good job.

But you know, being clear around it, so they are working on it from there.

 **Pamela O'Berry**  1:10:19

Gotcha.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:10:21

But of course I've worked on it with my team crisis like it just gives me.

Stresses me out.

So we, we've already put in our internal systems and in fact I have my team create an exemplar for our schools.

 **Pamela O'Berry**  1:10:37

Gotcha.

So if and and to your knowledge are you said the video you had pulled back and looked looked at the artifacts supporting that one piece, they probably let me is there ever a process where VDOE says Ohh that's a problem.

That doesn't really meet the criteria.

Therefore, we have to kind of undo things.

I mean, I I can't imagine that that's a thing.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:11:01

Yeah, yeah, yeah.

When?

Yeah, they they don't have the capacity to do that now.

I think it's too much for them to manage, but what I will say is that transaction was not the only one like I think that's what kind of makes this.

Like if it was just him, it would be, you know, but they're other students, right?

 **Pamela O'Berry**  1:11:23

Yeah.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:11:25

I mean, and not just a Huguenot, but also John Marshall, other schools too, where I mean it's not, it's not quality, but I think in his case the because he was virtual made it even harder.

Like if a kid worked in the store for two hours after school.

That is somewhat different than sitting in front of a computer or creating a flyer that could probably be done in 10 minutes.

 **Pamela O'Berry**  1:11:48

Right, right.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:11:48

Ohh yeah yeah.

 **Pamela O'Berry**  1:11:51

Gotcha.

Alright.

So then we talked a little bit about that.

Uh, the graduation criteria being met? Umm.

Can I?

Can we just talk a little bit about any conversations because obviously in this review we are not, we do not have access to Mr Gilstrap.

He has declined to participate, so I'm really interested in any conversations prior to

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

June 6 or after June 6th that you may have had or be familiar with related to things Mr Gilstrap may or may not have said or known about either you know walking for graduation, Shawn Jackson's mental health, any issues of safety and security around so Sean Jackson, that kind of thing.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:12:15

OK.

And no conversations.

I mean, even when I had conversations with him after the event, I mean, he was very aloof about it.

He was like, yeah, this kid went here two years ago.

I believe this may have happened.

You need to talk to Miss Harrison or Miss Harris.

They were the ones that had the best relationship with him and I think Mr Oles was assistant principal.

You had a great mom.

Yeah, that's all I could.

I mean, he's like, that's all I can add.

He was very.

Like hands off and as I said, this kind of disconnect that he didn't like, he did not.

Ohh have any really insight?

And again, I said as it became clear to me in April and May and as I said, I didn't even have any awareness of the Sean Jackson situation because I wasn't included on any of the chains.

But even as I listen to the staff talk this summer and yeah, he just he just went there.

I mean, he wasn't fully present.

I mean, some of our school leaders are two present.

But he just, you know, and to be completely honest, I mean, that narrative is that that's that it was like that year before as well.

Uh, so again.

Ohh yeah.

He just?

Yeah.

There were no conversations around Sean Jackson, and even with Doctor Connie

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Robinson, Robinson Carney, I mean, she she never raised a red flag about him to me either. So.

 **Pamela O'Berry**  1:14:38

And it's are you.

You're familiar with your homebound instruction manual.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:14:44

Ohh yeah yeah most definitely.

 **Pamela O'Berry**  1:14:46

And you're familiar with the part that talks about students on homebound or not to be on school, property or school, school sponsored activities.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:14:56

Yeah.

And so the language in that manual is so and we have cleaned it up.

It's just not it.

It's not clear because the other piece is, as I said, I've talked to people and RPS, including Angela Jones, who will tell you in the past that they've had situations where kids, umm, that had issues did come and graduation and they put them at the front end and they gave them their diplomas and they left with their families.

And so it's not that it hasn't been done before.

It just has not.

OK, I think we did a good job of expounding on what it means.

Academic, non academic right.

I can understand it.

Why kid can't be on campus for, like sports, but you really have to ask yourself the question if a kid has participated in, you know, pee through 12 education.

I mean, everybody wants to see their baby come across the stage, I mean.

God forbid, that's something happens, you know, forgetting the 12th grade year, so that you just take away all of the other 11 years.

So it's just we just have to be, you know, and that's as I said, the conversation that I was having with pack a lawyer around like.

You know discrimination.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I mean, it could be apparent that says, yeah, I want my child.
Well, I'm down that.

 **Pamela O'Berry**  1:16:38
Did did you take the?
Looking at when I looked at the last year's homebound instruction manual, and I know it's been tweaked a little bit, at least as it relates to page 6.
It basically says in order for a homebound student to be on school property or or or participate in in school based I mean school sponsored activities.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:17:01
From the from the principle principle, yeah, yeah, yeah.

**Pamela O'Berry**  1:17:01
There had to be approval from the principal.
Did that?
Was that something that that was kind of, was that considered policy or was that considered sort of a suggested practice?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:17:09
No.
So it really is a suggested practice in.
The funny thing about it is to be completely honest.
If you ask the principals how many of them actually read the homebound manual, it'll probably be 0 because we it was just posted on the website you know and you know, OK, I've had to read it backwards and forwards.
And you know, and part of it is is that.
Yeah, the school board, I believe has put a policy draft policy in place.
I bet seems to be a lot more clear based on what I saw.
However, there's still no process or procedure.
That's what I worked on, which I think we may have uploaded for you to see.
So yeah, so yeah, we've gone back to the school board, has gone back to create this draft policy.
But again, I think as you know if you call me right for Chesterfield didn't even have this stuff outlined in there handbooks or processes.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I mean, nobody would ever think that something like this would happen at a graduation.

 **Pamela O'Berry**  1:18:28
Great.

So for one do do you think that?

Do you feel like that's?

A supervision or a training vulnerability like just for there to be policies or suggested practices out there that your people who are supposed to to implement them don't even know about or haven't read as you.

You said you might you suggest they might not have even read it is that?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:18:59
Yep. Yep.

So so part of it is, is it's a training issue.

And then the other piece that really is a monitoring and oversight piece and so this year, as I've told them with the process is for their graduate like they can't wait till the last day like 95% of their graduates, they need to have submitted by like May 30th.

You know what I mean?

So that gives me a chance and the principal director a chance to actually go through and come through and certify.

 **Pamela O'Berry**  1:19:27
Umm.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:19:35
And then if there is that 5%, then we can look at those on a case by case basis, right?

 **Pamela O'Berry**  1:19:43
Right.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:19:45
I mean, even going as far as I mean one of the procedures is like there's gonna be a drop down to drop down says here your choices, I certify this graduate has met the requirements and I have no concerns.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Umm this graduate.

Uh has met the requirements, but I have behavior concerns, right?

So it's like a different drop down menu and based on that we will respond as principal Director and Chief academic officer.

The secondary to say OK if they're say for example, there are six kids that across all of our high schools that principal say have met the requirements, but they have behavior or safety concerns.

Then we'll convene A-Team a principles.

Also, some counselors and also people from Renesha team and we would make a decision about whether the child safety risk and communicate the family.

Now that's as of now I was.

 **Pamela O'Berry**  1:20:48

And you and that's you put this.

This is something you all have put in place for 2324 square.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:20:54

Well, now it's it's something that I have put in writing as a draft.

 **Pamela O'Berry**  1:20:59

OK.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:21:00

Uh, and Jason has seen it, and I even shared it with the school board.

So it is a procedure, not a policy like the process.

 **Pamela O'Berry**  1:21:08

Right.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:21:09

And again, I think I shared it with you.

If not, I can definitely share it with you because it's hot off the press this before right before I left.

But as I said, I was engaging in conversations with pack to make sure that we were in legal bounds and not being discriminatory.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  1:21:25

Gotcha.

Understood.

So didn't it do you?

So what I what I as I understand it the.

The homebound coordinator.

Miss portee.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:21:41

We spillard 40.

 **Pamela O'Berry**  1:21:42

Who's downtown?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:21:43

Yep.

Yep, Yep, Yep.

**Pamela O'Berry**  1:21:44

Yeah.

Who's downtown that?

Her office is the office that receives the medical certifications and does the approvals and that kind of thing her off? Umm.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:21:55

Yeah.

Yeah, but what will?

Let let me explain this though, because.

Home based home instruction used to be managed at Central Office.

We actually had a manager of home instruction.

And it was all managed through central office.

We have budget cuts and they introduce our VA, the chief of staff, and Jason decided to move home instruction in the board agreed to move home instruction to Richmond Virtual Academy.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

So Miss Portee department, there was Miss Pollard before.

Is not even a central office worker.

She's an employee of R VA, so it's very.

Weird in the sense that other divisions actually like have somebody in central office that manages that process.

It's almost like we gave oversight to that process to a principle versus.

I could coordinator or manager at Central Office.

 **Pamela O'Berry**  1:23:05

Umm.

So does that.

So what I have and and I I'm gonna try to loop this back into what you just said because this gives me new thinking on it.

So what I understand, if we're wherever the homebound coordinator is, that office gets the certifications and and knows kind of all the medical reasons why a kid is is on a homebound status.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:23:35

Yeah.

Umm correct.

 **Pamela O'Berry**  1:23:37

That office, then, you know, dispenses the the homebound instructor through the RBA.

Uh, do Richmond Virtual Academy, you know, gets nosy hours.

There's all of these things, but as you said going forward, that's going to be all pulled into RVA, not through this.

The the home schools, I mean the the school base, correct?

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:24:03

Yes, but because.

Yeah, because RVA is actually a school now.

 **Pamela O'Berry**  1:24:08

Yeah.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

School, not a program, right?

So but in the past it let's just be more specific.

As of last year, So what I've seen is that Miss Portese office knows why in this case Sean Jackson was on homebound and it was mental health and it was, you know, other things.

I haven't.

I haven't reviewed that document yet.

The the home bound specifics.

But so then the school is supposed to administer the testing and and all of these other things.

As I as I understand it and correct me if if I'm missing something, the school did not know and I ask this to school personnel did not know any of the specifics of why Sean was on homebound, except to the extent the mom had told them something.

**C** **c910373a-72bd-476c-aa06-889eea2eed63**  1:24:44

Yeah.

 **Pamela O'Berry**  1:25:03

Or Sean had said something.

Is that your understanding of the way it will work?

**C** **c910373a-72bd-476c-aa06-889eea2eed63**  1:25:08

Yeah. However.

Ohh Miss Harris had insight into why he was.

He was there and in most cases ohh the home instruction application is usually.

I mean, it's accessible to the principal even when I was the principal.

I mean, I did, you know, see what it shows on homebound or home instruction because and most cases this so part of that.

Well, not in his case, because he actually had a psychological from medical provider.

But normally there's insight and the other piece is, I mean, we've also encouraged principles to pick up the phone and have conversations because they were so many frustrations around RA.

It was like, well, pick up the phone and call.

I mean, if you have questions but there does not seem to be, I mean.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  1:25:56
Mm-hmm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:26:03
There was insight around Shawn Jackson's troubles.

There was a narrative going around about how there was a kid.

I guess Maria pilots friend who got shot and then Sean Jackson was a part of it, right?

So I think everybody kind of knew that narrative.

And also there were a couple issues that transpired at Huguenot before he went on homebound.

In the cafeteria, some disruptions around some neighborhood community type things where I think like even Rob had an awareness of who the kid was.

And you know that he had some mental health and community challenges.

So as far as the diagnosis itself, and you know, seeing what the doctor wrote, I can't speak to that, but I know that everybody, I mean, I would say minus me and I'm not even sure it's cause Jason was on some of the changes.

I'm not even sure if Jason read the chains or communicated with Mom.

Or what did they also communicate with mom and dad about her concerns about them trying to move him off of home instruction?

 **Pamela O'Berry**  1:27:16
Mm-hmm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:27:16
Ohh so there was a base not baseline knowledge of he had some challenges.

I just don't think anybody like really stopped.

I mean, I would say as a principal, he didn't really stop to really look into it closely.

 **Pamela O'Berry**  1:27:36
Is and is.

I mean, I know you said, like you said, pick up the phone.

If you've got these issues, but that would be, would that be an expectation that the

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

principal or somebody would stop and kind of put all the pieces together? Is the principle the person who should be doing that?

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:27:54

I mean, they really should.

I you know, and I think part of it is that.

You know, I think that Rob began had just checked out and also I don't believe that.

Miss Harris had confidence that he would make any other decisions, you know, because he was so lovely.

Fair.

So I believe she just kind of took it upon herself.

I mean it tried to do what she thought was in the best interest of Sean uh.

And again, I haven't spoke to Miss Harrison and his Harrison.

You know doesn't have the complete story like Miss Harris does, but Miss Harrison was aware of the challenges in, you know, and I'll try to provide some guidance to Miss Harris around some things.

But yeah, bottom line is I I don't believe that.

Rob was clued in enough to.

Even have known?

Ohm.

I mean, even the email that Mom sent about him, him tearing up the house and him getting kicked out and not feeling safe.

I think we're sure if he read those close enough.

Where a flag would just kind of go off.

Uh, and add him to because I mean, like, school is supposed to have.

We call this this school based intervention meetings and I think part of it is is that is where things got lost in translation, especially at the high schools.

When you had kids that were part of RBA where they were general Ed or like 504 IEP because sometimes those kids didn't get added to the school based conversations because they were in virtual Academy.

But the Virtual Academy weren't having conversations around those kids.

I mean, it's just it's it was so messy.

 **Pamela O'Berry**  1:30:02

There was sort of falling through the cracks.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:30:02

Even even.

Yeah, even retention conversations the year before last.

I mean, when we didn't have a chief academic officer, I remember in July having to deal with retention issues because.

Ohh, where there were kids that didn't meet the.

Standard and that we're RVA, RVA thought that the school was supposed to make the decision.

The school thought the RA was supposed to make the decision cause the Prince was like, I don't know, the child, never seen this child.

How can I make this decision about whether they go to the next grade or not?

And so I finally had to say to them come together.

And again, of course, the principal has the ultimate decision, but the principal needs some support from the Richmond Virtual Academy teachers and team because they're the ones that work with the kids on the day to day and sometimes the paper and the grades don't tell you enough.

 **Pamela O'Berry**  1:31:00

Umm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:31:00

So the intervention meetings that we would have for retention meetings we have for any other kid, I was like, well, that's use the form that's ask these questions.

But let's have the RV A-Team as a part of it.

And so we had some parents who are rightfully upset, who are like, is my kid going to the next grade is July 31st and I don't know.

So it's just it was just, it's very messy, this handle very messy.

 **Pamela O'Berry**  1:31:25

And and what is your school based intervention meeting?

What is?

What is that?

Like you said that he Rob wasn't checked in enough to raise a red flag, and maybe Sean should have been referred for school.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

**c910373a-72bd-476c-aa06-889eea2eed63**  1:31:31

Yeah, so this.

 **Pamela O'Berry**  1:31:36

But based intervention meeting what is what would that entail?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:31:39

Yeah.

So basically on that team you will have you have a counselor, you have a teacher, you have an administrator.

So you actually have like a school based intervention like, uh, like a Lee, which is usually a system principle, right.

And they would actually include the list of kids who need it, intervention for academics.

Uh intervention for behavior, right?

And so when I was a principal, if there was a kid that had challenges or red flag, I would have added them to that meeting.

Ohh.

I mean in it just say for example you can have 60 kids and 6th grade to discuss.

There's no way you're gonna discuss 60 kids and 60 minutes, right?

Or 90 minutes.

But if there is like an extreme case, that is when you isolate it out, like in Shawn Jackson's case, where you probably would have added him to the agenda as a item to say, hey, let's talk about Sean, that's getting to the tender that's getting back academic.

And I know he's over at our VA, but we need to pull in the RVA team to figure out how we support him and you know, but again, a lot of our schools, even some of our best high schools, are really good at it did not add those kids to the intervention conversations because they would A VA and they felt that RA should had the responsibility because they had a boatload of teachers and support over there.

 **Pamela O'Berry**  1:33:12

And do you know that Mister Gilstrap was having that had sort of a a school based intervention team or meetings?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

**c910373a-72bd-476c-aa06-889eea2eed63**  1:33:13

So.

Well, where?

**Pamela O'Berry**  1:33:20

Did he have those things?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:33:23

Well, if if they had him, he wasn't a part of them.

I mean, I can almost guarantee you that what I mean, as I said, the esbit chair is usually a system principle in most schools.

Not unless it's just a principle, and it's a really small school.

But I mean, as a principal, I said it on the that's with meetings because I felt that that is where I could provide it, clean it and provide the immediate resource for the kids.

**Pamela O'Berry**  1:33:53

So you said the AP usually takes charge of those.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:33:56

Yeah, in most cases is an AP.

Yep.

But again, if you're having your check-ins with your, at least in principle, that's one of the standing agenda items.

Is like, let's talk about your responsibility.

Role and responsibilities rest student based intervention teams.

Let's talk about how's it going.

Are there any kids on there that I should be aware of?

Now I was told my assistant principals and my department chairs.

I want any surprises, let me know what's happening in the building, especially if you can't fix it.

Please let me know.


**Pamela O'Berry**  1:34:36

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

As the principal should be SAP's about those and those one to ones that they should have been having weekly.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:34:42

Hmm yeah.

**Pamela O'Berry**  1:34:45

OK.

Well, I'm we are going long and I know I still, we haven't even gotten to June 6.

Did you need to take a A leg stretch or a bathroom break or anything?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:34:59

No, I'd rather.

Yeah, that's just I'd rather plow through.

**Pamela O'Berry**  1:35:03

Alright, alright.

Is there anything else before we move to the the events of June 6th at that?

I had not asked about that you think would be important for me to to know.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:35:13

No, I think no.

I I think I've given you enough.

**Pamela O'Berry**  1:35:19

Well, there's never enough, so if there's more, I'm happy to receive it because you know the process of distilling down everything I know is the next stage of things.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:35:22

Sure.

**Pamela O'Berry**  1:35:28

So before I have to distill down the the better, better informed I will be.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

**c910373a-72bd-476c-aa06-889eea2eed63**  1:35:30

Yeah.

**Pamela O'Berry**  1:35:33

So if there's anything else you think of, please, please share it with me.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:35:37

OK, OK.

**Pamela O'Berry**  1:35:39

Alright, so let's move forward to June 6th.

You were there that day.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:35:48

Yes, I was there, yeah.

**Pamela O'Berry**  1:35:51

What time did you run?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:35:55

I can't be there.

It's about 8:30.

That one eight o'clock 8 between 8:00 and 8:30 that morning.

**Pamela O'Berry**  1:36:04

Uh for the perf previous, I believe that was communities grad graduated.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:36:08

Community.

Yep, community had bears.

Yep, it's not.

Think I may have gotten there right o'clock or a little bit before because there's that night, if I'm not mistaken.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  1:36:17

It's a long day, even even with without what happened.

That's a long day, alright.

So you you arrive 8:30, you go through communities.

Graduation.

Did you stay on or did you leave and come back?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:36:31

Well, so if we back up, the first thing is when I got there that morning, of course, this is my first time going to graduation because I've only that middle school.

 **Pamela O'Berry**  1:36:44

Umm.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:36:45

So they tell me.

Are you could go through the side door.

So I did go through the side door.

And there is gas of RMC, older white gentleman.

Of course he wants me down, but it wasn't very.

Particular like you go to the airport or other places.

It just looks like a warm, but also doctor Ramsey was there as well as Laura Falcone.

And of course, they knew Elvis, central office and so basically, you know, I don't know.

That's why he just kind of did this.

Not feeling uh wanding.

**Pamela O'Berry**  1:37:21

Umm.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:37:22

And then actually went downstairs to.

Talk to the principal and just, you know, say good morning to some of the graduates that were already there from community.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

So yeah, in between the huge and I and the communities graduation, I did step out.
To go to like check on my car and just to go get some air.
So when I did that.
Ohh, I guess what I will say is probably I came back around 2 ish because I actually
was doing some work and what I will say is that uh, I did notice that some of the
huge and I I guess their families had gotten there early and kids were kind of waiting
outside.
Uh, but when I went back through the door, of course there was nobody there to
check.

**Pamela O'Berry**  1:38:21
You said it was about 2:00 o'clock.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:38:24
It's about two o'clock 230 ish.

**Pamela O'Berry**  1:38:25
OK, so background two and what did you notice?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:38:28
That that the arm MC person was not there to like one.
Yeah, just kind of went in.
Ohh and so no, no, doctor Harris Muhammed said that you know she had left and
she was not, you know, wandered or anything.
Yeah.
When I came back in, I was not wanted the second time either.
But the morning of it was, but again it was very nasalized, you know.

**Pamela O'Berry**  1:38:55
Did you see the guy there?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:38:56
Yeah.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  1:38:57

You said he was not there.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:38:59

Yeah, I didn't see anybody there.

I just kind of walked in.

 **Pamela O'Berry**  1:39:02

And the door was a was not secured.

So you were able to open the door, go in?

No wanding, no security guy.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:39:11

Yeah, they were actually a teacher.

At least there was a teacher or it was an RPS employee there.

Maybe that was that, but where the door was open, I can't recall exactly, but yeah, there was nobody there.

Uh, when I went back in.

 **Pamela O'Berry**  1:39:25

In it.

OK.

But you said a teacher RPS employee might have been in that area, but no security.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:39:32

Yeah, that.

That's how the door was open.

Yeah.

The door is open, but nose, no arm seats. Security.

Well, at least I don't recall.

Anyone being there?

 **Pamela O'Berry**  1:39:42

Do you recall if for the when do you recall whether or not the mag there were

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

magnetometers?

Now in place that you walk through.

**C**   **c910373a-72bd-476c-aa06-889eea2eed63**   1:39:52

Now now see.

I see I did not feed the the metal detectors.

Not it.

Not see those.

And again, as I said, I just walked in.

I didn't.

I didn't have to, you know, go through anything.

**Pamela O'Berry**   1:40:08

Gotcha.

Alright, so you walk back in.

Umm you see an employee there?

You don't recall which RPS employee you saw there around 2:00.

**C**   **c910373a-72bd-476c-aa06-889eea2eed63**   1:40:20

No.

**Pamela O'Berry**   1:40:23

OK.

And then where do you go when you get back?

**C**   **c910373a-72bd-476c-aa06-889eea2eed63**   1:40:28

Also, we actually had a there was a room for school board and division leadership team upstairs where we got ready, you know, without regalia and where we had lunch and where we were working until, you know, in between the ceremonies.

**Pamela O'Berry**   1:40:47

OK.

And so that's where you went and just kinda hung out for a while.

**C**   **c910373a-72bd-476c-aa06-889eea2eed63**   1:40:53

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Yeah, just hung out.

Yeah, hung out into the graduation. Yeah.

 **Pamela O'Berry**  1:40:57

And when you went up there around 2:00, where any other dignitaries or yeah, division central staff up there.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:41:03

Yeah.

Yeah, I think a lot.

Yeah, a lot of them had left.

I mean, most of them were division, leadership team members, myself, our office associate Ohm, Candice Vinney.

Chaplain.

Who's the manager of college and career pathways?

Uh and some of the school board members, they were kind of in and out.

Jonathan Young, I know was there that day.

Shonda Harris.

Muhammed Mariah white.

Ohm and.

Nicole Jones and.

I know.

Can you?

Gibson was not there.

I know this door was not there.

And Don Paige, start page there.

No, I don't believe that in Paige was there?

 **Pamela O'Berry**  1:41:55

So you're up there.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:41:55

Yep.

So folks, folks were kind of in and out.

Yeah.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  1:42:03

And once you got up to the room, this for the afternoon, did you stay up there?

Did you have some more in and outs?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:42:10

And I stayed there after I got up after after I got there and just did some work.

And then just change it to my regalia until the ceremony started.

**Pamela O'Berry**  1:42:20

Anything happened before you, you, you all are asked to to go down to get on the diets.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:42:28

No, no.

**Pamela O'Berry**  1:42:32

Alright, so you get on the Dias.

Anything unusual during the ceremony?

Like, do you have any specific recall of when Sean Jackson went across?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:42:44

Yeah, I do.

I mean, I've vividly remember.

Because miss of the hug that Miss Harris gave Sean.

And yeah, I I do recall him.

But the thing that I recall the most about the Huguenot ceremony in comparison to the community ceremony, and even it's their monies that we had afterwards was we told our principles to.

Prior to, you know, the graduation itself to come out around 2:45 or whatever for 15 minutes before and just to go over and read the script that we gave them around protocol because we know that our parents can be a little challenging.

And so I know Rob was apprehensive about reading that, and he even brought that to my attention like 2 weeks before graduation.

And I was like, no, every principle is going to do it because you know.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

But I recall he read the you know the pre script to them around behavior.

However, once the ceremony started.

As I said, I have a type, A personality, and I also just kind of ran a tight ship as a principal.

And so if I had an eighth grade crossover ceremony and I was very challenging school, my parents knew my expectations from the front end. Right.

And they will tell you my first year I had to walk a couple of parents out because they did not believe that I was true about them yelling and acting crazy and folks couldn't hear their name.

So off them out.

And so that sent the message for the next four years.

They were like this man is not playing.

So the whole ceremony, even when Rob was speaking and kids were speaking, it's just was disruptive.

And I think the code Jones was sitting next to me and I was just like this has to be better next year because I think part of it is is like the tone that you set.

This is like a once in a lifetime experience for every family, and people were yelling. They were talking.

It just was.

It's like had I been the principal, I would have gotten up the probably after the first five minutes to say, let me remind you again of the expectations like.

And so that was probably one of the things that was on my mind and I was, in fact, on my phone, just taking like notes about how we have to.

It's better.

So you know, that's the thing that probably surprised me the most about the.

Qanats graduation, the other thing we had sent out a communication about dress and what could be on the hats and that sort of thing.

And he could not.

It just was out of bounds.

People just, you know it doesn't wrong.

You want kids to customize it is their day, but I've been to 1,000,000 graduations in Henrico and other places that were done decently and in order.

And I just thought that this one just was it was.

It was out of order, so I'm not sure what was happening in the audience or but it was a clear indicator that they did not respect the school later.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Ohh I will give you an example.

Armstrong, when we actually had to move to doing that, the school Doctor Bell, who's the principal who's now the principal director when he gave the priest speech, you know, 15 minutes before he is one of the kids.

Yet I said don't get put out.

Doctor Bell puts you out.

You know, he had no problems, you know?

**Pamela O'Berry**  1:46:35

Right, right.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:46:35

So it's just it's one of those things around like them, understanding the culture and expectations, right.

**Pamela O'Berry**  1:46:41

Expectations.

**c910373a-72bd-476c-aa06-889eea2eed63**  1:46:44

And again, Rob did not have that, because if it were me and I kept looking at him trying to get his attention to like, you need to get this back, the kid was speaking.

Maybe the valedictorian?

Salutatorian I could barely understand what she was saying because there was so much chatter in conversation and I was on the stage.

I know Jason was a little bothered as well.

Uh, so that that's my recollection of the things that transpire.

Uh, yeah.

**Pamela O'Berry**  1:47:22

So you remember Sean coming across because you remember Miss Harris hugging him or making contact with him?

**c910373a-72bd-476c-aa06-889eea2eed63**  1:47:30

Yeah.

Yeah.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And there was and you know, and you could actually just just smile across his face the first like.

Yeah.

And then he kind of turned.

And you know, I guess whatever did some sort of wave, whatever they do.

So you could tell I I do.

I recall him and then when I saw him out there and I saw the pictures I was like ohh my God.

I just remember saying this give hand.

Umm so.

 **Pamela O'Berry**  1:47:58

Did you?

Did you recall that he was called slightly out of sequence out of order like in terms of cause?

I I believe there was a a JA and then there was a James and then he came two or three after James.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:48:07

Yeah, what?

 **Pamela O'Berry**  1:48:13

But out of sequence.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:48:14

Yeah.

Yes, I recall that.

And also I recall that he wasn't the only one like it just was.

It was.

It was problematic for me.

I mean that.

Yeah.

Yeah, it was problematic.

So the whole process and me, yeah.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry** 1:48:31

Did you know why he was out of sequence?

 **c910373a-72bd-476c-aa06-889eea2eed63** 1:48:35

No, I had no clue, but I just, you know, it's like this.

What we need to work on for next year?

 **Pamela O'Berry** 1:48:41

Right, right, right, right.

Alright.

Anything else unusual before you get to the procession procession out?

 **c910373a-72bd-476c-aa06-889eea2eed63** 1:48:50

No.

No, no.

 **Pamela O'Berry** 1:48:56

Alright, so you go through the ceremony.

I understand the folks on the diet processed out first to sort of create a greeting tunnel of some sort.

 **c910373a-72bd-476c-aa06-889eea2eed63** 1:49:04

Yeah, yeah.

 **Pamela O'Berry** 1:49:06

Alright.

And where were you once?

Once you know everybody got out and the greeting tunnel was sort of stationary, where were you within that tunnel?

 **c910373a-72bd-476c-aa06-889eea2eed63** 1:49:16

Yeah.

And so Jason.

You have Jason, a school board member.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I can't recall who it was.

And then I think it was Jonathan younger myself where Ohh side by side and what ended up happening was chasing and Jonathan and a couple of other board members actually went outside.

I actually there was a staff member.

Who actually got my attention?

I think to give me a hug or something.

Ohm who? Uh.

Who works in the district.

And so I was a bit delayed.

And I just heard the shots at the time.

I thought it was some balloons would be just some balloons that after whatever and at that point I just saw people running back in.

And so my first instinct, that principle as an administrator, what's to try to bring some calm to the situation?

And what I remember on the inside, which delayed me from getting outside was there was this.

Young man, you had to be all about.

Maybe in his mid 20s or 30s.

Kicking the door in some uproar.

You gonna F somebody up?

So in the middle of all of this chaos, I saw old people getting trampled and people getting pushed and kids getting pushed trying to get back in.

We had this pardon my language, this nut.

Trying to get back outside or calls like a fight or commotion.

I don't know what it was on the inside, but between myself and another, the guy we were like, calm down like.

Don't go back outside, but we need you to calm down.

And so we finally got him calm.

And then I was able to go outside and when I went outside, I see.

Sounds father Sean.

And there's another young man that looked like he had got shot in the back.

Yeah, three young ladies on the ground when I'm was hyperventilating.

And I also saw the teacher giving Sean mouth to mouth and some other adults trying to assist the young men.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And like he got shot in the back and at that point I went over to Jason.

And.

He was just in the state of shock.

And ohh.

And all I remember is saying let me call sharita.

I said we're gonna cancel TJ, he said yes.

So I called Sharia says he's the principal at TJ at the time to say, you know, there's been incident.

Please do a remind to say that Thomas Jefferson's you know, graduation will be rescheduled.

Rescheduled.

I'm sure you'll hear some more updates around the news, but there was a shooting, so tell her that so.

I look at Jason and Jason is just like, I can't believe it.

What are we gonna do?

So then my next call is to.

Renesha, you know she's the chief Wellness officer.

So a call renesha to let her know what had transpired.

And because, you know, we had some of our own our CSA where there and John Beasley was there.

I think that was his first day or second day.

Something weird like that.

Trying to explain to her what had transpired.

And it's funny because.

She called me back and said, Solomon, I did not understand the words you said, like it was some self taught.

Uh, but of course I was at, I guess, so much shock, myself, I didn't even realize that I wouldn't articulating, you know, the matter at hand, right?

So after I call after she called back to get clarity around what was going on, and by then she had already gotten the phone call.

Umm, I called shape Harris.

Who's our director of?

You know, I community relations, so we could, you know, actually get a statement out, you know, from the district and that sort of thing.

And so at that point, you know, the ambulance and everything had come and we

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

had.
And Rob and and Doctor Massa, who is actually the interim principal there, you
know, of course we, they were all standing by when the ambulance came to try to
get a report on the update on, you know, the kids.
But of course they put us out of the perimeter.

 **Pamela O'Berry**  1:54:36

Mm-hmm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:54:37

Ohh, because it was so much going on and of course we were a little offended at the
time, but of course they were doing their jobs.
Umm.
And so we were just outside trying to figure it out.
And the next question I remember Jason asking what would Jason fit?
Well, we gotta cancel all of the graduations.
And and I just remember saying to him, just let me handle it because we need to
think about the impact of that, right.
If their kids that if families from other schools like they work, what, 1213 years?
So this is they went to early childhood and so we have to give them something.

 **Pamela O'Berry**  1:55:18

Yeah.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:55:20

And so I just recalled him saying, yes, did you figure it out?

 **Pamela O'Berry**  1:55:25

Right.

 **c910373a-72bd-476c-aa06-889eea2eed63**  1:55:26

So then I called video E.
Ohm, the deputy Superintendent, just to kind of talk through our initial thoughts for
you know, what are we gonna close school?
Uh, for the next few days, just to kind of talk through some of those pieces.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And then, of course, they would like, you know, once you make a decision just.

You know, let us know, but I was just trying to, you know, run my thoughts by them to make sure we were in the line that.

And so yeah, I recall, I mean trying to, I think my role there was even though I was traumatized and shocked and the be completely honest, I mean, I've been in a lot of places that seem fights and things and other things that, but I've never seen like 3 bodies on the ground like.

Profusely bleeding.

You know what I mean?

It just, but my role was to support Jason and to try to make some sound decisions around like where we go from here.

Right.

And The funny thing about it is is I had happened to be out of town in April when they had the of actually at a conference for Jason when they had the shooting at George will.

So you know Jason has experienced more of the you know than I had at the time. Uh.

And so I just he was just in a really bad place.

I'm sure it's he will tell you or has told you.

And so, you know, I stayed around probably until about maybe 8:00 o'clock that night.

If not later, to make sure that all of the kids got back on the bus like the choir and all of those, they had to go back to the schools to make sure that the assistant principals had everything that they needed to communicate with families, that sort of thing.

And in fact, the board had gone back upstairs and Jason was confirmed with the police chief and all the other people.

And so I told him that I was gonna go up and talk to the board to try to give them some updates, even though I didn't have any updates, but also try to bring some calm to them.

They are a.

You make parts with their own individual personalities.

Uh, but I did, Jason says. Please.

So I go up and.

Ohm people, everybody together.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

I just kind of give them some updates and just share my thoughts with them and they were pretty much in alignment and but of course they had questions and they were speculating and making the extreme years baseless statements and the child must have went to Ras and just which is an alternative school.

It's just.

So.

Yep.

And then from there, I think my job was that night I spent a lot of time on the phone with.

The interim principle owes and of course principles calling, because they're concerned about their graduations.

Ohm and but a lot of community folks, even from Henrico, was I worked at Henrico wanting to support us.

Ohh and the other piece is was also talking to.

School board members to try to.

Ohm answer some of their questions, but again, like I said, a lot of the.

You know, and try to give them as much updates as possible, that all of them weren't reaching out, of course.

But there was specific ones that were so Needless to say, for me it was all.

It's like take it all in, but you still have a job to do.

Because the next day I spent.

Ohh, working on closing school because you know Jason finally made the decision to close schools, so work with the Communications department to put out. You know, school will be closed.

We're not gonna have.

And then I convened the meeting with principals that night.

Ohh took on the share.

My thoughts about rescheduling graduation and that sort of thing, and then after I put out, we put out the communication about closing schools and we weren't gonna have the 8th grade crossover for the kindergarten ceremonies.

Of course, that created this another layer of stress.

Ohh man.

Anxiety and questions from parents and then that spent by next two days and even the weekend.

I believe it was.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Yep, ohm.

Rescheduling graduations at schools.

Ohm.

Yep, so quite a few meetings with my teams around.

Redoing the tickets with the tickets look like how many seats will we give per school based on the number of things that are graduating.

Like just a lot of.

And then Renesha course took charge in terms of like the protocols can't bring in bags, that sort of, you know, so her and I work together quite a bit.

 **Pamela O'Berry**  2:01:11

Right.

 **c910373a-72bd-476c-aa06-889eea2eed63**  2:01:14

But yeah, that is where I spent most of.

I mean, that's what I did that night, and that's what I did.

For the next few days and then we had three days.

Please, just maybe two or three.

It's all a blur.

Days of rescheduled graduations that went off without a hitch.

Umm.

And I was relieved and ohm, I think I took a day.

And then I came back to work and started working on preparing for the next school year.

 **Pamela O'Berry**  2:01:46

Yeah.

 **c910373a-72bd-476c-aa06-889eea2eed63**  2:01:47

So.

 **Pamela O'Berry**  2:01:48

So are did you have the responsibility of making any putting together any staff statements just or collecting statements from any staff who were on the scene?

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **c910373a-72bd-476c-aa06-889eea2eed63**  2:02:03

No, just no.

 **Pamela O'Berry**  2:02:03

That day.

 **c910373a-72bd-476c-aa06-889eea2eed63**  2:02:04

Jason Jason took that on as well as I think he actually delegated it to renesha.

So now the school board kept asking for statements from Doctor Ramsey.

And don't you think they know who are Falcon was, but umm.

But yeah, so they eventually asked for statement that particular day.

I mean, in the day after my focus was on closing schools, communicating with VDOE to make sure we were in compliance, because you have to have a certain number of hours or days and you know that sort of thing.

So we wouldn't be dinged as a school system getting communication out around, you know, canceling of the ceremonies at fielding some parents phone calls, believe it or not, around their child not having us an eighth grade crossover for fifth grade crossover.

And yeah, rescheduling graduation, setting up practices for schools because it was a change.

Yeah.

So that was my primary role.

And then?

I would dare to say we kind of took a little break away from that and like I said, I started playing it for the school year and then, you know, I think the school board continue to ask questions and then that is when we kind of picked up again like, let's get statements from people that were there.

I never wrote a statement to be completely honest.

Yeah.

So, but I know the school but was more curious about getting one from Doctor Ramsey and who covered the door.

And we're all kids checked and that sort of thing, so.

 **Pamela O'Berry**  2:03:56

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And do you know which staff were specifically requested to provide statements or I guess RENESHA would know all that?

**c910373a-72bd-476c-aa06-889eea2eed63**  2:04:03

Yeah, Renesha wouldn't know, but I know I I was on the email chain where they asked about Doctor Ramsey and they did request getting statements from people who were at the side door.

Like I said, the other person that was at the side door was door Falcon, who was at the time our director of secondary success Pathways.

Jesus left, left us and just doing something else.

 **Pamela O'Berry**  2:04:27

OK.

Umm, I don't think I've seen that email request from the school board for which staff was requested to make statements, but I'll check in with Renesha on that.

**c910373a-72bd-476c-aa06-889eea2eed63**  2:04:39

Yeah.

Yeah, it was really more so.

They kept saying Doctor Ramsey, Dr Ramsey, Dr Ramsey and then they showed the Harris Muhammed was the one.

That kind of initiated then king you.

Gibson sent another change, and if I'm not mistaken, like they were the one and then Mariah White.

Kind of chimed in too.

So, but like nobody ever asked for a statement for me, I don't even think we got statements from the school board members. Umm.

**Pamela O'Berry**  2:05:03

OK.

Well, Mr Jefferson.

**c910373a-72bd-476c-aa06-889eea2eed63**  2:05:09

And I think part of it is is with this I mean you would assume that the police would have gotten the, you know, the statement that they needed from who you know.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

 **Pamela O'Berry**  2:05:11

Umm.

Yeah.

And to the extent the police have gotten those, we've steered clear because they have made it very clear that they would not allow us to sort of talk to anybody or interfere with the criminal investigation which which I get.

I've been on that side before, so I don't know what statements they do have, but I I will check with Renesha to see which statements which staff particularly were requested to make statements.

Is there anything I didn't ask that you? I know?

I asked this as sort of at the halfway point, but anything I have not asked that you think would be important to inform this review.

 **c910373a-72bd-476c-aa06-889eea2eed63**  2:06:00

Well, all I can say is I think the other piece that's critical as.

I stepped into.

Graduation outcomes and graduation logistics.

The piece that I'll say about graduation logistics that I was very maniacal about was making sure.

That we cause we had this contract with our trio that said that we had to have certain things in place.

You know, based on the number of people, uh.

And so there were a couple of places where they were like, well, we don't have the money for this.

You'll have the money for extra safety and security for nicia and I work through that maniacally to make sure that we've met all of you know, the things that were asked for in, you know, the Altria contract, right.

As relates to safety and you know and and and EMS, those types of things.

 **Pamela O'Berry**  2:07:00

Umm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  2:07:06

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

But again, I don't think anybody would have anticipated the need for more EMS or anything to that extent.

 **Pamela O'Berry**  2:07:06
Umm.

 **c910373a-72bd-476c-aa06-889eea2eed63**  2:07:13
But you know, I mean, our budget was cut severely this year for graduation, which made it really hard.
Uh, muse.
Cut about $45,000, if not more, maybe fifty $60,000.
So I mean, I just felt like that that year was just for me.
It's like trying to work miracles.
I mean, it was willing and dealing with people, I mean, it just was.
It's bad, it's really bad.
Thank God for Renesha in her having a budget and you know other departments working with us.
But I mean, from a logistical standpoint, it was challenging that year as well.
But I do know that we met the requirements and that R MC and I was very clear when I met with.
The Altria team about who was responsible for what?
Uh, that they had the responsibility for, you know, checking, you know, bags and those sorts of things.
And so, ah, yeah, I I think that's the last piece that I would add is that like logistically. We started.
Had a late there were some gaps because of gaps in.
Staff there were funding deficits because we overspent the previous year.
Somebody overspent the previous year so it just was, it was very challenging in addition to.
Academic side and you know, yeah.

 **Pamela O'Berry**  2:08:54
And that's one thing I did forget to ask, since you were you were the the sort RPS person designated to sign off on the RPS contract, which you had you all had negotiated with them.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

And I've read through that contract and basically, you know you it was really security was the venues responsibility and you all put CSA's inside the building as well.

**c910373a-72bd-476c-aa06-889eea2eed63**  2:09:22

Yeah, yeah.

**Pamela O'Berry**  2:09:25

It was there to, to, to the best of your knowledge, was there ever any discussion?

**c910373a-72bd-476c-aa06-889eea2eed63**  2:09:25

Yeah.

Yeah.

And so.

**Pamela O'Berry**  2:09:30

Detailed discussion about.

Wanding, or magnetometers or anything like that in your Altria discussions.

Or did they?

Kind of just say, look, we have the security package for the venue.

**c910373a-72bd-476c-aa06-889eea2eed63**  2:09:42

Yeah, there was no real detail conversation.

We did ask them what it looked like, but I think because they have been doing graduation there for so long, I mean, they were sort of like, yeah, we, we we use our MC all these years.

We haven't had any issues.

We got this, you know?

And so we never really.

Delved into that, but the reason we added our CSA is because we know that I mean and I'm not, I worked at him right though.

Uh, but if you go to the Siegel Center, it's a different experience.

And also if you go to even the graduation, that Henrico are different than the ones that I've experienced in Richmond.

Ohh in terms of like not to say that some of our parents aren't, they're not difficult.

Ain't right though.

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

It just looks different than different ways, but we know that we have some compliance challenges.

You know, some of our parents would bring some challenges.

So that's why we did at extra CSA.

Right.

 **Pamela O'Berry**  2:10:59

Based people being in the venue, I don't recall that that happened.

**c910373a-72bd-476c-aa06-889eea2eed63**  2:11:01

The. Yeah. Yeah. Yeah.

Yeah, because right didn't even have security guards until recently, so.

 **Pamela O'Berry**  2:11:11

Yeah.

Well, Mr Jefferson, I know I've warn you out and I appreciate you kinda pushing through and and indulging all of my questions and and helping me kind of understand it the the all the moving parts.

So I thank you for your time and for your candor and for your information.

**c910373a-72bd-476c-aa06-889eea2eed63**  2:11:34

Yeah, I appreciate it.

Yeah.

Feel free to call back if you have any more questions, OK.

 **Pamela O'Berry**  2:11:38

Alright.

Well, thank you so much.

**c910373a-72bd-476c-aa06-889eea2eed63**  2:11:41

Alright, thank you.

Have a good one.

 **Pamela O'Berry**  2:11:42

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

Alright, you too.

Bye bye.

**C**   **c910373a-72bd-476c-aa06-889eea2eed63**   2:11:44

Bye bye.

**c910373a-72bd-476c-aa06-889eea2eed63** left the meeting

**PA**   **Paulsrud, Kimberly A.**   2:11:49

I'm going to hang up now, Pam, cause we're recording.

**Pamela O'Berry**   2:11:51

OK, OK.

Yeah.

Do.

Ohh so there's no stop recording button.

You just hang up.

That stops it.

**PA**   **Paulsrud, Kimberly A.**   2:11:58

Yeah, but I'll call you right back.

**Pamela O'Berry**   2:12:00

OK.

Ohh I'm gonna run to a little ladies room this time.

For real.

**PA**   **Paulsrud, Kimberly A.**   2:12:04

I thought.

**Paulsrud, Kimberly A.** left the meeting

◉   **Paulsrud, Kimberly A.** stopped transcription

CONFIDENTIAL
ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE