IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| TYRA HARRISON | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No.: 3:24cv384 |
| | ) |
| RVA DIRT, LLC, *et al.* | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO REBECCA DUVAL'S MOTION TO DISMISS

Richard F. Hawkins, III, VSB #40666
THE HAWKINS LAW FIRM, PC
2222 Monument Avenue
Richmond, Virginia 23220
(804) 308-3040 (telephone)
(804) 308-3132 (facsimile)
rhawkins@thehawkinslawfirmpc.com

Counsel for Plaintiff

0

INTRODUCTION

"An individual's interest in protecting his good reputation from being falsely impugned, the interest at the core of modern defamation law, has been carefully guarded from time immemorial." *Wells v. Liddy*, 186 F.3d 505, 520 (4th Cir. 1999).  As Benjamin Franklin once said, 'Glass, China, and Reputation, are easily crack'd, and never well mended." *Pages v. Feingold*, 928 F. Supp. 148, 154 (D.P.R. 1996).

Here, DuVal falsely impugned Harrison's good name by making false and defamatory statements about her in her post titled "The Altria Shooting and the Attorney-Client-Public Report" (the "Article").  DuVall posted the Article on the RVA Dirt. LLC ("RVA Dirt") website on January 18, 2024[1], following the public release of an investigative report (the "Report") about a tragic shooting that occurred on June 6, 2023, immediately after a high school graduation ceremony at the Altria Theater in Richmond, Virginia. Relevant here, the Article, ***using information nowhere contained in the Report***, falsely said that Harrison, a lifelong educator and the *former* Executive Director of Teaching and Learning for the Richmond Public Schools ("RPS"), was an "aggrieved underling" (i) who "went after" the then-RPS Chief of Staff (Michelle Hudacsko) and "set off [a]. . . wave of resignations"; (ii) who "had been denied [the RPS Chief Academic Officer] position" "so she" retaliated by filing "unsubstantiated allegations of abuse against Hudacsko"; (iii) who "quit before she could be fired," and (iv) who, in essence, caused the entire leadership void that allowed the shooting to happen.  **None of these statements are true**.  Indeed, Harrison had nothing at all do with any of the circumstances surrounding the shooting.

---

[1] The Article is no longer posted on the RVA Dirt website.  Instead, a statement that says "404 Oops! Page Not Found" now comes up in its place.  *See* **Exhibit A** (screenshot of the "Not Found" page) and  https://www.rvadirt.com/blog/2024/1/17/0kni9rzwymzmiofwp30s6ha8gfvvlu (visited on August 25, 2024).  Nevertheless, from at least January 18, 2024 though early July 2024, the Article was publicly available on the RVA Dirt website.

Duval does not deny making her statements. Nor could she. For roughly six months, these falsities were etched in proverbial stone as part of the of the world wide web. *See infra* n.1. Instead, DuVal seeks to escape the consequences of her unlawful statements by making a host of arguments in support of dismissal, none of which has merit.

First, DuVal says many of her statements are non-actionable opinions, even though they are either statements that are "laden with factual content" where the underlying facts are false[2] or negative characterizations that are coupled with "clear but false implication[s] that the author is privy to facts about the person [here Harrison] that are unknown to the general reader"[3] In either case, when the statements are properly considered and construed under Virginia law, they state or imply *actual facts* about Harrison and are not mere opinions.

Second, DuVal says that some of her false statements lack the requisite defamatory "sting." DuVal is wrong. All of the statements at issue in this case (i) attack Harrison's fitness to perform her job duties and/or her integrity in the discharge of those duties and/or (ii) prejudice Harrison in her profession as an education professional.[4] This makes them defamatory *per se* under Virginia law and, in turn, means that they necessarily contain the requisite "sting" to make them actionable.[5] Stated otherwise, as defamatory *per se* statements, the article's false statements about Harrison, by definition, contain the necessary defamatory sting.

---

[2] *Goulmamine v. CVS Pharm, Inc.*, 138 F. Supp.3d 652, 660 (E.D. Va. 2015).

[3] *Baylor v. Comprehensive Pain Mgmt. Ctrs*., 2011 WL 1327396 at *11 (W.D. Va. Apr. 6, 2011) (quoting Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 4:3.2 (4th ed. 2010)).

[4] *Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588. 591 (Va. 1954) (listing types of statements that qualify as defamatory *per se* under Virginia law).

[5] *Green v. City of Portsmouth*, 2024 WL 1160681, *24 (Va. Ct. App. Mar. 19, 2024) ("The limited 'per se' categories of defamatory words ***inherently establish the required defamatory sting*** if adequately pled.") (emphasis added).

2

Third, DuVal attempts to invoke the "fair report privilege" affirmative defense. According to DuVal, for some of the defamatory statements that are sued upon here, she simply relied on, or repeated, statements from the Report, so therefore she cannot be liable if those statements were themselves defamatory. This position, however, is premature and disputed. Indeed, as Harrison explains in detail in the Complaint, DuVal did not merely repeat statements from the Report, nor did she portray any such statements in a "fair and substantially correct" manner. To the contrary, DuVal took certain information from the Report, blended it with dash of rumor and a splash of extra-Report falsity, and created a written concoction that was wholly her own. In other words, on the face of the Complaint, there is no way this Court can say as a matter of law that DuVal's creative license as to the information she used from the Report is a fair and substantially correct description of that information.

Fourth, DuVal tries to say – again, as a matter of law at the motion to dismiss stage - that the Article did not imply that Harrison was responsible for creating the circumstances that allowed the Altria Theater graduation shooting to occur. Again, DuVal is wrong. When the Article is properly viewed through the lens of such instructive cases as *Carwile v. Richmond Newspapers, Inc.*, 82 S.E.2d 588 (Va. 1954); *Schnupp v. Smith*, 457 S.E.2d 42 (Va. 1995); *Hatfill v. New York Times, Co.*, 416 F.3d 320 (4th Cir. 2005); and even *Depp v. Heard*, 104 Va. Cir. 377 (Fairfax 2020), DuVal's narrative created the clear and unmistakable picture that Harrison – *by her alleged lack of leadership at RPS, her alleged actions in causing a leadership vacuum at RPS and her absence in June 2023* – bore blame for the shooting. Now, did DuVal explicitly write the words "Harrison was at fault"? No. But she did not need to. As the Supreme Court of Virginia stated seventy years ago, "it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory." *Carwile*, 82 S.E.2d at 592. That is the case here.

Finally, DuVal seeks refuge in Virginia's Anti-SLAPP[6] statute. Specifically, she seems to believe that Va. Code. § 8.01-223.2's immunity applies here because, according to her, Harrison did not allege in the Complaint facts sufficient to show that DuVal published her defamatory words with *New York Times* "actual malice" – that is, with "reckless disregard for whether they were false." Def's. Br. at 17. DuVal's position, however, wrongly rests on the assumption that Virginia's Anti-SLAPP immunity is only ***in***applicable if "actual malice" is shown or plausibly alleged. This is not the case. Instead, as fully explained herein, Virginia's Anti-SLAPP immunity is inapplicable in ***two*** situations (i) where the victim of defamation shows that the statements were published with "actual malice" ***or***, (ii) as is true here, where victim shows simple negligence – that is, that the declarant "knew *or **should have known***" that his defamatory statements were false. This latter standard, unlike its "actual malice" counterpart, is not difficult to meet (especially at the motion to dismiss stage), and, as more fully explained herein, it is satisfied here.

In sum, the Complaint alleges facts which satisfy all of the necessary elements of a defamation claim under Virginia law, and none of DuVal's dismissal arguments prove otherwise. As such, DuVal's motion to dismiss should be denied in its entirety.

## STANDARD OF REVIEW

On a Rule 12(b)(6) motion, "the task at hand is to determine the sufficiency of the complaint." *Daly v. Virginia*, 2014 U.S. Dist. LEXIS 82531 at *2 (E.D. Va.  June 17, 2014). In doing so, a court starts and ends with Federal Rule 8(a)(2).  According to Rule 8, all a complaint is required to contain is a "short and plain statement of the claim showing that the pleader is entitled to relief."  FED.R.CIV.P. 8(a)(2).  This standard is the hallmark of "Notice Pleading" under the Federal Rules, and its purpose

---

[6] Anti-SLAPP laws "aim to discourage the filing of SLAPP suits" – "Strategic Lawsuits Against Public Participation." Austin Vining and Sarah Matthews*, Introduction to Anti-SLAPP laws* https://www.rcfp.org/introduction-anti-slapp-guide/ (visited on August 25, 2024).

4

is simply "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Indeed, under notice pleading standards, this Court must accept all well-pleaded facts in the complaint as true and must construe all reasonable inferences arising therefrom in favor of the plaintiff. *Nemet Chevrolet, Ltd. V. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

In its *Twombly* and *Iqbal* decisions from 2007 and 2009 respectively, the Supreme Court refined the Rule 12(b)(6) standard and created the "plausibility standard." This standard is satisfied if a plaintiff's complaint contains "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Even so, "*Twombly* and *Iqbal* did not rewrite Rule 12(b)(6) or abandon notice pleading." *Williamson v. Walmart Stores, Inc*., 2015 U.S. Dist. LEXIS 45657 at *14-15 (M.D. Ga. April 8, 2015). The plausibility standard, for example, does not require "detailed factual allegations." *Twombly*, 550 U.S. at 555, nor does it require a complaint "to allege ***all*** the facts that could permit the plaintiff to obtain relief." *Trail v. General Dynamics Armament & Tech. Prods.*, 697 F. Supp.2d 654, 657 (W.D. Va. 2010) (emphasis added). It simply requires a complaint to provide "more than labels and conclusions." *Snipes v. Southwest Virginia Regional Jail Authority*, 350 F.Supp.3d 489, 495 (W.D. Va. 2019).

Additionally, "the Court in *Twombly* did not elevate the pleading standard applicable to a motion to dismiss to something akin to the standard which applies at the summary judgment stage." *E.I. Dupont de Nemours and Co. v. Kolon Industries, Inc.*, 688 F. Supp.2d 443, 459 (E.D. Va. 2009). In *SD3, LLC v. Black & Decker (U.S.) Inc*., 801 F.3d 412, 425 (4th Cir. 2015), for example, the Fourth Circuit reminded district courts "not to import the summary-judgment standard into the motion-to-dismiss stage" and, in turn, "not to subject the complaint's allegations to the familiar 'preponderance of the evidence' standard." It explained: "[w]hen a court confuses probability with

plausibility, it inevitably begins weighing the competing inference that can be drawn from the complaint." *Id*. This, the Fourth Circuit said, is "not our task." *Id*.  As such, with these sentiments in mind, district courts should be especially wary at the motion to dismiss stage of – consciously or unconsciously – "impos[ing] a heightened pleading requirement … [which] does not apply on a Rule 12(b)(6) motion." *Id*. Indeed, "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations." *Id*. at 428 (citation omitted).

### OBJECTION TO DEFENDANT'S "LEGAL STANDARD" SECTION

Harrison begins by objecting to the heightened pleading standard proposed by DuVal in the "Legal Standard" section of her Brief.  Specifically, citing non-binding decisions from the District of Columbia District Court[7] and the District of Columbia Circuit, respectively, and citing and quoting Judge Hilton's unpublished decision in *Arthur v. Offit*, 2010 WL 883745 (E.D. Va. Mar. 10, 2010), DuVal says that "federal courts have historically given ***close scrutiny*** to pleadings in libel actions." Def's. Br. at 5 (quoting *Offit* at *3) (emphasis added).  In other words, she argues that plaintiffs in defamation cases – including Harrison here – must be held to a higher standard under Rule 8 than other civil plaintiffs. This position not only has no merit, it is incompatible with Fourth Circuit precedent.

The erroneous nature of DuVal's heightened pleading standard is best illustrated by the motion-to-dismiss decisions from this Court and the Fourth Circuit in the highly publicized anthrax mailing case of *Hatfill v. New York Times*.  There, the operative legal question was whether, at the Rule 12(b)(6) stage, several New York Times articles about the deadly anthrax mailings in 2001

---

[7] While neither of the two District of Columbia federal decisions are binding upon this Court or otherwise persuasive, the decision in *Kahl v. Bureau of Nat'l. Affs., Inc.*, 856 F.3d 106, 113 (D.C. Cir. 2017) is particularly inapposite to DuVal's motion to dismiss since it involved a district court's summary judgment decision, not motion to dismiss decision.

unlawfully defamed Dr. Steven Hatfill, a research scientist with the Department of Defense, when they focused solely on him as a potential person of interest regarding the mailings.[8] Hatfill claimed the articles implied that *he sent* the anthrax letters and thus defamed him, while the New York Times argued otherwise, claiming that, under Virginia law, the articles did not actually imply that he *was responsible* for the mailings.

At the trial court level, Judge Hilton ruled in favor of the New York Times. Applying both (i) the same strict pleading standard language cited by DuVal in her brief *and* (ii) D.C. District Court case law,[9] Judge Hilton held the articles were not "reasonably capable of being understood to convey either an accusation that plaintiff [was] the anthrax mailer or an intention by the author to make such an accusation." *Hatfill v. New York Times, Co.*, 2004 WL 3023003, *8 (E.D.Va. Nov. 24, 2004). As such, he dismissed the Complaint. *Id.*

On appeal, the Fourth Circuit disagreed. In fact, not only did it reverse Judge Hilton's Rule 12(b)(6) dismissal decision, it also directly addressed the proper pleading standard under Rule 8 for defamation claims. Noting that Judge Hilton had expressly commented in his opinion that Rule 12(b)(6) needed to be "applied with particular care" in the defamation context, the Fourth Circuit said this was not the correct analysis. It explained:

> A defamation complaint, ***like any other civil complaint in federal court***, must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), sufficient to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests," *Conley*, 355 U.S. at 47, 78 S.Ct. 99. While the Federal Rules of Civil Procedure require more specific pleading in certain cases, ***defamation cases are not among them***. See Fed.R.Civ.P.

---

[8] *Hatfill v. New York Times Co.*, 416 F.3d 320, 324 (4th Cir. 2005).

[9] Judge Hilton expressly relied on the District of Columbia District Court's decision in *Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26, 30 (D.D.C. 1995), *aff'd*, 88 F.3d 1279 (D.D. Cit. 1996) for the proposition that "it is particularly appropriate for courts to scrutinize such actions at an early stage of the proceedings to determine whether dismissal is warranted." *Hatfill*, 2004 WL 3023003, *5.

9(b). Thus, ***the usual standards of notice pleading apply in defamation cases*** such as this one.

*Hatfill*, 416 F.3d at 330 (emphasis added).  The Court of Appeals said that "[t]o the extent that the district court applied a stricter standard to Hatfill's complaint than the ordinary standards under Rule 12(b)(6), ***that was error***."  *Id.* (emphasis added).

DuVal invites similar error here with her proposed stricter Rule 8 standard for defamation cases.[10]  Specifically, by asking this Court to give "close scrutiny" to Harrison's defamation claim at the motion to dismiss stage of the case, she seeks to apply the same heightened "particular care" pleading standard that the Fourth Circuit rejected in *Hatfill*.  As such, this Court should decline DuVal's invitation, and instead, should follow the ordinary non-heightened pleading standards under Rule 8 for civil actions. As Judge Lauck explained *Santos v. Christian*, 2015 WL 7738353 (E.D. Va. Nov. 30, 2015):

> The Fourth Circuit explicitly has held that "[w]hile the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them." *Hatfill*, 416 F.3d at 329. Thus, courts in the Fourth Circuit have consistently ruled that complaints containing a "short and plain" statement of the alleged defamation ***satisfy pleading requirements and do not warrant dismissal***.

*Id.* at *4.[11]  Harrison easily satisfies this standard here.

---

[10] While *Hatfill* was decided prior to *Twombly* and *Iqbal*, the Fourth Circuit, post *Twombly* and *Iqbal*, has fully endorsed its "usual standards of notice pleading apply in defamation cases" rule of law, and it remains the controlling rule in this Circuit.  *See, e.g., Mayfield v. National Ass'n. for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377 (4th Cir. 2012) (citing *Hatfill* and expressly re-iterating the "usual standards" rule of law for defamation cases).  *See also Fairfax v. CBS Corporation*, 2 F.4th 286, 293 (4th Cir. 2021) (quoting *Mayfield* approvingly as to the "usual standards" for defamation claims). That Judge Hilton seemingly again invoked a heightened pleading standard for defamation cases in his unpublished post *Hatfill Offit* decision does nothing to lessen the precedential or controlling force of *Hatfill*.

[11] *See also Mann v. Heckler & Koch Defense, Inc.*, 2008 WL 4551104, *8 (E.D. Va. Oct. 7, 2008) ("applying Virginia law, the Fourth Circuit has made it clear that ***no heightened pleading standard applies to defamation claims***") (citing *Hatfill* and *Southprint, Inc. v. H3, Inc.*, 208 Fed. Appx. 249, 254 n.2 (4th Cir. 2006)) (emphasis added).

SUPPLEMENTATION TO DuVAL'S "BACKGROUND" SECTION

In the "Background" section of her Brief, DuVal purports to summarize allegations from the Complaint. DuVal's recitation is materially incomplete, however, and requires additional detail. Specifically, additional detail is necessary about RVA Dirt, for whom DuVal published her false and defamatory statements about Harrison, to show how it portrays itself and its authors to the public. As well, additional details are necessary about the Report and the full text of the RVA Dirt post. We address each of these items.

A.    **RVA Dirt Bills Itself As A Trusted Source Of Factually True Information.**

First, RVA Dirt does not bill itself as a mere gossip rag, a tabloid, or an op-ed column. Instead, it touts itself as an expert on all matters involving the Richmond City Council and the Richmond City School Board. It proudly says, for example, that its members are "self-appointed"[12] "Local Government Watchdogs" and that they are "Digging Up The ***Truth***."[13] (emphasis added).

---

[12] https://www.rvadirt.com/about-us (visited on August 23, 2024). A full screen shot of the "About Us" webpage on the RVA Dirt website is attached as **Exhibit B**. It is appropriate to consider the website information contained on this screenshot (and the other screenshots attached to this Memorandum) either as a matter of judicial notice or through the incorporation by reference doctrine. *See, e.g., Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) ("A court may take judicial notice of information publicly announced on a party's website, so long as the website's authenticity is not in dispute and it is capable of accurate and ready determination."); *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.,* 325 F. Supp.3d 728, n. 3 (N.D. Tex. 2018) (over defendant's objection, taking judicial notice of defendant's website on Rule 12(b)(6) motion to dismiss because "the website is a source whose accuracy cannot be (and has not been) reasonably questioned by Defendants."); FED R. EVID. 201(b); 201(C)(2); 201(d). *See also Spy Optic, Inc. v. Alibaba.com, Inc.*, 163 F. Supp.3d 755. 763 (C.D. Cal. 2015) (taking judicial notice of screen shots of one of defendant's website under the doctrine of incorporation when deciding Rule 12(b)(6) motion). Indeed, Harrison specifically cited to and relied on facts from the RVA Dirt website in paragraphs 1 and 2 of the Complaint. *See* Complaint, ¶¶ 1-2, n.1 & n. 4.

[13] https://www.rvadirt.com/ (visited on August 23, 2024). A full screen shot of the opening page of the RVA Dirt website is attached as **Exhibit C**.

RVA Dirt also calls itself a "go to source" for "reliable coverage" about City Council and School Board matters. **Exhibit B** (emphasis added).[14]

On that same webpage, RVA Dirt goes into detail why readers should trust its posts.  As the screenshot below shows[15], RVA Dirt touts its "***reliable*** analysis" and "***fact-based***" recaps.

| | |
|---|---|
| **01.**<br>**–FACT-BASED RECAPS**<br><br>We go to the meetings, do our research, and relay what we learn. We're more "commenters" than journalists, but when we share our opinions, we'll share the receipts supporting them, too. | **02.**<br>**–RELIABLE ANALYSIS**<br><br>*Why did that happen?* and, *Why does it matter?* We consider the local, national, and historical context to better understand the events unfolding in the River City. |
| **03.**<br>**–ENGAGING COMMUNITY CONVERSATIONS**<br><br>Come for the dirt - stay for the jokes! Our irreverent punditry is cheeky, honest, and ripe for public engagement. | **04.**<br>**–ACCESSIBLE INFORMATION**<br><br>Can't make it to a 5 hour Board Meeting, or find a ride to (or parking at) City Hall? We reach across these equity barriers to bring the latest news right to your Twitter feed, Youtube, and airwaves. |

*See* **Exhibit B**.

And, even when RVA Dirt offers its so-called opinions about a topic, it does so based *on facts*. As it explains: "We go to the meetings, ***do our research***, and relay ***what we learn***. We're

---

[14] https://www.rvadirt.com/about-us (visited on August 23, 2024).

[15] https://www.rvadirt.com/about-us (visited on August 23, 2024)

more 'commenters' than journalists, but when we share our opinions, ***we'll share the receipts supporting them, too.***" *Id.* (emphasis added).

Finally, even though it calls itself "cheeky" and "irreverent," RVA Dirt still portrays itself as a provider of fact-based educational information. Importantly, it says it provides "edutainment -- a portmanteau of *educational* entertainment -- which is "media designed to ***educate*** through entertainment."[16] (emphasis added). In other words, while it strives to be fun – even funny -- and get the reader's attention with quirky and engaging word choices, RVA Dirt is, at bottom, an entity that provides factual *information* – information that, it says, will allow "Richmond residents . . . to confidently vote their interests at the ballot box."[17]

**B.     The Report And The Article.**

Second, DuVal's brief omits a few important details about both the Report and the actual article itself.

Regarding the Report, DuVal's brief omits the fact that the Report did ***not*** focus on the actual *cause* of the graduation ceremony shooting. Indeed, the Report expressly states that the law firm which drafted the Report was not charged with trying to determine "[w]hether the shooting at Huguenot High School could have been prevented" or making any "[r]ecommendations regarding personnel matters in light of the June 6, 2023 shooting."[18]

Regarding the Article, DuVal's Brief minimizes the way the Article focuses on Harrison, saying DuVal simply mentions Harrison "a handful of times" but also names "numerous RPS employees and board members." Def. Br. at 1. This is too myopic and conspicuously ignores the

---

[16] https://en.wikipedia.org/wiki/Educational_entertainment (visited on August 25, 2024).

[17] https://www.rvadirt.com/ (visited on August 23, 2024). *See also* **Exhibit B**.

[18] https://resources.finalsite.net/images/v1705512766/rvaschoolsnet/uoot32dcg4qelktc7y1q/RedactedSandsAndersonReport1.pdf (visited on August 25, 2024).

entire narrative journey that the Article takes.

To be sure, the first 30% of the Article focuses on details about the shooting and, in general, RPS's failure to properly assess safety concerns about the graduation ceremony. In doing so, the Article provides background about the Report (including a discussion about the VFOIA litigation), discusses School Board members' apparent motivations for authorizing the investigation at issue in the Report, and provides a list of 13 bullet points of information contained in the Report. **Ex. 1** to Def's. Br., p 1-5. The Article summarizes these topics with a section that says "**Basically, this $25K report tells us:**" *Id.* at 5 (bold in original). <u>**Nowhere**</u> in this first 1/3 of the article is Harrison mentioned – either directly or indirectly.

The Article, however, conspicuously shifts gears at this point and completely changes its focus. With ominous foreshadowing, the Article says "this report is damning . . . ***just not for the reasons Board blowhards told local <u>media</u>.***" **Ex. 1** to Def's Br., p. 5 (emphasis added). The Article then begins an entirely new section, titled with the attention-grabbing and bolded headline of "**My God, this is such a messy story**" (**Ex. 1** to Def's Br.) (emphasis in original), and starts the first sentence of its first paragraph of the section with the words: "The ***<u>real shoe drops</u>*** around page 251 of the 1132 pages of interview transcripts." *Id.* (emphasis added).

That proverbial "shoe" dropped on Harrison. To set up this "drop," this new section first adopts the thesis that a large number of vacancies in the RPS central office helped cause RPS's failure to properly assess safety concerns for the graduation ceremony. Indeed, DuVal says RPS's central office was so full of 'high profile vacancies' . . . . that their organizational chart looked like Swiss cheese." **Ex. 1** to Def's. Br. at p.5. DuVal also portrays Solomon Jefferson, the RPS Chief Academic Officer of Secondary Instruction, as the last man standing at RPS -- who had to "fend for himself alongside a skeleton crew" – by the time of the ceremony. *Id.* at 6.

Within this new and unique narrative context, the Article turns to *Harrison* and alleges that **_she_** exacerbated the leadership vacuum at the RPS central office by, *inter alia*, "going after" Michelle Hudacsko (the RPS Chief of Staff) and, in turn, setting off a wave of resignations and quitting *before she could be fired.* The Article portrays Harrison as an "aggrieved underling," who was angry at RPS because she was allegedly passed over the position of Chief Academic Officer at RPS. In relevant part, it says:

> Solomon was overseeing this transition, Austin's portfolio of principals, and his own, when his boss, Tyra Harrison, Director of Teaching and Learning, ( 🌱 note:and another aggrieved underling) "went after" the Chief of Staff, Michelle Hudacsko, and set off another wave of resignations.
>
> Tyra "was supposed to be leading the department in the absence of a Chief Academic Officer." The last CAO, Tracy Epp, had resigned a couple of months earlier; but really, the position had been vacant long before then. (Epp had been out on FMLA.)
>
> Epp was the second of three cabinet members the School Board would drive out of the division: COO Gonzalez, CAO Epp, COS Hudacsko.
>
> Rumor has it that Tyra had been denied that CAO position, so she filed unsubstantiated allegations of abuse against Michelle Hudacsko, took her own FMLA break, then (per a source) "quit before she could be fired." (Obligatory note: Tyra's perspective is not represented in this report, and I'm sure she'd have much to say about these characterizations UPDATE, she describes this a "very poor representation of this story.")
>
> Solomon tells investigators that Tyra and Tracy "were there, [but] they weren't really present…" which left "other folks holding the bag."

**Ex. 1** to Def's Br., p. 6.[19]  The information noted above that is not derived or implied from the Solomon Jefferson transcript is highlighted with **red lines**.

As for how the Article creates a narrative that lays blame on Harrison for causing a vacuum that allowed the graduation ceremony shooting to take place, we turn to the final section of the

---

[19] None of this proper context is included in DuVal's Brief.  Instead, she seeks to compartmentalize the article's statements about Harrison into discrete and isolated segments.  She also wants to talk generally about how the Article allegedly "overwhelmingly focuses on vacancies in leadership positions with RPS that were present during the 2022-2023 school year," *see* Def. Br. at 3, without including the necessary details about what *caused* the vacancies.  *See* **Ex. 1** to Def's Br., p. 6

Article, titled "**SO. Let's connect Dots.**" *See* **Ex. 1** to Def's Br. at 7 (emphasis and capitalization

in original).  There, the Article first places direct blame for the shooting on the failure of the student

victim's counselor to alert her principal or other members of school leadership about safety

concerns relating to the student victim.  But the Article *also* blames RPS leadership – including

Harrison specifically – for the shooting.   It says:

> *Don't get me wrong*. The counselor still should have told someone! But the responsibility of managing
> Shawn's (complicated) path to graduation never should have landed solely on the shoulders of any
> Virginia School Counselor. Our state's "standards of quality" (quite a misnomer) expects these
> counselors to juggle a student caseload of more than 300 students – which far exceeds the 250-caseload
> limit that national experts recommend. Solomon calls Ms Harris "one of our hardest working
> counselors" a calling her "insightful" and "empathetic." Mom showers her with praise. Nevertheless –
> per this report – she messed up big time.
>
> Someone from central office probably should have thought to ask – to identify particularly challenging
> cases and offer support. But the woman (Tyra) responsible for the 2023 graduations was a no-show
> after "about a month" on the job – and the guy (Solomon) forced to fill her shoes was "actually doing 3
> jobs" and didn't even "have a high school background."

*See* **Ex. 1** to Def's Br. (emphasis added).  In sum, connecting "someone from central office" with

"Tyra" as the "woman responsible for the 2023 graduation" and then calling her a "no-show after

'about a month' on the job" blames *Harrison* personally for the circumstances that allowed the

shooing to happen.  These dots are connected with the highlighted orange lines.

**ARGUMENT**

**DUVAL'S MOTION TO DISMISS MUST BE DENIED IN ITS ENTIRETY**

**I.    GENERAL PRINCIPLES FOR DEFAMATION CLAIMS UNDER VIRGINIA LAW**[20]

**A.    Elements Of Defamation Under Virginia Law.**

To prevail on a defamation claim in Virginia, a plaintiff must prove "a publication of false

information concerning the plaintiff that tends to defame the plaintiff's reputation."  *Hatfill v. New*

---

[20] Because this case is before this Court on diversity jurisdiction (28 U.S.C. § 1332), Virginia law
applies to Harrison's claim. *See, e.g., Jarrell v. Kroger Ltd. P'ship*, 33 F. Supp.2d 645, 649
(E.D.Va. 2014).

*York Times Co.*, 416 F.3d 320, 330 (4th Cir. 2005) (relying on *The Gazette, Inc. v. Harris*, 325 S.E.2d 713 (1985)). This involves three elements: "(1) publication of (2) an actionable statement with; (3) the requisite intent." *Chapin v. Knight Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993). "To be 'actionable,' the statement must not only be false, but also defamatory, that is, it must tend[] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Chapin*, 993 F.2d at 1092.

**B.    "Gatekeeping" Is Not Shorthand For Dismissal.**

Trial courts applying Virginia defamation law must also, as Duvall correctly notes in her Brief, *see* Def. Br. at 6, exercise a "gatekeeping function" to determine if the allegedly defamatory statements are "reasonably capable" of "defamatory meaning." *Webb v. Virginian-Pilot Medica Companies, LLC*, 752 S.E.2d 808, 812 (Va. 2014). This "gatekeeping" role, however, does not mean that trial courts must reflexively dismiss or reject any defamation claim that is challenged by a defendant at the motion to dismiss stage. To the contrary, the "gatekeeping" function simply asks a court to decide whether the statement at issue, together with the circumstances surrounding its making and publication, would "reasonably cause the statement to convey a defamatory meaning to its recipients" *Pendleton v. Newsome*, 772 S.E.2d 759, 763 (Va. 2015). As the Supreme Court of Virginia has explained:

> Allegations that such circumstances attended the making of the statement, with an explanation of the circumstances and the defamatory meaning allegedly conveyed, will suffice to survive demurrer if the court, in the exercise of its gatekeeping function, deems the alleged meaning to be defamatory. Whether the circumstances ***were reasonably sufficient to convey the alleged defamatory meaning***, and whether the plaintiff was ***actually defamed thereby***, remain issues to be resolved by the ***fact-finder at trial***.

*Id.* at 763 (emphasis added). *See also Vivera Pharmaceuticals, Inc. v. Gannett Co., Inc.*, 107 Va. Cir. 394, 2021 WL 6550461, at *1-2 (City of Fairfax 2021) (explaining "gatekeeping").

II.     THE COMPLAINT STATES A PLAUSIBLE CLAIM FOR DEFAMATION.

In the first four "Argument" sections of her Brief, DuVal tries to break down the allegedly defamatory statements in this case and then assert, for various different reasons, that none of them can support Harrison's defamation claim in this case.  DuVal is wrong at every turn.

A.     Statement 1 States Facts And Contains The Requisite Defamatory Sting.

First, DuVal says that the Article's statements calling Harrison an "aggrieved underlying" who "went after" the RPS Chief of Staff, Michelle Hudacsko, and set off a wave of resignations at RPS's central office, *see,* Complaint, ¶ 28; **Ex. 1** to Def's. Br. at 5, are simply opinions and/or lack the requisite defamatory sting under Virginia law.  DuVal is wrong on both fronts, and, indeed, she improperly analyzes these statements without reference to the *entirety* of the Article.

1.     Whether An "Aggrieved" Harrison "Went After" Hudacsko
       And "Set Off" A Wave Of Resignations Are Verifiable Facts.

In Virginia, defamatory speech must "contain a ***provably false factual connotation***, or statements which [can] *reasonably be interpreted as stating actual facts* about a person." *Fuste v. Riverside Healthcare Ass'n*, 575 S.E.2d 858, 861 (Va. 2003) (quoting *Yeagle v. Collegiate Times*, 497 S.E.2d 136, 137 (Va. 1999)) (emphasis added). While "pure expressions of opinion are not actionable" for defamation, the Supreme Court of Virginia has long held that "'factual statements made ***to support or justify an opinion*** . . . can form the basis of an action for defamation.'" *Raytheon Tech. Servs. Co. v. Hyland*, 641 S.E.2d 84, 90 (Va. 2007) (quoting *Williams v. Garraghty*, 455 S.E.2d 209, 215 (Va. 1995) (emphasis added); *Restatement (Second) of Torts*, § 566 cmt. a (1977) (false statement of fact "expressly stated or implied from an expression of an opinion" subject to defamation under common law). Stated another way, "even opinion statements are actionable if they 'imply an assertion of fact.'"  *Depp v. Heard*, 107 Va. Cir. 80, 2021 WL 6550462, *4 (County of Fairfax Jan. 4, 2021)

16

"To determine whether a statement posits facts, the Court must look to the actual language used, as well as the context and general tenor of the statement." *Potter v. AP*, 2015 U.S. Dist. LEXIS 92303 at *17 (E.D. Va. July 15, 2015). The "Fourth Circuit makes clear that the court *must* consider the context of an allegedly defamatory statement in the analysis of whether the statement constitutes opinion." *Id.* (emphasis in original) (citing *Snyder v. Phelps*, 580 F.3d 206, 219-220 (4th Cir. 2009)). Virginia law too says "[i]n determining whether a statement is one of fact or opinion, a court may ***not*** isolate one portion of the statement at issue from another portion of the statement. . . . .Rather, a court must consider the statement as a whole." *Hyland v. Raytheon Tech. Servs. Co.*, 670 Va. S.E.2d 746, 751 (Va. 2009) (emphasis added).

Here, all of the statements at issue are factual or imply facts. For example, whether Harrison "went after" Hudacsko is capable of being proven true or false – especially when the allegation is viewed through the lens of the article's statement three paragraphs later that (falsely) says Harrison filed unsubstantiated charges against Hudacsko because she was denied the CAO position at RPS. Indeed, the connected nature of these allegations indicates that: (i) Harrison was denied the CAO position; (ii) *as such*, Harrison filed unsubstantiated charges against Hudacsko; and (iii) Harrison's actions in filing these charges *caused* a wave of resignations.  In other words, the "went after" allegation must be contextually tethered to the alleged filing of unsubstantiated charges and the alleged denial of the CAO position.

As well, the entirety of the statements about Harrison under "Statement 1" (and the other Statements too) communicate to a reasonable listener that DuVal knows more than she is telling and has more *facts* in her cupboard that have yet to come out. This too makes them actionable. As has been noted, "[d]efendants can be held liable for defamation 'when a negative characterization ***is coupled with*** a clear but false implication that the author is privy to facts about the person that

are unknown to the general reader.'" *Baylor v. Comprehensive Pain Mgmt. Ctrs.,* 2011 WL 1327396 at *11 (W.D.Va. Apr. 6, 2011) (quoting Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 4:3.2 (4th ed. 2010)) (bold added). "The test for determining whether facts that may be actionable defamation may be implied is 'whether the reasonable listener would take [the speaker] to be basing his opinion on knowledge of facts of the sort that can be evaluated in a defamation suit.'" *Id.* at *11 (quoting Sack, § 4:3.2).

Here, this test is satisfied. Harrison has clearly alleged a situation where a reasonable listener would take DuVal to be basing her "went after" and/or "aggrieved underling" statements on knowledge of undisclosed facts of the sort that can be evaluated in this defamation suit. Among other things, the "unspoken facts that could be evaluated in [this] defamation suit"[21] are (i) what were the so-called "charges" Harrison allegedly filed against Hudacsko? (ii) what are the facts that underlie the Article's claim that Harrison was an "aggrieved underling"?; and (iii) what facts exist to show that Harrison's actions caused other people to resign? All of these are reasonable and fair inferences, and all of them, when they are resolved – as they must be – in Harrison's favor – allow for the conclusion that the Article's statements are capable of defamatory meaning. *See Carwile v. Richmond Newspapers*, 82 S.E.2d 588, 592 (Va. 1954) ("[E]very fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor.").

Indeed, faced with similar mixed opinion/fact statements, federal courts[22] in Virginia have

---

[21] *Reynolds v. Pionear*, 2016 WL 1248866 at *6 (E.D. Va. Mar. 25, 2016).

[22] *See, e.g., Baylor*, 2011 U.S. Dist. LEXIS 37699 at *33-34 (statement that plaintiff was "let go for 'ethical reasons" was not opinion on a motion to dismiss, "whether someone was terminated for ethical reasons can be proved true or false. …The term 'ethical reasons' used in this context suggests that Dr. Baylor was terminated for a violation of a code of medical ethics, something more serious than unprofessionalism."); *Andrews v. Virginia Union Univ.*, 2007 U.S. Dist. LEXIS 85273 at *27-28 (E.D. Va. Nov. 19, 2007) (holding that on a motion to dismiss, statements that a

routinely held that seemingly opinion statements -- such as saying (i) that a person was let go for "ethical reasons", (ii) that students were "misadvised" by their college advisor; (iii) that a teacher was "abrasive, unprofessional and rude," or (iv) that an employee was let go from her job because she made a "grievous mistake" from which "there was no recovery" -- were actually verifiable fact-based statements *when viewed in the full context in which they were made*.  The same is true here, especially at the motion to dismiss stage.

Further, as here, "[w]here an individual is engaged in a profession, such as medicine, law, or ***teaching*** . . . 'words charging professional incompetence are actionable per se." *Lamb v. Weiss*, 62 Va. Cir. 259, 267 (City of Winchester Cir. Ct. 2003).  This is true even where the words do not, at least on the surface, seem factual. *See Echtenkamp*, 263 F. Supp.2d at 1064 (holding on a motion to dismiss, that statements that teacher "was abrasive, unprofessional, and rude" were actionable as defamatory).[23] Indeed, in *Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 34, 43 (Va. 1987), the Supreme Court of Virginia held that criticisms of a teacher as "disorganized, erratic, forgetful, and unfair" and as someone who "demeans and humiliates" her students were fact-based statements capable of being defamatory. The Court said that while "[m]any of the potential defamatory statements . . . were intermingled with what were arguably statements of opinion, . . . the jury could consider those opinions as 'laden with factual content.'"  *Id.* at 44 n.8.

---

professor had "misadvised" students at the University was laden with factual content and was capable of being proven true or false); *Potter v. The Associated Press*, 2015 WL 4393401 at *7-8 (E.D. Va. July 15, 2015) (holding that on a motion to dismiss, court needed additional context to determine if statement that plaintiff had committed a "grievous mistake" from which "there was no recovery" was opinion or fact); *Echtenkamp v. Loudon County Pub, Schs,*, 263 F. Supp.2d 1043, 1064 (E.D. Va. 2003) (holding that on a motion to dismiss, statements that a teacher "was abrasive, unprofessional, and rude" were actionable for a defamation claim).

[23] That Harrison is an educational professional, *see* Complaint, ¶¶ 9-10, materially distinguishes her from the plaintiff in *Raytheon Tech Servs. Co. v. Hyland*, 641 S.E.2d 84 (Va. 2007).

As a final matter, while RVA Dirt's website may seem cheeky, the fact that the defamatory statements in this case appeared as a blog post does not negate their defamatory nature. The case of *Leask v. Robertson*, 589 F. Supp.3d 508, 523 (D.S.C. 2022) addressed this issue directly, and did so where, as is true here, a defendant simultaneously claims that allegedly defamatory blog posts are, on the one hand, opinions and, on the other, matters of public concern. It stated:

> Defendants argue . . . that the court may take into account the "general tenor" of the blog posts to determine that they could not be interpreted as stating actual facts. ECF No. 26-1 at 23. In doing so, defendants argue that "[a]ll of the purportedly defamatory statements occurred on ... a self-professed source of **'dirt'** that Plaintiffs refer to as a 'tabloid.' " Id. at 19. Defendants argue, therefore, that "[w]hen reviewed in context, the Vendor Alley Blogposts are protected by the First Amendment as rhetorical hyperbole, subjective surmise or conjecture, opinions based on disclosed facts, or a combination thereof." Id. ***The court rejects any wholesale attempt to claim that the entire series of blog posts constituted rhetorical hyperbole.*** While attempting to argue that the blog posts were on matters of public concern to the real estate industry, defendants stated that the blog posts were meant to "out Leask's behavior to the real estate industry" and "expos[e] Leask's questionable conduct and behavior toward business competitors." Id. at 14. Now, in this context, they argue the speech is "playground banter." Id. at 23. ***Either the posts are purely farcical, or they are meant to expose the wrongful conduct of a member of the business community; defendants cannot have it both ways***.

*Leask*, 589 F. Supp.3d at 523 (emphasis added).[24]

The Court then concluded "[a]t this stage of the proceedings, the complaint has plausibly alleged that the *quantity, pointedness, and specificity* of the posts does not fully "negate[ ] any impression that the speaker is asserting actual facts" such that they are nonactionable." *Id.* (emphasis added). The same is true here. Despite its cheekiness, RVA Dirt portrays itself as a

---

[24] In both this case and in *Leask*, the blogs at issue irreverently say that they dig up "dirt" on certain topics. *Compare* https://www.rvadirt.com/ (describing RVA Dirt as "Digging Up The Truth") *with Leask*, 589 F. Supp.3d at 513 (saying the offending blog is named "Vendor Alley – Where Real Estate Gets Its Dirt"). And in both this case and in *Leask*, the plaintiffs pejoratively describe the offending blogs as "gossip." *Compare* Complaint, ¶ 3 (explaining that RVA Dirt's blog post at issue in this lawsuit "all but morphed into a gossip column about Harrison") *with Leask*, 589 F. Supp.3d at 513 (explaining that plaintiffs allege that the offending blog "posts, dirt, gossip about the real estate industry" and "effectively serv[es] the purpose of a real estate industry tabloid.").

"go to source" that "does its research," provides the "Truth," and provides "reliable analysis" and "fact-based" recaps of events and topics.  *See infra* at 9-10 & **Exhibit B**.

> ### 2. Taken Together, The Entirety Of Statement 1 Attacks Harrison As A Professional and Contains The Requisite Defamatory Sting Under Virginia Law.

DuVal next says that Statement 1 – at least in part – lacks the requisite defamatory sting under Virginia law. Although DuVal directly challenges the "boss" statement (which perhaps, if read by itself, might not carry a defamatory sting), the central message from the various statements in Statement 1, when taken together and when read in context with Statement 2, is that Harrison acted vindictively against a fellow employee and then caused other RPS employees to quit their jobs.  This properly and legally stings Harrison's reputation.

The reason for this conclusion is simple.  Statements such as those found in Statement 1 (especially when read with Statement 2) involve Harrison's alleged conduct while she was the Executive Director of Teaching and Learning at RPS and thus attack her reputation as a professional educator.  This makes them defamatory *per s*e.  *Fleming v. Moore*, 275 S.E.2d 632, 635 (Va .1981) (explaining that under Virginia law, statements that "impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment" and  those "which prejudice such person in his or her profession or trade" qualify as defamatory *per se*).  Indeed, as required under Virginia law, there is "a nexus between the content of the defamatory statement and the skills or character required to carry out the particular occupation of the plaintiff," here Harrison.  *Id.* at 636.

*Because* the statements here are defamatory *per se* under Virginia law, they, by definition, contain the requisite defamatory sting. As has been explained: "[t]he limited 'per se' categories of

defamatory words inherently establish the required defamatory sting if adequately pled." *Greene v. City of Portsmouth*, 2024 WL 1160681 at *24 (Va. Ct. App. March 18, 2024).[25]

**B.      Statement 2 Stands Independently Unchallenged On DuVal's Motion.**

Next, the statements in "Statement 2," *see* Def. Br. at 4,[26] stand substantively unchallenged as standalone false statements of fact capable of defamatory meaning on DuVal's motion.  This is important.   As guided by the case law cited and discussed above, the allegations of "Statement 2" (e.g., that Harrison was denied the CAO position so she retaliated by filing unsubstantiated charges of abuse against Hudacscko and then "quit before she could be fired") easily convey fact-based and defamatory criticisms of Harrison as to her fitness to perform her job duties and/or a want of integrity in the performance of those duties.  *Sroufe v. Scripps Media, Inc.*, 2024 WL 1494753, *2-4 (E.D. Va. Apr. 5, 2024) (discussing the negative connotations of a false claim someone was forced to resign). They also clearly prejudice her in her profession.  As such, they are defamatory *per se*.  *Fleming*, 275 S.E.2d at 635-636.  *See also Bego v. Gordon*, 407 N.W.3d 801, 811 (S.D. 1987) ("Accusations or statements, written or oral, imputing to a school teacher want of professional capacity are generally actionable per se. 50 Am.Jur.2d § 129, at 630 (1970)").

---

[25] *See also Meredith v. Nestle Purina Petcare Company*, 516 F. Supp.3d 542, 554 (E.D. Va. 2021) ("Virginia law requires the statements at issue to 'either fit within a specific category of defamation per se or be sufficiently severe to meet the general defamation standard.'")

[26] In DuVal's organization of the statements at issue, she defines Statement 2 as "Rumor has it that Tyra [Harrison] had been denied that [Chief Academic Officer] position, so she filed unsubstantiated allegations of abuse against Michelle Hudacsko . . . then (per a source) 'quit before she could be fired.'"  Def. Br. at 4; Complaint, ¶ 29.  Also, although not discussed by DuVal, the fact that she used the words "Rumor has it" as a preface to her false statements about Harrison does not make nonactionable.  *See, e.g., Condit v. Dunne*, 317 F. Supp.2d 344, 366 (S.D.N.Y. 2004) ("[s]tatements that constitute false assertions of fact are no less defamatory simply because they are preceded by qualifying expressions.") (*citing Cianci v. New York Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir. 1098) (Friendly, J.) ("It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think.'")).

**C.  Statement 3 Is Not Protected By The Fair Report Privilege At The Motion To Dismiss Stage And Is Otherwise An Actionable Statement Of Fact.**

Next, DuVal claims that Statement 3 is not actionable because it is protected under the "fair report privilege" and/or because it reflects nonactionable opinions.  Neither of these arguments has merit – especially at the motion to dismiss stage.

For starters, the fair report privilege is an affirmative defense[27] which is best resolved at the summary judgment (not motion to dismiss) stage of a case.[28]  Indeed, even in its seminal case involving the fair report privilege, the Supreme Court of Virginia was clear in stating that

> The general rule, which has been repeatedly stated by this court, is that it is the court's duty to determine as a matter of law whether the occasion is privileged, while the question of whether or not the defendant was actuated by malice, ***and has abused the occasion and exceeded his privilege are questions of fact for the jury***.

*Alexandria Gazette Corp. v. West*, 93 S.E.2d 274, 279 (Va. 1956) (emphasis added).

Also, under the rule of law from *Alexandria Gazette*, even if the privilege *could* be invoked at this stage, the issue of whether the privilege has been abused – that is, whether the article is "fair and substantially correct statement" of the record -- cannot be resolved *as a matter of law* based on the facts in the Complaint.  Specifically, under comment f. to § 611 of the Second Restatement of Torts, for the privilege to apply:

---

[27] *Choctaw Town Square, LLC v. Kokh Licensee, LLC*, 2015 WL 11661754, * n.3 (W.D. Okla. June 18, 2015) ("The common law and statutory fair report privileges are *affirmative defenses to a defamation claim*.") (emphasis added).

[28] *See, e.g., Folta v. New York Times Company*, 2017 WL 10822984 *2 (N.D. Fla. Nov. 16, 2017) ("the existence of an affirmative defense like the fair reporting privilege generally does not support a motion to dismiss."); *Bilinski v. Keith Haring Fdtn., Inc.,* 96 F. Supp. 3d 35, 48-49 (S.D.N.Y. 2015) ("[w]hether or not the fair reporting privilege applies requires a determination of whether or not the report is 'substantially accurate,' " and "[a]pplication of the fair reporting privilege is inappropriate at the motion to dismiss stage if a reasonable jury could conclude that the report *'suggest[ed] more serious conduct than that actually suggested* in the' judicial proceeding.") (emphasis added) (quoting *Karedes v. Ackerley Grp.*, 423 F.3d 107, 119 (2d Cir. 2005)).

. . . it is necessary that ***nothing be omitted*** or ***misplaced in such a manner as to convey an erroneous impression to those who hear or read it***, as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence, or the use of a defamatory headline in a newspaper report, qualification of which is found only in the text of the article. The reporter is not privileged under this Section ***to make additions of his own that would convey a defamatory impression***, nor to impute corrupt motives to any one, nor ***to indict expressly or by innuendo the veracity or integrity of any of the parties***.

RESTATEMENT (SECOND) OF TORTS, § 611, comment f (emphasis added).

Here, the Article's use of Jefferson's quoted language about Harrison not being "really present" or leaving folks "holding the bag" do not stand in isolation. Instead, they are part of much larger narrative that is painted not only with Jefferson's quotes, but also with the Article's numerous other (false) statements about Harrison that DuVal affirmatively included on her own. *See, infra*, at 13 (graphic with red lines). As such, at the motion to dismiss stage, it is disputed as to whether the Article's statements about what Jefferson said is a fair and accurate report of the transcript of his remarks. *See, e.g., Banka v. Columbia Broadcasting Co.*, 63 F. Supp.3d 501, 509 (E.D. Pa. 2014) ("In this case, while the May 1 Report is a privileged occasion because it is for the most part focused on a state court malpractice case filed against Dr. Banka, it is possible that some statements in both the Internet article and televised report constituted an abuse of that privilege. This Court cannot decide at this stage if CBS 3 has forfeited such privilege.").

Nor are Jefferson's interview statements nonactionable opinions. To the contrary, saying that an education professional such as Harrison was not "really present" and left others "holding the bag" – especially in the overall context of who was, and was not, responsible for handling issues related to the graduation ceremony – accuses her of professional incompetence and unfitness as to her duties and are defamatory per se, especially when viewed at the motion to dismiss stage. *See, e.g., Bego*, 407 N.W.2d 801 at 811 ("Accusations or statements, written or oral, imputing to a school teacher want of professional capacity are generally actionable per se."). *See also Saadi*

24

*v. Maroun*, 2008 WL 4194824, *3 (M.D. Fla. Sept. 9, 2008) (holding on a motion to dismiss that internet posting saying, in part, that plaintiff was "mentally unstable" implied factual knowledge and could support claim for defamation).

> **D.    Statement 4 Is Not Protected By The Fair Report Privilege At The Motion To Dismiss Stage.**

Next, as with Statement 3, Statement 4 too cannot be protected by the fair report privilege at the motion to dismiss stage. The most critical problem with the application of the privilege to this particular statement is that DuVal *factually misrepresented* what Jefferson actually said about Harrison's alleged absences from work. *The Article* says that Harrison was a "no-show ***after 'about a month' on the job***." **Ex. 1** to Def. Br. at 6.  But *in Jefferson's interview* – following statements by him that Harrison was out of the office a lot on FMLA leave – Jefferson said that Harrison was "probably there about a month *[] in [the] aggregate*."  **Ex. 2** to Def. Br. at 11.  In other words, whereas the Article implies that Harrison showed up for a month and then completely disappeared, Jefferson's interview actually indicates that Harrison was on the job sporadically -- *for a total of about a month in work days* -- but was still physically present (at least sometimes) during the full duration of her tenure.

The former of these two meanings is far more damaging to Harrison than the latter.  Indeed, the latter makes it sound like Harrison wholly abandoned her job duties after only one month.  That meaning, especially when considered at the motion to dismiss stage, is ***not*** a "fair and substantially correct" interpretation or recitation of Jefferson's interview comments. Indeed, the "about a month" statement is taken completely out of context.

> **E.    The Article's Statements, Construed In Harrison's Favor At The Motion To Dismiss Stage, Imply That She Was Responsible For The Altria Theater Graduation Ceremony Shooting.**

> **1.    Virginia Recognizes Libel-By-Implication Claims.**

In Virginia, a defamatory charge need not be express or direct to be actionable. *Carwile v. Richmond Newspapers,* 82 S.E.2d 588, 592 (Va. 1954).  Instead, it may be made "by ***inference***, ***implication***, or insinuation." *Id* (emphasis added).  Libel-by-implication is a well-recognized theory of defamation.  As Professor Prosser has explained:

> If the defendant juxtaposes [a] series of fact so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication … he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though particular facts are correct.

PROSSER, The Law of Torts, § 116 5th ed. (Supp. 1988) (cited and quoted in *Fanelle v. LoJack Corp.*, 2000 U.S. Dist. LEXIS 17767 at *10 (E.D. Pa. Dec. 7, 2000)).  As the Supreme Court of Virginia has stated, "it matters not how artful or disguised the modes in which the meaning is concealed if it is in fact defamatory." *Carwile*, 82 S.E.2d at 592.  Also, "[i]n determining whether the words and statements complained of in the instant case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved ***in the plaintiff's favo***r." *Id.* at 591-592 (emphasis added).

## 2. This Case Is Exactly Like *Carwile*, And Just Like The Plaintiff Did In *Carwile,* Harrison Here States A Plausible Claim For Defamation.

Here, applying the above principles, Harrison states a plausible claim for libel by implication under Virginia law regarding the claim that the Article implies that *she* contributed to the circumstances that allowed the shooting.  The case of *Carwile v. Richmond Newspapers*, 82 S.E.2d 588 (Va. 1954) is on point on this issue.  In that case, a Richmond attorney sued the local newspaper after it published an article about him.  The article truthfully stated how an investigation of alleged graft and corruption in the city's police department that had been championed by the attorney at issue had uncovered no wrongdoing by any officials.  It then interviewed some of the

city officials to ask whether they might bring bar complaints against the attorney. After a sentence where a city official specifically declined to say whether he would or would not bring bar charges, the article truthfully stated:

> Under the State Code, the State Bar as an administrative agency of the Supreme Court of Appeals may request a court of competent jurisdiction to disbar an attorney for violation of the ethical code governing the professional conduct of attorneys.

*Id.* at 589-590. The attorney sued for defamation, but the trial court granted summary judgment against him, concluding that the article was literally true.

The Supreme Court of Virginia reversed.  Agreeing with the attorney, the Court held that the language of the article was capable of defamatory meaning.  It explained:

> it is a reasonable implication of this language, read in connection with the whole article, that the plaintiff is guilty of unethical and unprofessional conduct for his charges made against the Police Department; for which conduct the defendant suggests in a ***veiled but pointed way*** that the plaintiff could and should be subjected to disbarment proceedings under Code, § 54-74, et seq. While the defamatory language does not in express terms charge the plaintiff with a breach of his professional honor, ***yet, when aided by the innuendo, operating within the scope of its legitimate functions, it does impute conduct tending to injure him in his profession.***

*Id.* at 592 (emphasis added).

So too here.  Like the article in *Carwile,* the Article "in a veiled but pointed way" suggested that Harrison's conduct created the leadership vacuum that contributed to the circumstances that allowed the shooting. While these accusations are not necessarily stated in express terms, the entire second phase of the Article (beginning with the "My God, this is such a messy story" section) paints this picture. As such, like the attorney/plaintiff in *Carwile*, Harrison here has stated a plausible claim for defamation by implication.[29]

---

[29] Although *Carwile* is perhaps the most on point example of Virginia precedent which supports Harrison's claim, ample additional authority shows that courts applying Virginia law routinely

III.   **VIRGINIA'S ANTI-SLAPP IMMUNITY DOES NOT APPLY HERE BECAUSE THE COMPLAINT SHOWS THAT DUVAL, AT A MINIMUM, MADE HER FALSE AND DEFAMATORY STATEMENTS ABOUT HARRISON NEGLIGENTLY.**

As a final matter, DuVal claims that, regardless of whether she has published defamatory statements about Harrison (and she has), she is nevertheless entitled to immunity from Harrison's defamation claim under Virginia's Anti-SLAPP statute.  According to DuVal, the Complaint "fails to allege that Ms. DuVal had a 'high degree of awareness of the probable falsely' related to the statements she included in the Article referencing Ms. Harrison," and this failure means that she can invoke the immunity. Def. Br. at 17. DuVal is wrong.

Specifically, under the most recent iteration of Virginia's Anti-SLAPP statute (enacted in 2023), Anti-SLAPP immunity can be lost in two ways: where a person makes statements (covered by the statute) that she "[1] ___*knew or should have known*___ were false ___*or*___ [2] were made with reckless disregard for whether they were false."  Va. Code § 8.01-223.2(B) (2023) (emphasis added). While DuVal's Brief discusses the _second_ method through which immunity can be lost, it says **nothing** about whether Harrison's Complaint satisfies the _first_ method.

DuVal's silence is not surprising.  Whereas the *second* method for losing Anti-SLAPP immunity involves *New York Times* actual malice (which is hard to satisfy), the *first* method only involves negligence. As a leading treatise on defamation explains: "Broadly stated, the negligent test [for defamation claims] permits recovery on a showing that in publishing a defamatory

---

recognize defamation by implication claims such as Sroufe's.  *See, e.g., Hatfill v. New York Times Co.*, 416 F.3d 320, 332-333 (4th Cir. 2005) (applying *Carwile* and concluding that columns by the New York Times about the anthrax mailings would lead "a reasonable reader . . . [to] conclude that Hatfill was responsible for the anthrax mailings in 2001."); *Schnupp v. Smith*, 457 S.E2d. 42, 45-47 (Va. 1995) (holding that defendant's statements, while not charging the plaintiff in express terms, did impute to the plaintiff the commission of the crime of aiding and abetting in the possession of narcotics).

falsehood the defendant knew or, on the exercise of reasonable ***should have known***, that the statement was false or would create a false impression in some material respect." Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS, § 6.2.1 (5th ed. 2017) (emphasis added). *Lewis v. Kei*, 708 S.E.2d 884, 891 (2011) (explaining "knew or should have known" negligence standard for defamation claims under Virginia law); *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 724-25 (1985) (same).

The only real question then (nowhere addressed by DuVal) is whether the Complaint plausibly shows that DuVal acted negligently in making her defamatory statements in the Article – that is, whether it shows that DuVal knew *or should have known* that her false statements about Harrison were indeed false. It does. In determining whether a defendant knew or should have known her allegedly defamatory statement was false, courts ask "whether [she] acted reasonably in checking the truth or falsity or defamatory character of the communication before publishing it.'" RESTATEMENT (SECOND) OF TORTS, § 580B cmt. g (1977). *See also League of United Latin American Citizens – Richmond Region Council 4614 v. Public Interest Legal Foundation*, 2018 WL 3848404 at *6 (E.D. Va. Aug. 13, 2018) (explaining that "a defendant acts negligently in failing to ascertain the facts on which a publication is based when ***they fail to investigate information that poses a substantial danger or risk of reputational injury to another***.") (emphasis added).

Here, the Complaint plausibly makes such allegations. *See* Complaint, ¶ 47. Indeed, the allegations of negligence here are similar to, if not stronger than, the negligence allegations that

the Supreme Court of Virgina and others[30] have readily accepted as sufficient, either at the pleadings stage *or*, as in *Lipscomb*, at the trial stage of the case.

As the Supreme Court of Virginia explained in *Lipscomb*, liability against a newspaper for defamation under a negligence standard was appropriate because "the jury had ample evidence from which to conclude that a reasonably prudent news reporter writing this article could readily have contacted a number of other [persons] to verify (or contradict) these accusations [about the plaintiff] and ***should have done so.***"  234 Va. at 289; 382 S.E.2d at 38 (emphasis added).  The same is true here.  DuVal could readily have reached out to a number of sources to verify or rebut the false accusations against Harrison, but she failed to do so.  This was negligent, and it means that, at least at this stage of the case, Virginia's Anti-SLAPP immunity provides no immunity to DuVal from Harrison's defamation claim.

CONCLUSION

With all this said, DuVal's motion to dismiss has no merit and should be denied.

Respectfully submitted,

TYRA HARRISON

By:     s/ Richard F. Hawkins, III
        Virginia Bar Number: 40666
        THE HAWKINS LAW FIRM, PC
        2222 Monument Avenue
        Richmond, Virginia 23220
        (804) 308-3040 (telephone)
        (804) 308-3132 (facsimile)
        Email: rhawkins@thehawkinslawfirmpc.com
        Counsel for Plaintiff

---

[30] *See League of United Latin American Citizens – Richmond Region Council*, 2018 WL 3848404 at *6 ("Defendants also fail to show that they conducted even a cursory investigation of the accuracy of the information they obtained from the registrars. Accordingly, Plaintiffs have sufficiently pled that Defendants had constructive knowledge of the falsity of the information."); *Scripps Texas Newspapers, L.P. v. Belelcazar*, 99 S.W.3d 829, 837 (Ct. App. Tex. 2003) (reporter who covered a trial negligently failed to verify with court the accuracy of her information).

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of August, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF systems which will send notification of such filing to the following to:

J. Benjamin Rottenborn (VSB No. 84796)
Jamie H. Wood (VSB No. 97297)
Woods Rogers Vandeventer Black PLC
10 South Jefferson Street, Suite 1800
Roanoke, Virginia 24011
Telephone: (540) 983-7600
Facsimile: (540) 983-7711
ben.rottenborn@woodsrogers.com
jamie.wood@woodsrogers.com

       Counsel for Defendant DuVal

       s/ Richard F. Hawkins, III
       Virginia Bar Number: 40666
       THE HAWKINS LAW FIRM, PC
       2222 Monument Avenue
       Richmond, Virginia 23220
       (804) 308-3040 (telephone)
       (804) 308-3132 (facsimile)
       Email: rhawkins@thehawkinslawfirmpc.com

       Counsel for Plaintiff

31