IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TYRA HARRISON,                          )
                                        )
            Plaintiff,                  )
                                        )
v.                                      )        Civil Action No.: 3:24-cv-384–HEH
                                        )
RVA DIRT, LLC, *et al.*,                )
                                        )
            Defendants.                 )

### AMENDED MEMORANDUM OPINION[1]
### (Denying Defendants' Motions to Dismiss)

THIS MATTER is before the Court on Defendant Becca DuVal's ("DuVal")

Motion to Dismiss (ECF No. 18) and consolidated Defendant Solomon Jefferson's

("Jefferson") (collectively, "Defendants") Motion to Dismiss (ECF No. 7)[2], both filed on

August 8, 2024.  Defendants move to dismiss Plaintiff Tyra Harrison's ("Plaintiff" or

"Tyra") defamation allegations for failure to state a claim.  The parties have filed

memoranda supporting their respective positions, and the Court heard oral argument on

December 5, 2024.  At the hearing, the Court denied Defendants' Motions for the reasons

articulated below.  (Min. Entry at 1, ECF No. 40.)

---

[1] The Court amends its previous Memorandum Opinion to fix a typographical error on page 11.
(*See* Mem. Op. at 11, ECF No. 48 (changing "substantiated" to "unsubstantiated").)

[2] References to Plaintiff's suit against Jefferson may be found at Case No. 3:24-cv-385.

# I. BACKGROUND

On June 6, 2023, following the graduation of Huguenot High School ("HHS") in downtown Richmond, six individuals were shot in Monroe Park, adjacent to the graduation venue. (RVA Dirt Compl. ¶ 15, ECF No. 1.)[3] Among the victims were a graduating HHS senior and his stepfather, both of whom died from their injuries. (*Id.*) In response to this tragedy, the Richmond Public School ("RPS") Board hired Sands Anderson PC, a law firm, to investigate the graduation day operations, procedures, and preparations and produce a report (the "Sands Anderson Report"). (*Id.* ¶ 17.) Rather than investigating how or why the shooting occurred, the RPS Board, and therefore Sands Anderson, was particularly focused on the process surrounding the entrance of participants and the homebound process. (*Id.*) Sands Anderson interviewed twenty-nine individuals, including Jefferson, who was employed by RPS as the Chief Academic Officer, Secondary Education. (Jefferson Compl. ¶ 3, Case No. 3:24-cv-385, ECF No. 1.) Plaintiff, however, was not interviewed. (RVA Dirt Compl. ¶ 18.)

After the Sands Anderson Report was completed and submitted to the RPS Board, the Board voted not to release the Report to the public. (*Id.* ¶ 19.) After ensuing litigation under the Virginia Freedom of Information Act, the Sands Anderson Report was ordered to be released by the Circuit Court for the City of Richmond. (*Id.* ¶ 20.)

---

[3] For clarity, the Court refers to Plaintiff's Complaint against RVA Dirt and DuVal as the "RVA Dirt Complaint" and Plaintiff's Complaint against Jefferson in Case No. 3:24-cv-385 as the "Jefferson Complaint."

Many Richmond-area media outlets ran news stories about the Report; most focused on how "RPS officials had prior security concerns about the safety of the student victim and that RPS officials allowed the student victim to participate in the graduation ceremony without proper consideration of the safety concerns." (*Id.* ¶ 22.) None of these stories mentioned Plaintiff. (*Id.* ¶ 23.)

RVA Dirt also ran a story based on the Sands Anderson Report. (*Id.* ¶ 24.) Founded in 2016, RVA Dirt "consists of four busy women making time to stick their noses into Richmond politics." (*See id.* ¶ 1.) It offers "clever, irreverent, and reliable coverage of City Council and School Board Meetings, candidate interviews, and city events," imploring readers to "come for the dirt [and] stay for the jokes." (*See id.* ¶ 2 n.4 (citing RVA Dirt, *About Us*, https://www.rvadirt.com/about-us (last visited Feb. 20, 2025)).) RVA Dirt's article on the Sands Anderson Report was titled "The Altria Shooting and the Attorney-Client-Public Report" (the "Article"). (RVA Dirt Compl. ¶¶ 24–25; RVA Dirt Article, ECF No. 19-1.) DuVal wrote the Article which explored the safety concerns surrounding the graduation ceremony and the RPS Board. (*Id.*)

DuVal begins the Article by discussing much of the controversy surrounding the release of the Report, the findings of the Report, and other matters generally related to the RPS Board. Half-way through the Article, DuVal states that "[t]he real shoe drops around page 251 of the 1132 pages of interview transcripts and staff emails the investigators compiled." (*Id.* ¶ 27; RVA Dirt Article at 5.[4]) There, the Article begins to

---

[4] The Court employs the pagination assigned by the CM/ECF docketing system.

discuss the interview of Jefferson which was included in the Sands Anderson Report.

The Article notes that Jefferson recounted the "'disastrous' story of the start of the 2022-

23 school year, when RPS' central office was so full of 'high profile vacancies'

(resignations) that their organizational chart looked like Swiss cheese." (RVA Dirt

Article at 5.) After discussing several vacancies, and the reasons for them, the Article

moves into a discussion of Plaintiff:

> Solomon was overseeing this transition, Austin's portfolio of principals, and his own, when his boss, Tyra Harrison, Director of Teaching and Learning, (~ note: and **another aggrieved underling**) **"went after"** the Chief of Staff, Michelle Hudacsko, and **set off another wave of resignations.**
>
> . . .
>
> Tyra "was supposed to be leading the department in the absence of a Chief Academic Officer." The last CAO, Tracy Epp, had resigned a couple of months earlier; but really, the position had been vacant long before then. (Epp had been out on FMLA.)

("Statement 1") (RVA Dirt Compl. ¶ 28 (emphasis in original); RVA Dirt Article

at 6 (emphasis added).) After noting the RPS Board would then drive out COO

Gonzalez, CAO Epp, and COS Hudacsko, the Article again discusses Plaintiff:

> **Rumor has it** that Tyra had been denied that CAO position, **so** she filed unsubstantiated allegations of abuse against Michelle Hudacsko, took her own FMLA break, then (per a source) **"quit before she could be fired."** (Obligatory note: Tyra's perspective is not represented in this report, and I'm sure she'd have much to say about these characterizations UPDATE, she describes this a "very poor representation of this story.") [("Statement 2")]
>
> . . .
>
> Solomon tells investigators that Tyra and Tracy "were there, [but] they **weren't really present** . . ." which left "other folks holding the bag."

("Statement 3") (RVA Dirt Compl. ¶¶ 29–30 (emphasis in original); RVA Dirt

Article at 6 (emphasis added).)

4

Finally, the Article begins to conclude by discussing how the student victim's mother had discussed threats against the student with a HHS counselor, but the counselor did not tell anyone. (RVA Dirt Article at 7.) But neither was it the counselor's responsibility, the Article notes. (*Id.*) That responsibility fell on the school's central office:

> Someone from central office probably should have thought to ask - to identify particularly challenging cases and offer support. But the **woman (Tyra)** <u>**responsible for the 2023 graduations**</u> **was a no-show after "about a month" on the job** - and the guy (Solomon) forced to fill her shoes was "actually doing 3 jobs" and didn't even "have a high school background."
>
> . . .
>
> Obviously, this was NOT ideal.

("Statement 4") (RVA Dirt Compl. ¶ 32 (emphasis in original); RVA Dirt Article at 7 (emphasis added).)

Before ending the Article, DuVal brings the discussion full circle— impugning the efficacy of the RPS Board:

> Now look. All I have to work from is a transcript. But I imagine this is the point in Solomon's story where the investigator takes off her glasses, sits back in her chair, and rubs her temples.
>
> *Investigator: What do you attribute that sort of vacuum of leadership to?  Like, was it just because of a bad series of people moving on, and sicknesses, and FMLA, and deaths?  Or was it just kind of more systemic than that?*
>
> *Solomon: Well.*
>
> *Yeah.*
>
> *It was School Board.*
>
> Specifically: vacancies created by the School Board's "toxic" "mean-spirited" leadership in 2022 (then-Chairwoman Harris-Muhammed

and Vice Chair Gibson), and the many cumulative failures of the remaining staff who were unprepared, overworked, and/or bickering among themselves.

(RVA Dirt Article at 8 (italics in original)).

After the publication of the Article, Plaintiff filed a suit against RVA Dirt and DuVal and a suit against Jefferson. Plaintiff alleges that the Article unlawfully twisted the Sands Anderson Report and defamed her. (RVA Dirt Compl. ¶¶ 40–48.) Moreover, Plaintiff alleges that during Jefferson's underlying interview included in the Report, Jefferson made false statements about Plaintiff and likewise defamed her. (Jefferson Comp. ¶¶ 25–33.) The Court consolidated the cases and heard argument on Defendants' Motions to Dismiss, wherein the Court denied Defendants' Motions for the reasons that follow.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey*, 706 F.3d at 387) (alteration in original). But a "complaint must provide 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Allegations have facial plausibility 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged.'" *Tobey*, 706 F.3d at 386 (quoting *Iqbal*, 556 U.S. at 678).

A court "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Turner*, 930 F.3d at 644 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)). In considering such a motion, a plaintiff's well-pleaded allegations are taken as true, and the complaint is viewed in the light most favorable to the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Legal conclusions enjoy no such deference. *Iqbal*, 556 U.S. at 678.

For a Rule 12(b)(6) motion, courts may consider documents that are either "explicitly incorporated into the complaint by reference" or "those attached to the complaint as exhibits." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal citations omitted). A court may consider a document not attached to the complaint, when "the document [is] integral to the complaint and there is no dispute about the document's authenticity." *Id.* (citations omitted). "[I]n the event of conflict between the bare allegations of the complaint and any exhibit attached . . ., the exhibit prevails." *Id.* (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)) (alteration in original).

### III. ANALYSIS

To support a defamation claim, Plaintiff must present evidence of "1) publication 2) of an actionable statement, 3) with the requisite intent." *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015). Whether a statement is actionable as defamation is a

question of law that is decided by the Court. *Gilberston v. Jones*, No. 3:16-cv-255, 2016

WL 44533, at *6 (E.D. Va. Aug. 17, 2016) (quoting *Chapin v. Knight-Ridder, Inc.*, 993

F.2d 1087, 1092 (4th Cir. 1993)). "[S]tatements of opinion" are not actionable as

defamation "because such statements cannot be objectively characterized as true or

false." *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005). "In determining whether a

statement is one of fact or opinion, a court may not isolate one portion of the statement at

issue from another portion of the statement. Rather, a court must consider the statement

as a whole." *Hyland v. Raytheon Tech. Servs. Co.*, 670 S.E.2d 746, 751 (Va. 2009)

(citations omitted). On a motion to dismiss, the court must credit the plaintiff's allegation

of falsity. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing

*Conley v. Gibson*, 355 U.S. 41 (1957)).

### A. DuVal Motion to Dismiss

#### i. Statements 1 and 2

DuVal contends that Statement 1 reflects an opinion and does not contain the

requisite defamatory sting. (DuVal's Mem. in Supp. at 7, ECF No. 19.) She argues that

whether Plaintiff was an "aggrieved underling" that "went after" Chief of Staff Hudacsko

("Hudacsko") and "set off another wave of resignations" is opinion and hyperbolic

language. (*Id.*) Moreover, the comments reflect the personal viewpoint of DuVal and are

"largely figurative and incapable of being proven true or false." (*Id.* at 9.)

On the other hand, Plaintiff argues that opinion statements can "imply an assertion

of fact," as they do here. (Pl.'s Resp. in Opp'n at 16, ECF No. 25.) She contends that

stating Plaintiff "went after" Hudacsko is capable of being proven true or false, especially

8

when the allegation is viewed in the context of the rest of the article. Three paragraphs later, the Article states that Plaintiff "filed unsubstantiated allegations of abuse against" Hudacsko and then Plaintiff quit before she could be fired. (*Id.* at 17 (quoting Statement 2).) Plaintiff also contends that Statement 1 is defamatory *per se* because, when read in context, it directly attacks her reputation and her ability to discharge the duties of her profession or trade (i.e., school administration). Since the statements are defamatory *per se*, they inherently carry the required defamatory sting. (*Id.* at 21–22 citing *Greene v. City of Portsmouth*, R. No. 1461-22-1, 2024 WL 1160681, at *24 (Va. Ct. App. Mar. 18, 2024).)

"In determining whether a statement is one of fact or opinion, a court may not isolate one portion of the statement at issue from another portion of the statement." *Hyland*, 670 S.E.2d at 751. Thus, despite the partitioning of the Article into four (4) statements, the principal question is whether the Article *as a whole* may constitute defamation or is otherwise not actionable. Referring to Plaintiff as "another aggrieved underling" is undoubtedly a hyperbolic description from DuVal's personal opinion.[5] Similarly, stating that Plaintiff "went after" Hudacsko *could* be "largely figurative and incapable of being proven true or false;" however, this is not the case here. (DuVal's

---

[5] DuVal notes that "another aggrieved underling" actually refers to *another* individual, not Plaintiff, and that both Plaintiff and that individual "went after" Hudacsko. (DuVal's Mem. in Supp. at 9 n.3) While this is a reasonable reading of the sentence, it is not the only reasonable interpretation. "Another aggrieved underling" can refer to Plaintiff if "another" indicates that Plaintiff is aggrieved, similar to a person already discussed in the Article. In that meaning, both Plaintiff and that individual are aggrieved, but only Plaintiff "went after" Hudacsko. This reading is far from a stretch considering the Article mentions several individuals who left their positions.

Mem. in Supp. at 9); *see Raytheon Tech. Srvs. Co. v. Hyland*, 641 S.E.2d 84, 91 (Va. 2007) ("[O]pinions may be actionable where they 'imply an assertion' of objective fact." (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990)). Shortly after describing Plaintiff as "aggrieved," DuVal further details that after Plaintiff was denied the Chief Academic Officer position, she "filed unsubstantiated allegations of abuse against Michelle Hudacsko, took her own FMLA break, then (per a source) 'quit before she could be fired.'"[6] (Statement 2.) This immediate follow-up clarifies how Plaintiff "went after" Hudacsko. Rather than leaving the details of "going after" vague—and arguably figurative—the Article supplies a precise detail of events which can only be either true or false: (1) Plaintiff was denied the CAO position; (2) Plaintiff filed unsubstantiated allegations of abuse; (4) Plaintiff took her own FMLA break; and (3) Plaintiff quit before she could be fired. Whether this series of events caused "another wave of resignations" is likewise a factual issue—i.e., whether there is proximate cause between Plaintiff's actions and subsequent resignations.

DuVal compares her statements with those other courts have found were simply opinions. (DuVal's Reply at 10–13, ECF No. 27.) The Court finds none of these comparisons persuasive. DuVal contends that her statements are like those from an employee's performance review that stated the employee was "frequently verbose and vocal," "appeared to be unwilling to accept and work with [] feedback," or "had shown

---

[6] DuVal concedes that she is moving to dismiss on only three (3) of the four (4) statements. Yet she argues the Court should still dismiss the Complaint as a whole. Defamation by implication, however, necessarily relies on assessing how *all* the statements fit together.

aggressive and threatening behavior towards various staff which has impeded patient care." (*See id.* at 11 (quoting *Raytheon*, 641 S.E.2d at 90–82; *Hartman v. Centra Health Inc.*, 550 F. Supp. 3d 331, 346 (W.D. Va. 2021).) This argument is unavailing.

Unlike descriptions of an employee's behavior and the perceived effect of such behavior, DuVal's Article recounts a step-by-step series of events of what happened (Plaintiff filed unsubstantiated allegations against Hudacsko), why it happened (because Plaintiff was denied the CAO position), and how these actions affected her employment and the school (led to her resignation and a wave of other resignations). These statements are not "relative in nature and depend[ing] on a speaker's viewpoint." Instead, they recount specific and verifiable events within the RPS.

Thus, Statements 1 and 2 do not constitute opinion. The question remains, then, whether they carry sufficient defamatory sting to be considered actionable. Before the Court turns to consideration of whether these statements, and the Article as a whole, carry sufficient defamatory sting to be considered actionable, the Court must address whether Statements 3 and 4 may be considered, or if they are otherwise privileged.

### ii. Statements 3 and 4

DuVal asserts that Statement 3 is not actionable due to the fair report privilege and because it reflects an opinion. (Duval's Mem. in Supp. at 11.) Under the fair report privilege, "[t]he publication of public records to which everyone has a right of access is privileged, if the publication is a fair and substantially correct statement of the transcript of the record." *Alexandria Gazette Corp. v. West*, 93 S.E.2d 274, 279 (Va. 1956). Accordingly, the Article, which Duval alleges is merely a recitation of Jefferson's

11

comments in his interview—a public record—is protected by the privilege. This privilege applies even if the underlying statements in the public record are defamatory. *Id.* Alongside Statement 3, Duval argues that the fair reporting privilege applies to Statement 4 because the Article "fairly and substantially correctly reported that Ms. Harrison was 'responsible for the 2023 graduations.'" (Duval's Mem. in Supp. at 13.)

Plaintiff counters that the fair report privilege is an affirmative defense. (Pl.'s Resp. in Opp'n at 23.) Thus, although whether the privilege applies is a matter of law, "the question of whether or not the defendant was actuated by malice, and has abused the occasion and exceeded his privilege are questions of fact for the jury." *Alexandria Gazette Corp.*, 93 S.E.2d at 279. Consequently, the question should be left for the jury—or at the very least summary judgment. But Plaintiff contends that DuVal factually misrepresented what Jefferson said and thus she cannot claim the privilege. (Pl.'s Resp. in Opp'n at 25.)

The parties dispute when a court may apply the fair report privilege. Usually, a court is precluded from assessing the merits of an affirmative defense on a motion to dismiss. But this principle is not absolute. "In the limited circumstances where the allegations of the complaint give rise to an affirmative defense, the defense may be raised under Rule 12(b)(6), but only if it clearly appears on the face of the complaint." *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Indeed, it is clear from Virginia jurisprudence that at times a court may apply the privilege at a motion to dismiss. *See, e.g., Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC*, 821 F. App'x 234, 239 (4th Cir. 2020) (applying the fair report privilege at a motion

12

to dismiss); *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 488 (E.D. Va. 2018) ("While most cases analyzing the fair report privilege contemplate later stages of litigation, a Court may apply the privilege as a matter of law when 'the facts are not in dispute and reasonable people could not differ [as to] whether or not the publication constitutes a substantial departure from the public record . . . .'" (quoting *Rush v. Worrel Enters., Inc.*, No. 4459, 1990 WL 751510, at *3 (Va. Cir. Ct. Sept. 10, 1990)); *Patel v. Cable News Network*, No. 1573-23-4, 2025 WL 248217, at *15 (Va. Ct. App. Jan. 21, 2025) (Frucci, J., dissenting) (finding the fair report privilege did not apply at a motion to dismiss). Whether a court may resolve a case on this basis, however, depends on what factual disputes exist.

The fair report privilege has two steps. First, the Court must "determine as a matter of law whether the occasion is privileged." *Alexandria Gazette Corp. v. West*, 93 S.E.2d at 276 (quoting *Bragg v. Elmore*, 147 S.E. 275, 280 (Va. 1929)). If the occasion is privileged, "the question of whether or not the defendant was actuated by malice, and has abused the occasion and exceeded his privilege are questions of fact for the jury." *Id.* Here, the Court asks whether the Article was "published in good faith and was a substantially correct report of the record." *Alexandria Gazzette*, 93 S.E.2d at 279. "It is not necessary that the published report be verbatim, but it must be substantially correct." *Id.* (quoting *James v. Powell*, 152 S.E. 529, 545 (Va. 1930)). This step becomes a question for the jury only if "there is a substantial conflict in the evidence and it is necessary to determine the facts before the legal question can be intelligently decided by the court." *Bragg*, 147 S.E. at 280; *see Luhring v. Carter*, 69 S.E.2d 416, 423 (1952)

13

("Yet if the evidence upon which the asserted privilege is based is in substantial conflict, whether or not the occasion is one of privilege becomes a mixed question of law and fact to be determined by the jury under appropriate instructions from the court."); *Rush*, 1990 WL 751510, at *3 ("If the facts are not in dispute and reasonable people could not differ whether or not the publication constitutes a substantial departure from the public record, then the issue of whether the absolute privilege is lost is one for the trial judge.") Here, the parties agree that the Article was derived from Jefferson's interview within the Sands Anderson Report.[7]

Therefore, on the current record, the Court finds that "reasonable people could differ whether or not the article is an impartial and accurate account of the" Sands Anderson Report. *Rush*, 1990 WL 751510, at *3; *see Spirito*, 350 F. Supp. at 488. In making this finding, the Court does not isolate Statements 3 and 4 from the rest of the Article. Virginia law requires that the Court read the Article "as a whole, and the article is not actionable unless the elements making it such are present in the article itself, or *are fairly to be inferred from the article* and the circumstances surrounding its publication." *Alexandria Gazette*, 93 S.E.2d at 280 (emphasis added). The Article substantially relies on Jefferson's interview and often directly quotes him, but the Article does not confine itself to Jefferson's account. And to be clear, to be actionable, the Article *must* add something beyond the statements or implications of Jefferson's account. *See Spirito*, 350 F. Supp. 3d at 487 ("While Virginia law recognizes defamation by implication, courts

---

[7] DuVal has not asserted, at this stage, that her representations of Jefferson's testimony was derived from another source other than the Sand Anderson Report.

analyzing the fair report privilege suggest that a newspaper must add something to the content of a report to support a defamation claim." (citation omitted)).

Parts of the Article closely reflect Jefferson's account that Plaintiff was supposed to be leading the department in the absence of a CAO, was "supposed to be leading the graduation charge," and resigned in January or February. (Jefferson Interview, ECF No. 19-2 at 12–13.) Yet the Article *adds* that Plaintiff "went after" Hudacsko by filing unsubstantiated allegations of abuse against her and "quit before she could be fired." (Statements 1 and 2.) DuVal does not identify anywhere in Jefferson's interview or the Sands Anderson Report that contain these facts. The Court finds that DuVal "made broader statements that went far beyond what could be fairly supported by the" Sands Anderson Report and Jefferson's interview. *Patel*, 2025 WL 248217, at *15 (Frucci, J., dissenting). This conclusion similarly guides the Court's decision on whether the Complaint against DuVal sufficiently states a claim for defamation.

"Virginia law recognizes defamation by implication." *Spirito*, 350 F. Supp. 3d at 482. A plaintiff may proceed with her claim if the alleged statements are "reasonably capable of defamatory meaning." *Id.* Here, the challenged statements are reasonably capable of such meaning. The Article makes factual statements that Plaintiff made false allegations of abuse and quit before she could be fired. One can also infer from the Article the implication that Plaintiff was directly responsible for the 2023 graduation, and blameworthy for the tragic shooting that occurred due to lack of diligent planning. The Article states that "[s]omeone from central office probably should have thought to ask to identify particularly challenging cases and offer support. But the woman (Tyra)

15

responsible for the 2023 graduations was a no-show . . . ." It is reasonable to infer that the "someone" implicates Plaintiff, who is directly referenced by name in the subsequent sentence. While the Article ultimately places blame on the School Board and their failures, it also reasonably implicates Plaintiff's alleged failures to plan the 2023 graduation.

DuVal asserts that to plead defamation by implication, there may only be one sole implication of the publication. This is inconsistent with *Spirito*, where the Court was clear that only a "reasonable implication" was necessary. 350 F. Supp. 3d at 483. While *Spirito* noted that "clarity of an implication is dispositive," the court was not requiring that a plaintiff be the "sole and unmistakable target" in order to pursue a claim. *Id.* Rather, the court held the implication itself must simply have a clear defamatory conclusion. *Id.* Here, the implication is clear—Plaintiff bears some responsibility for the failures leading up to the 2023 graduation and shooting—even if the Article spreads the blame towards multiple individuals. Accordingly, the Court finds that Plaintiff adequately pleads a claim for defamation.[8]

### iii. Anti-SLAPP

Virginia provides immunity to persons for certain speech that would be protected under the First Amendment under Virginia Code § 8.01-223.2 ("Anti-SLAPP"). This Anti-SLAPP provision provides that "[a] person shall be immune from tort liability if the

---

[8] Because Plaintiff adequately states a claim for defamation by implication, the Court does not address Plaintiff's arguments that the Article constitutes defamation *per se* or other remaining arguments.

tort claim is based solely on statements [] regarding matters of public concern that would be protected under the First Amendment to the Constitution of the United States made by that person that are communicated to a third party." *Id.* § 8.01-223.2(A). Yet this immunity does "not apply to any statements that the declarant knew or *should have known were false* or were made with reckless disregard for whether they were false." *Id.* § 8.01-223.2(B) (emphasis added).

At this stage, the Court cannot find that DuVal is entitled to immunity. The Article includes statements derived from sources other than the Sands Anderson Report and Jefferson's interview. (*See* Statement 1 (quoting a source that Plaintiff "went after" Hudacsko); Statement 2 (stating that Plaintiff "(*per a source*) 'quit before she could be fired'" (emphasis added)); Statement 3 (quoting that Plaintiff and another individual "weren't really present"). Other than the Sands Anderson Report, there is no indication where these quotes are from. If these quotes are from the Sands Anderson Report, DuVal has not adequately directed the Court to their locations. If the quotes are fabricated, DuVal's statements clearly fall outside the Anti-SLAPP provisions and immunity cannot apply. Because the Court is left only to speculate, it is appropriate to deny immunity until the Court has the proper record before it. For these reasons, DuVal's Motion to Dismiss will be denied (ECF No. 18).

### B. Jefferson's Motion to Dismiss

Plaintiff asserts that Jefferson made false and defamatory statements during his interview with Sands Anderson in development of the Sands Anderson Report. Plaintiff contends that Jefferson, fueled by actual malice, made statements intending to shift the

blame surrounding the 2023 graduation from himself onto Plaintiff.  (Jefferson Compl.

¶¶ 21–23, 31–32.)[9]  The most pertinent statements Jefferson made during the interview

are the following:

> Sands Anderson Interviewer: And who took it [(graduation meetings)] on after December?
>
> Jefferson Answer: So.  O[m]g.  My God, this is such a messy story. . . . So in the absence of a [Chief Academic Officer], *we ha[d] an executive director of teaching and learning who, [was] supposed to be leading our department*, principal directors and Director of Exceptional Ed[ucation].  So that was her [(Ms. Harrison's)] responsibility.  However, she was out on [FMLA] quite a bit, and her mom, I feel the[n] passed away.  So what I would say is maybe.  Does she eventually resign[] in January? . . . *But essentially what I would dare to say is from the summer until [] [h]er resignation[] [s]he was probably there about a month [] in [the] aggregate.*  Umm.  *And so she was really supposed to be leading the department in the absence of a chief academic officer . . . So she was supposed to be leading the graduation charge as well . . . And so to be completely honest, it just didn't happen.*  Umm.  And so what I found in January was I just took on everything, all things high school, even though I don't have a high school background, I was elementary and middle school.  I learned everything high school pretty quickly and took on the graduation charge.

(Jefferson's Mem. in Supp. at 3, Case No. 3:24-cv-385, ECF No. 8 (emphasis added); *see*

*also* Jefferson Compl. ¶ 20.)

Similar to DuVal, Jefferson asserts that these statements (1) lack the requisite

defamatory sting; (2) convey opinion; (3) do not defame by implication; and (4) are

entitled to immunity under Virginia's anti-SLAPP statute.

First, Jefferson contends that the statements convey his understanding of

Plaintiff's roles and responsibility, none of which "tend to injure one's reputation in the

---

[9] Due to the consolidation of this case after the conclusion of briefing, all references to CM/ECF filings in Jefferson may be found within 3:24-cv-385.

common estimation of man." (Jefferson's Mem. in Supp. at 6.)  Similarly, his observations that Plaintiff "was out on [FMLA] quite a bit," "was probably there [(in her role)] about a month [] in [the] aggregate," and resigned in January or February mirror Plaintiff's own admissions in her Complaint and lack an injurious nature.  (*Id.* at 7.)

Second, Jefferson argues that the remaining statements about Plaintiff's role in organizing the 2023 graduation were those of opinion, based on "Jefferson's perception at the time about [Plaintiff's] work leading the graduation charge." (*Id.* at 8.)  "Whether Ms. Harrison [was] 'leading the graduation charge' [and it] 'just didn't happen' is not a statement that is subject to objective verification and is largely incapable of being proven true or false, so it is therefore not actionable." (*Id.*)

Third, Jefferson asserts that these statements taken as a whole fail to project the implication that Plaintiff bore blame for the failures surrounding the 2023 graduation. (*Id.* at 9.)  Pivotal, he argues, is the remaining context of his statements—namely, that after Plaintiff left the school, Jefferson took over the organizing of the graduation himself.  Thus, a reasonable reader would not have inferred that Plaintiff bore any responsibility for the graduation and shooting. (*Id.* at 11.)

On a motion to dismiss, when a plaintiff represents that a factual statement is false, the Court presumes the statement is false. *Chapin*, 993 F.2d at 1092.  Here, Plaintiff asserts that Jefferson made multiple false statements about her:  (1) that she had a supervisory capacity over Jefferson; (2) that she had "responsibility" for the 2023 graduations as part of her job at RPS; (3) that she abandoned or failed in her duties at RPS before her resignation; and (4) that she caused vacancies or a leadership vacuum.

(Jefferson Compl. ¶ 21.) Plaintiff also alleges that while she worked at RPS, Jefferson "repeatedly targeted her with hostile comments and statements," such that in August of 2022, Plaintiff "raised concerns to School Board members . . . about how she was being mistreated and disrespected by the RPS Principal Directors (of whom Jefferson was the leader)." (*Id.* ¶ 31.)

At this stage, the Court finds that Plaintiff has sufficiently pled defamation. While many of Jefferson's statements may be innocuous by themselves—such as identifying Plaintiff as leading Jefferson's department—together, they form a sufficient implication of wrongdoing by Plaintiff to constitute defamation by implication. Jefferson readily admits in his interview that he was inexperienced in planning graduations. (*See* Jefferson Interview at 12 ("So what I found in January was I just took on everything, all things high school, even though I don't have a high school background, I was elementary and middle school. I learned everything high school pretty quickly and took on the graduation charge.").) The responsibility for the graduation only fell on him, however, because the individual who "was supposed to be leading the graduation charge" did not, and "it just didn't happen." (*Id.*) That individual, according to Jefferson, was Plaintiff. In contrast, Plaintiff contests she was not responsible for the 2023 graduation and did not she have any supervisory role over Jefferson. (Jefferson Compl. ¶ 21.) Accordingly, it is not unreasonable for a listener to believe that Jefferson was shifting the blame away from himself and implying that Plaintiff bore responsibility for the messy situation and ultimate failures that led to the 2023 graduation. Moreover, Plaintiff's reputation as a

school administrator or educator can undoubtedly be hurt by implications that she was derelict in her duties and responsibilities.

Jefferson also contends he is entitled to protection under Virginia's Anti-SLAPP provisions. Similar to DuVal, Jefferson cannot avail himself of these protections at this stage. *See supra* Section III.A.iv. An individual has no immunity for statements "declarant knew or should have known were false or were made with reckless disregard to whether they were false." Va. Code § 8.01-223.2(B). Plaintiff has alleged facts that Jefferson harbored animus towards Plaintiff and therefore acted maliciously. (*See* Jeferson Compl. ¶ 31.) Again, the Court must accept Plaintiff's factual allegations as true. Moreover, Plaintiff is entitled to all reasonable inferences, including that Jefferson, fueled by animus toward Plaintiff and self-preservation, intentionally misrepresented Plaintiff's role in the 2023 graduation. Thus, the Court cannot afford Jefferson immunity under Virginia's Anti-SLAPP at this time.

## IV. CONCLUSION

For the foregoing reasons, DuVal's Motion (ECF No. 18) and Jefferson's Motion (ECF No. 7) will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: February 26, 2025
Richmond, Virginia

21